**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------- X

JOE HOWIE,                                        :        Civil Action No.:
                                                  :
                              Plaintiff,          :
                                                  :        **COMPLAINT**
        -against-                                 :
                                                  :
ERNST & YOUNG LLP, ERNST & YOUNG US               :        **Jury Trial Demanded**
LLP, AND ERNST & YOUNG GLOBAL                     :
LIMITED,                                          :
                                                  :
                              Defendants.         :
                                                  :
                                                  :
--------------------------------------------------------------- X

        Plaintiff Joe Howie ("Howie" or "Plaintiff"), by and through his attorneys, Wigdor LLP,

as and for his complaint against Defendants Ernst & Young LLP, ("EY LLP"), Ernst & Young US

LLP ("EY US LLP"), Ernst & Young Global Limited ("EYG" or "EY Global") (together, "EY"

or the "Firm"), (collectively, "Defendants"), hereby alleges as follows:

## NATURE OF ACTION

        1.      Plaintiff files this complaint and brings this action to recover damages arising from

Defendants' unlawful retaliation against him, including stripping him of his job roles, terminating

his employment and forcing him to take retirement benefits from the Firm early, and the reduction

and loss of his compensation, because of his protected whistleblower activities, in violation of

Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (the "Sarbanes-Oxley Act" or

"SOX").

        2.      Such activities included, but were not limited to, Plaintiff identifying and

communicating matters within EY that involved violations of federal securities laws and improper

professional conduct by the Defendants and related EY audit teams.

3.     Plaintiff informed EY management that the Firm had abetted/furthered and contributed to securities law violations by its clients, who were fraudulently misleading investors in violation of the Securities Act of 1933, the Securities Exchange Act of 1934, and other U.S. and international laws. Howie further reported that EY was enabling these illegal activities and violations through its work for, and continued association with, several high-risk publicly traded clients whom he had credible reason to believe were engaged in serious criminal conduct both domestically and internationally.

4.     The criminal activities included actions by publicly traded EY clients that involved, or appeared to involve, individuals connected to major transnational organized crime groups engaged in illegal operations worth billions of dollars. His reporting also involved work done by EY for such clients who were implicated and/or involved by proxy in bribing government officials, defrauding governments, and other serious illegal acts.

5.     Plaintiff informed senior EY leadership of numerous instances where EY audit teams failed to perform procedures required by Public Company Accounting Oversight Board ("PCAOB") and International Auditing standards. These failures included deficiencies in auditing noncompliance with laws and regulations ("NOCLAR"), management integrity, and material disclosures. For example, EY auditors failed to prevent fraudulent disclosures as early as 2017 and each year thereafter across multiple SEC registrants and other clients. These audit failures on behalf of publicly traded clients, whether due to negligence or willful disregard of auditing standards and federal regulatory requirements, overlooked or deliberately ignored unlawful conduct and violations of securities-related regulatory requirements by its clients and/or their associates and business partners. Further, EY was not taking appropriate steps to curb similar criminal associations, professional misconduct, and/or regulatory violations in the future.

6.     Howie identified actions and omissions by Defendants showing that EY failed to comply with PCAOB standards and internal controls requirements regarding due professional care, professional skepticism, supervision, and documentation. More concerning, the problems with high-risk clients, especially those with NOCLAR allegations, were noted to be systemic, not simply observed in a few individual engagements. The actions and omissions also were present in more extreme risk situations.  As detailed herein, these actions and omissions caused violations of Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1, and 13a-13 promulgated thereunder.

7.     For example, from 2017 to 2023, EY issued unqualified audit opinions on the financial statements of Registrant 1, a foreign private issuer listed on NASDAQ, Registrant 2, a foreign private issuer listed on the NYSE and controlled by Registrant 1, and Registrant 3, a U.S. based company listed on NASDAQ  (collectively, the "Casino group registrants"), among others, and allowed them to be included in SEC and other filings, despite those filings containing material misstatements, including in their Form 10-Ks or 20-Fs and securities offerings. EY's audit reports—filed with the Casino group registrants' annual filings—falsely stated that EY conducted its audits in accordance with PCAOB standards and that the financial statements were fairly presented in all material respects in accordance with U.S. Generally Accepted Accounting Principles, with effective internal control over financial reporting. These misstatements were a direct violation of Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1, and 13a-13 promulgated thereunder.

8.     During the relevant period, EY issued internal guidance emphasizing the need for greater focus and expanded audit procedures related to NOCLAR, particularly in response to heightened fraud risks. Some of this guidance was prompted by high-profile audit failures,

including the Wirecard, NMC Health, and Luckin Coffee scandals. EY's then-Global Chairman, Carmine Di Sibio, also issued a letter to reassure clients nervous about being associated with EY's tarnished brand. In it, he outlined EY's planned improvements, such as increased due diligence in assessing client integrity and stronger measures to address fraud risk.

9.      However, the Firm's communications were misleading. Despite Howie's repeated warnings about serious criminal allegations against a growing list of clients and EY's inadequate audit responses, the Defendants knowingly continued their audit and other engagements without taking effective action to end these relationships or reduce the risk of audit failures for publicly traded clients, particularly those discussed in this Complaint. As a result, EY failed to properly conduct client acceptance and continuance procedures, including necessary risk assessments, and failed to detect and/or disclose fraud by these and other high-risk clients—some of whom were allegedly controlled by members of organized crime or involved in facilitating criminal activities.

10.     By failing to comply with PCAOB standards, Defendants knew—or were grossly negligent in not knowing—that they contributed to the Casino group registrants issuing materially false and misleading financial statements, including key disclosures about having effective anti-money laundering ("AML")  programs involving checks to ensure probity with whom they did business, in their periodic filings from at least 2017 through the third quarter of 2024. As a result, Defendants were a cause of the Casino group registrants' violations of Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1, and 13a-13 promulgated thereunder.

11.     Howie also raised similar concerns with EY leadership about audit failures involving other clients facing NOCLAR allegations, even when those audits were not subject to PCAOB standards. Many of these clients were still subject to U.S. laws, SEC rules and regulations, and applicable auditing and compliance standards and laws in other jurisdictions. Examples

include EY clients such as Registrant 4 and companies controlled by Gautam Adani ("Adani" or "Adani Group"), about whom Howie began to alert Firm leadership starting in or around 2022. Notably, current and former executives of these entities, including Gautam Adani, were indicted by the U.S. Department of Justice ("DOJ") for securities fraud, violations of the Foreign Corrupt Practices Act, and other charges in November 2024.

12.    Howie reported deficiencies that caused the system of quality control overseen by the Defendants to fail. These deficiencies resulted in multiple EY audits over several years being conducted in violation of applicable federal audit standards and internal controls requirements. EY leadership, with direct participation by senior members of EY Global and US's compliance and legal teams, were made aware but repeatedly denied the existence of these deficiencies. Moreover, EY leadership took deliberate steps to prevent the PCAOB and other key stakeholders from discovering the failures in EY's system of quality control, further exacerbating the severity of their misconduct.

13.    EY's failure to comply with the PCAOB (which is overseen by the SEC) and other applicable auditing standards, along with related deficiencies in its control environment, contributed to the Firm's violations of securities laws and regulations. Accordingly, Howie's communications to EY leadership[1], as part of his Global roles, regarding significant control issues, including those tied to deficiencies identified in audits of high-risk clients, constitute protected activity under SOX.

14.    Plaintiff also noted unethical conduct and professional misconduct by senior EY leadership at EY Global, EY LLP, EY US, and at other member firms, as well as by EY's audit professionals. This behavior included violations of prior cease-and-desist orders from regulatory

---

[1]    This included senior leaders in EY Global, EY US and each of its Area practices, Americas, EMEIA, and APAC, among others.

settlements (e.g., SEC settlements on Ethics Exam Cheating matter and Weatherford restatement[2])

and EY engaging in misleading communications with its regulators, including the PCAOB and

International Forum of Independent Audit Regulators, as well as the public and investors.

15.     As a result of the conduct described herein, Defendants also violated federal

securities laws, rules, and regulations including Section 4C[3] of the Exchange Act and Rule

102(e)(1)(ii)[4] of the SEC's Rules of Practice.

16.     In FY 2024,[5] Howie increased communications about his concerns, including by

providing even more extensive documentation of his research to EY leadership of organized crime

involvement by certain clients and the Firm, as well as by discussing the widespread control and

regulatory compliance problems within EY. He noted several of the key clients linked to

involvement with organized crime had former senior members of EY leadership on their boards,

including the audit committees. He noted a general lack of skepticism and objectivity being applied

to many of EY's high-risk audits, particularly those involving NOCLAR.

17.     However, because Howie refused to remain silent, continued to oppose the Firm's

unlawful and unethical conduct, attempted to end EY's relationships with publicly traded clients

of questionable integrity, and advocated for stronger risk identification, proper audit responses to

those risks, and compliance with PCAOB and other applicable standards, he became a target of

---

[2]     Examples include the June 28, 2022 SEC order on ethics exam cheating Ernst & Young LLP and  the October 18, 2016 SEC order on the Weatherford matter Ernst & Young LLP, Craig R. Fronckiewicz, CPA, and Sarah E. Adams, CPA.

[3]     Section 4C provides, in relevant part, that: "The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found … (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder."

[4]     Rule 102(e)(1)(ii) provides, in pertinent part, that: "The Commission may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it … to any person who is found … to have engaged in unethical or improper professional conduct."

[5] EY's fiscal year begins July 1 and ends on June 30 of the following year.

increasing pressure, threats, and retaliation by senior members within EY's Assurance leadership, Professional Practice Groups, General Counsel's Office ("GCO"), and other key functions. In response to Howie's advocacy for investor protection, Defendants removed him from two global leadership roles, prematurely stopped him from making a smooth transition of matters under investigation and his duties, threatened to force him into early retirement, and forcibly removed him from the EY partnership under punitive terms, in addition to other retaliatory actions, all causing him irreparable harm.

18.    Accordingly, Howie files this complaint of whistleblower retaliation against EY pursuant to the employee protection provisions of SOX.

## ADMINISTRATIVE PREREQUISITES

19.    On December 17, 2024, Plaintiff filed a Charge of Retaliation with the Occupational Safety and Health Administration ("OSHA") in which he alleged violations of the whistleblower protection provisions of SOX.  On May 8, 2025, OSHA amended Plaintiff's Charge of Retaliation to include further violations of the whistleblower protection provisions of SOX, namely EY's decision to forcibly withdraw Plaintiff from EY Partnership.  On June 6, 2025, OSHA made a factual finding that Howie qualified as a covered and protected "employee" under SOX.

20.    More than 180 days have passed since the filing of Plaintiff's OSHA Charge. OSHA has not yet reached a final determination with respect to the allegations contained in Plaintiff's OSHA Charge.  In addition, on June 16, 2025, OSHA issued to Plaintiff a "kick out" letter advising him of his right and option to file an action under SOX in federal court. Accordingly, pursuant to 18 U.S.C. § 1514A, Plaintiff is entitled to seek *de novo* review of his allegations from this Court.

21.    Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

22.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action is brought under SOX.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

24.    Plaintiff Joe Howie is a former Partner in the U.S. Professional Practice Director group of EY, a Certified Public Accountant ("CPA") in the Firm's Assurance practice (e.g., external audit) who has been stripped of his roles and all official titles and forcibly withdrawn from EY partnership in retaliation for his legally protected complaints of legal and regulatory violations covered by SOX. Prior to his removal, Howie was the co-leader of the Global Assurance Risk Center of Excellence ("Risk COE"), a group he co-founded, and the Global Process for Acceptance and Continuance of Engagements ("PACE") leader for the Assurance practice at EY. Howie is a resident of the state of Georgia.

25.    Howie has worked on some of the largest audits at the Firm, with most of his partner assignments being in the EY US Professional Practice and National Accounting groups, consulting on complex technical accounting and auditing and Firm risk management matters. He has significant experience dealing with audit matters involving NOCLAR.

26.    At all relevant times, Plaintiff was an "employee" of EY under SOX and applicable law.  Throughout the relevant periods of his employment at EY, Howie engaged in work while located in Georgia, with periodic travel for work outside Georgia on behalf of EY. Howie was

continuously employed with EY for almost 35 years, 24 of those with the title partner, and was assigned to its Dallas, New York, Zurich, and Atlanta offices.

27.    EY is one of the largest multinational accounting firms in the world, a member of the "Big Four," and provides assurance, tax, financial reporting, information technology services, consulting, and advisory services to clients.

28.    Respondent Ernst & Young LLP is organized in Delaware with its United States headquarters located at 401 Ninth Avenue, New York, New York 10001.  Ernst & Young LLP is an affiliate of Ernst & Young US LLP.  At all relevant times, Ernst & Young LLP was an "employer" under SOX.

29.    Respondent Ernst & Young US LLP is organized in Delaware and operates as a professional services firm, offering various services, including auditing, accounting, and bookkeeping services to clients, and is headquartered at 401 Ninth Avenue, New York, New York 10001.  At all relevant times, EY US LLP was an "employer" under SOX.

30.    Defendants Ernst & Young US LLP and Ernst & Young LLP are affiliates and are member firms of Ernst & Young Global Limited.

31.    Defendant Ernst & Young Global Limited ("EYG") is a United Kingdom company limited by guarantee and the parent company of EY LLP (which is one of EYG's member firms), with its headquarters at 1 More London Riverside in London in the United Kingdom.[6]  EYG is governed by the Global Executive ("GE"), which oversees the operations, financial affairs, and management of EYG and is charged with maintaining consistency and quality of the Global Practices and developing strategy.

---

[6]    This information can be found in the 2024 EY US Transparency Report at page 5.

32.     EYG establishes and maintains the Global Audit Methodology, key systems to support Independence, sanctions, and conflicts compliance, the client and engagement acceptance and continuance system and policies, the common electronic audit workflow and documentation tool (i.e., Canvas), a common Code of Conduct, risk management and other policies, all critical to enabling individual teams to execute consistent audits globally, including those conducted through EY US LLP. EYG policies are implemented by member firms, including EY US. As noted in EY US's 2024 Transparency Report, "Besides agreeing to comply with the regulations of EYG, EY member firms enter into several other agreements covering aspects of their membership in the EY organization, such as the right and obligation to use the EY name and share knowledge among EY member firms. EY member firms are subject to reviews to evaluate adherence to EYG requirements and policies governing issues, such as independence, risk management, audit methodology and talent. EY member firms unable to meet quality commitments and other EYG membership requirements may be subject to termination from the EY organization."

33.     At all relevant times, EY member firms are grouped into three geographic Areas: Americas; Asia-Pacific ("APAC"); and Europe, Middle East, India and Africa ("EMEIA"). These Areas comprised multiple Regions, which were groupings of EY member firms along geographical lines.

34.     These EY entities collectively serve multinational clients, including those registered in the U.S. At the individual audit engagement level, the EY member firms apply a common global audit methodology, use the global research tools for accounting and auditing decisions, use a common global consultation database, rely on key global systems for client and engagement acceptance and continuance, independence, risk management, audit documentation, and share a common code of conduct, management, administrative resources (including

technology support,), and allow employees—such as Howie—to move between firms at EY leadership's discretion.

35.     EY performed and oversaw various professional services including tax, audit, financial compliance, and financial reporting work for many EY clients which are publicly traded and listed in the United States, as well as listed on public stock exchanges abroad.

36.     EY has over 400,000 employees and business operations in over 150 countries, including in the U.S. and United Kingdom. It operates in almost every state within the U.S., including Georgia, New York, and New Jersey.

## FACTUAL ALLEGATIONS

## I.    BACKGROUND

37.     Investors rely heavily on the global EY organization to faithfully fulfill a vital role: protecting the public interest by acting as auditors of a sizeable portion of the publicly listed and privately held companies globally. The Firm's public messaging promotes this reliance, with reassuring disclosures about the Firm's commitments to quality, its robust client vetting processes and controls, and its focus on compliance with professional standards. For example, in its Transparency Report for the US, EY proclaims, "The consistent stance of EY US is that no client or external relationship is more important than the Firm's professional reputation and the ethics and integrity of each of our professionals." EY Global's stated values include, "People who build relationships based on doing the right thing."[7]

38.     Yet, the reality at EY is in stark contrast to its messaging. EY leaders have abandoned these stated values and instead prioritized commercial pursuits over meeting their obligations to the public, legal and regulatory compliance, and the quality of EY audits. This has

---

[7]     Transparency Report 2024 - EY US, similar statements are made by the other relevant member firms' in their Transparency reports or other publications.

been especially true when those audits involved alleged noncompliance with laws and regulations ("NOCLAR"), including elevated risk of fraud.

39.     Auditors like Howie are bound by a professional code of conduct requiring them to prioritize the public interest, maintain independence in fact and appearance, and perform audits with objectivity and skepticism. Often described as gatekeepers, auditors play a critical role in protecting the public. Throughout his career at EY, Howie took pride in this public service mandate and its importance to the effectiveness of global capital markets and investors, both large and small.

40.     PCAOB auditing standards require auditors like EY to exercise due professional care, including maintaining appropriate professional skepticism throughout an audit. Section 10A of the Securities Exchange Act of 1934 mandates that auditors of publicly traded companies have procedures designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on financial statements. It also provides for reporting requirements to the SEC if an auditor detects likely illegal acts that have a material impact on financial statements and appropriate remedial action is not being taken by management or the board of directors. Further, every audit opinion issued includes wording affirming the responsibility of auditors to uphold these obligations.[8]

41.     Despite these clear obligations and their superior access to clients' internal information, far beyond that available to investors or credible short sellers, EY has a poor track record of timely fraud detection. EY leadership's action and inaction sets a tone that impairs both

---

[8]     Sample typical boilerplate language excerpted from an EY audit opinion reads as follows: "Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error **or fraud**. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error **or fraud**, and performing procedures that respond to those risks."

the system of quality management and internal controls necessary to effectively support the Firm's audits, as well as the engagement-level execution, thereby negatively impacting compliance with federal legal requirements and professional standards and quality. This adverse effect is magnified in judgements concerning audits of high-risk clients.

### A.    Howie is Assigned to Assist Global PPG in Remediating EY Audit Quality, Particularly Around Elevated Fraud Risks

42.    In the summer of 2020, in response to pressure from the public, regulators, and its own clients resulting from a recent series of high-profile audit failures, including the $1.9 billion fraud by EY's audit client Wirecard, the multi-billion dollar fraud at NMC Health, and fraud at U.S. Registrant Luckin Coffee, among others, EY Global began an initiative called "Strengthening Trust and Confidence" ("STC"), gathering a team of professionals from across multiple member firms. In September of 2020, EY's Global Deputy Assurance Leader David Kane ("Kane") selected Howie along with a team of others, to work on STC full-time. The overall objective of STC was to remediate the significant shortfalls in EY's audit processes, evidenced by the recent high-profile audit failures to improve both audit quality and risk management.

43.    Howie's role involved frequent interaction with senior leaders from EY Global and all three Areas, primarily within the Professional Practice group. It also involved communications with the Global Quality Enablement leader, Global Risk Management leader, and others.

44.    As part of Howie's assignment to STC, he co-led initiatives to evaluate policies, practices, and decisions in high-risk client situations and to develop improvements to client due diligence and risk assessment processes. This included reviewing past high-profile audit failures, including how audits involving publicly traded clients were conducted (e.g., Wirecard, Luckin

Coffee, NMC Health[9]), and analyzing how these frauds could have been detected, and assessing why client due diligence or the audit team's identification and assessments of elevated risks, including management integrity, failed to identify the associated bad actors.

45.    Proper client due diligence, as required by federal law, would have helped the Firm avoid taking on clients involved in large-scale fraudulent activities. It also would have prompted the Firm to cut ties with such clients before the misconduct escalated, enabled more objective risk assessment and oversight, and led to earlier identification of fraud and proper disclosure of the risks these companies presented to investors and the public, especially when clients were linked to organized crime, money laundering, or tax evasion.

### B.    Howie's Role as an Employee at the Firm

46.    Throughout his employment at EY, management could hire or fire Howie at any time and without cause. EY partners, including under the Partnership Agreement, were subject to employment terms and conditions that were unilaterally and arbitrarily set exclusively by the Firm without negotiation, including the Firm's ability in its sole discretion to terminate Howie, a nominal "partner," without warning. Furthermore, EY unilaterally set the terms, conditions, rules and policies/procedures of Howie's work. For example, EY controlled the resources and projects assigned to Howie. EY would also set deadlines for him to complete the projects and tasks assigned to him. In fact, EY assigned projects even if Howie objected that he could not take on any additional projects because he was at capacity or did not have the resources necessary to complete the projects assigned within the time required. They also required Howie to work across multiple

---

[9]    See Financial Times, "EY accused of 'serious' failings in audits of collapsed NMC Health," (May 19, 2025), https://www.ft.com/content/f2420f88-9b3b-40bf-b130-40d9ed596acc?accessToken=zwAGNtWsZsRwkdPyQg ImztAv9OxMEDZ7VlqzA.MEYCIQDcFxMRvdMBnYL2J7m1XM9pacC5sXz1_dSC5jw1q10qwIhANW7OX1wP eq6OoBTPZ0fAyA2SJznnsncynTSkwp4ZBhx&sharetype=gift&token=d76dcbb5-187d-4790-8f9c-37916f6ff332 (last visited June 5, 2025).

time zones and attend meetings outside of non-traditional business hours, and he did not have the ability to decline to do so and control his hours of work. Ultimately, Howie did not have discretion to determine what projects or assignments he worked on, when he worked on those projects, or how long he spent working.

47.     Additionally, Howie had supervisors who assigned and reviewed his work product to decide whether more work on a project was required and which projects Howie had to work on next. At EY Global, beginning in 2020, Howie reported to Vice Chair of Assurance David Kane ("Kane"), Global Vice Chair of Professional Practice Jean-Yves Jegourel ("Jegourel"), Global Deputy Vice Chair of Professional Practice Kurt Hohl ("Hohl"), and Global Assurance Quality Enablement Leader Jay Paulson ("Paulson") who led the Strengthening Trust and Confidence Initiative. In 2021, Kane took over Jegourel's role. In 2023, Howie began reporting to the new Global Deputy Vice Chair of Professional Practice Eric Spiekman ("Spiekman") and Global Risk Leader for Professional Practice Laney Doyle ("Doyle"). These supervisors also gave input into Howie annual performance reviews, which directly impacted his compensation at the Firm (which was determined through the discretion of management).

48.     Despite his partnership title, Howie did not have a bona fide or true ownership interest in the Firm. ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████[10]

49.    █████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

50.    █████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[10]    The redactions made throughout the Complaint are not a concession that these allegations are in any way privileged or confidential. Rather, Plaintiff has redacted certain allegations at Defendants' request, to avoid unnecessary motion practice related to the disclosure of allegedly privileged communications or confidential information while the Court rules on Plaintiff's ability to file an unredacted version of the Complaint on the docket.

████████████████████████████████████████████████████

████████████████████████████████████

51.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

52.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

53.    Moreover, EY assigned an assistant and other team members to work with Howie. However, he did not have any control over the hiring, compensation, or termination of those assistants. In fact, Howie could not hire or select staff to assist him in projects without EY's approval.

54.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

**C.**    **Howie Tries to Help EY Leverage Lessons Regarding Legal Compliance Learned from the Wirecard Scandal and Other High-Profile Frauds**

55.    Before hiring EY as its auditor, publicly traded EY client Wirecard AG ("Wirecard") asked EY to investigate shareholder allegations that it was improperly counting customer deposits as its own cash. In 2008, EY reported no issues and soon after became Wirecard's official auditor. Wirecard's early business centered on electronic payment processing for high-risk clients, including those in the pornography and gambling industries.

56.    In April 2019, before EY Germany issued its audit opinion over Wirecard, a partner in EY US's Central region received an email warning about Wirecard's fraud from U.S. short seller Marc Cohodes, who had been key in helping uncover a fraud at then-EY US client MiMedx. Cohode's email was forwarded to EY US GCO and the Central Region Professional Practice Directors ("PPD"), so the PPD group in the U.S. and Germany could be alerted. Howie was copied. He reviewed information online about the Wirecard allegations and noted to the Central region PPD and others that the NOCLAR allegations and support described appeared credible and should be taken seriously. Wirecard also had subsidiaries in the U.S. that were audited by EY's U.S. firm. This was just one of many internal and external warnings over the years that EY leadership received prior to Wirecard's collapse. After this, EY Germany and EY US issued the opinions over

Wirecard anyway. In fact, PACE showed the EY US, including its head of PPD, approved continuing the relationship with Wirecard in May 2020, and with respect to the US subsidiary did not reflect the elevated risk, claiming the issues Wirecard was experiencing were limited to the Germany operations.

57.    In June 2020, Wirecard collapsed after nearly $2 billion it claimed to hold in trustee-controlled bank accounts in Asia could not be located. The "missing" cash was ultimately tied to falsified revenue. For years prior, EY's audits failed to independently verify these cash balances—despite their material significance and existing warnings about fraudulent revenue. EY also overlooked that the entity allegedly holding much of the cash was not licensed to operate as a trustee, something that could have been easily confirmed through a government website.

58.    Worse, the scandal showed EY ignored repeated warnings and missed multiple opportunities to uncover the Wirecard fraud. For years, credible sources—including investigative journalists (such as some working for the *Financial Times*), short sellers, and whistleblowers— raised serious allegations of fraud and illegal activity. Even concerns raised by EY's own professionals were overridden or dismissed within the Firm and not properly addressed.

59.    In 2016, four years before Wirecard's collapse, EY's own Forensics auditors raised concerns during an internal investigation called "Project Ring," involving whistleblower allegations. Reporters noted that EY allowed Wirecard's management board to obstruct the investigation and ultimately halt it before key procedures were completed. Although EY initially stated it couldn't issue an audit opinion for 2016 without finishing the investigation, EY backed down and issued an unqualified audit opinion, thereby misleading the public and paving the way for the financial disaster that followed.

60.     Moreover, during debriefings as part of the STC and Risk COE's review of previous audit failures, EY forensic professionals Martin Korte ("Korte") and Mike Savage ("Savage") told Howie that EY never fully addressed allegations from a forensic executive who reported being offered a bribe by a senior Wirecard executive to stop investigating Wirecard. This alone should have ended the client relationship and triggered a full investigation. Taken together with the many other warning signs, these facts point to a deeper, systemic problem within EY, not just a failure by the Wirecard audit team.

61.     Unfortunately, Howie observed similar behavior displaying a broader pattern at EY in which audit teams and Firm leadership resisted involvement by and disregarded concerns and input from forensic professionals, especially in high-risk audits or when allegations of NOCLAR were present. Forensic specialists who recommended expanded procedures were ignored, and in some cases, audit teams deliberately limited their involvement. In clear NOCLAR situations, some audit teams and Professional Practice Directors failed to even involve forensic professionals.

62.     These findings were especially troubling to Howie, because most auditors have limited experience handling NOCLAR allegations. Therefore, bringing in specialists is a prudent and necessary safeguard in high-risk audits. A general survey at EY reflected a negative environment for forensic professionals, many of whom reported reluctance to work on EY audits due to the marginalization of their role at the Firm.

63.     To address these issues, Howie and Savage recommended stronger policies requiring forensic involvement in NOCLAR matters. For example, Howie and Savage recommended giving forensics approval authority over audit responses to such allegations so that audit partners and leadership could not unilaterally override the forensic professionals. These and

other suggestions were made repeatedly to Firm leadership under the STC initiative and as part of Howie's Risk COE role.

64.    Despite EY's public statements about learning from past audit failures, leadership never fully implemented these and other recommendations. Howie's recommendation to expand forensic roles and tighten NOCLAR protocols met with particularly strong resistance from EY US The pattern continued from 2021 into 2024, with the Global Forensic and Integrity leader Andrew Gordon, Savage and Carol Palmer Winig raising similar concerns about EY Americas Vice Chair — Assurance Dante D'Egidio ("D'Egidio") and others in EY US leadership's consistent failure to support forensic professional's involvement in audits, including for NOCLAR. Palmer-Winig put it best in June 2024 when she told Howie EY US leadership did not value the audit quality and risk management piece provided by the forensic professionals in audits and that they only valued sales and growth.

65.    Howie and Savage also proposed a straightforward test: compare the companies flagged by the Risk COE for possible NOCLAR with corresponding consultation memos in EY's Global Consultation database. The purpose of this test was to verify whether audit teams properly consulted with PPD, forensics, and others in accordance with EY policy.

66.    EY leadership rejected the idea, initially citing legal concerns. Even when it was proposed that someone from GCO conduct the comparison internally, the Firm declined. As such, Howie reasonably believed that the Firm declined to avoid uncovering systemic noncompliance and suppression of whistleblower concerns related to audit failures, especially in the U.S.

67.    Finally, Howie and Savage recommended that Global Forensics, under Savage's leadership, perform a quality review of existing NOCLAR consultation memos. This was not to

second-guess audit conclusions, but to ensure the memos reasonably addressed the allegations and included input from appropriate parties beyond the engagement team.

68.    EY leadership also rejected this recommendation. ███████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████    These repeated rejections of basic compliance checks suggest that EY leadership was aware of systemic audit failures and sought to avoid exposure, particularly where client relationships or revenue might be at risk or the findings might increase the Firm's legal exposure.

69.    This lack of leadership support was especially troubling considering scathing internal and external reviews. After Wirecard's collapse, the German audit regulator APAS reportedly found EY's audits were "at the very least negligent and in some cases grossly negligent," and that its audit opinions were "objectively inaccurate."

70.    Audit regulators said EY auditors need to be more skeptical and stated that there "should be more emphasis on challenge of management" of audit clients. In a *Financial Times* article, EY global managing partner Andy Baldwin claimed the Firm had learned lessons from Wirecard. A senior EY Germany partner admitted in public reporting that, "We should never have been there in the first place," highlighting failures in EY's client selection and due diligence processes. See Wall Street Journal, "String of Firms That Imploded Have Something in Common: Ernst & Young Audited Them," (Oct. 16, 2020), https://www.wsj.com/articles/string-of-firms-that-imploded-have-something-in-common-ernst-young-audited-them-11602863319 (last visited Jan. 8, 2025); Irish Times, "German watchdog finds EY's Wirecard audits grossly negligent," (Apr. 16, 2024), https://www.irishtimes.com/business/2024/04/16/german-watchdog-finds-eys-wirecard-audits-grossly-negligent/ (last visited Jan. 8, 2025).

71. EY's failure to act on NOCLAR allegations has repeatedly allowed misconduct to continue, worsening the harm to investors and the public, thereby being a cause of securities law violations by both registrants and non-registrants. EY has not only failed to protect the public interest, but it has enabled corporate wrongdoing by lending its credibility through flawed audits. Often, EY responds appropriately only when under regulatory pressure or public scrutiny.

72. In a step that could have improved the Firm's performance in assessing risk and detecting fraud, Howie was assigned to lead Global PACE efforts, and both Howie and Savage were tasked with co-leading the Risk COE, charged with identifying high-risk clients, particularly those with elevated fraud and NOCLAR risks.

73. The Risk COE used adverse media scraping to help uncover troubling client relationships early on, partnered with external short research firms and academics to leverage financial analysis, and developed new forensic tools to identify clients with elevated fraud risk and focus efforts. However, as the group flagged high-risk clients, Howie encountered growing resistance from EY leadership. His efforts to improve risk identification, audit objectivity, and ethical standards and bring the Firm into compliance increasingly clashed with leadership's commercial priorities.

74. After Wirecard's collapse, EY publicly cited the Risk COE's work and tools as evidence of its reform efforts, including in its Global Transparency Report and presentations to global regulators. But Howie repeatedly warned that while risk identification centrally had improved, the Firm's audit responses, especially to NOCLAR matters, remained inadequate. He came to believe that EY treated these initiatives as a means of improving their public image rather than genuine reforms, reluctant to implement measures that could negatively impact client relationships, hurt revenue, or reveal additional audit failures.

75.     Ultimately, Howie witnessed increasingly troubling behavior and consistent hostility from leadership in response to his escalation of his concerns. In short, EY was not only failing in its legal duty to protect investors but was actively making matters worse by providing false assurances, misleading reports, and inadequate responses to serious client risks.

## II.    HOWIE DISCLOSES THAT EY WAS WILLINGLY ENGAGING WITH CLIENTS CONTROLLED BY ALLEGED CHINESE MAFIA GROUPS AND FACILITATING THEIR CRIMINAL ACTIVITIES

### A.    EY's Willing Engagement with High-Risk Clients Having Credible Links To Alleged Criminal Activity

76.     Beginning in June 2021 and continuing through 2024, Howie observed that EY leadership across Global, Area, Regional, and member firms—including leaders within Professional Practice Groups—knowingly permitted the Firm to provide audit and other professional services to companies, particularly in the gaming, casino, and hospitality sectors, that were controlled by or closely connected to organized crime syndicates and other criminal groups and activity.

77.     Upon review, Howie found that EY's acceptance and continuance decisions, including for publicly traded clients he identified, were inappropriate and failed to reflect known fraud, NOCLAR, and other risks identified through adverse media. In most cases, these risks were absent from the required PACE forms, indicating that audit teams had conducted incomplete risk assessments. This raised serious concerns that key audit procedures were either insufficient or not performed at all.

78.     The absences Howie found on the required PACE forms greatly increased the risk that both current and prior audits were noncompliant with SEC laws and regulations, including Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1, and 13a-13 promulgated thereunder. EY's failure to properly identify and respond to these risks increased the likelihood

that fraudulent or illegal conduct went undetected, exposing shareholders to otherwise preventable harm even beyond the specific examples identified in this Complaint (e.g., Registrants 1-7, Listed Companies 1-7, Private company 1, and others). Between 2021 and 2024, Howie repeatedly alerted senior EY leadership that certain publicly traded and other clients presented serious legal risks due to credible evidence of unlawful conduct, including findings from U.S. and foreign government investigations and investigative media reports. He was concerned that through EY's association with these high-risk clients, its clear failures to follow professional standards and address the NOCLAR risks, and its failure to take exception to fraudulent reporting, EY was facilitating activity in violation of professional standards,[11] committing discreditable acts of professional misconduct, and potentially committing violations of law.[12] EY's involvement with high-risk clients and its failed audits in connection with them aided in obscuring their schemes and prolonged both the periods and severity of investor harm. This was not the first time EY was a cause of securities law violations and engaged in seriously unethical conduct.[13] However, Howie felt this matter stood out as one of the worst examples in the Firm's history of failures.

---

[11]     For example, see AICPA guidance over Integrity and Objectivity, Rules 101-Independence, 102-Integrity and Objectivity, 201-General Standards, 302-Confidential Client Information, and ET Section 92-Responding to Illegal Acts, PCAOB guidance AS 1005, 2405, and Ethics and Professional Conduct, and IESBA Fundamental Principles, Sections 220-Objectivity, and 330-Responding to Non-Compliance with Laws and Regulations (NOCLAR).

[12]     In addition to Exchange Act Section 13 (a) and Exchange Act Rules 12b-20, 13a-1, and 13a-13, promulgated thereunder as repeatedly cited above, the Firm's practices implicated and violated: (i) Securities Act of 1933 Section 17a and Securities Exchange Act of 1934, specifically Section 10(b) and Rule 10b-5 regarding fraud in the sale and trading of securities, given the Registrants and Auditors had knowledge that the disclosures excluded the organized crime involvement, related AML, and other compliance failures and accounting and disclosure implications. Other violations discussed herein also implicated this statute; and (ii) 18 U.S.C. § 1956(a), which concerns money laundering. As the Auditors received payment for comfort letters, audit opinions, and other services required in connection with the US and other securities offerings by casino groups and others who the auditors knew, or were recklessly negligent in not knowing, they were and persisted in commingling funds and engaging in or facilitating money laundering and other illegal activity.

[13]     As one example, in June 2022, the SEC imposed a $100 million civil money penalty on EY and required various other actions in connection with its professionals cheating on their ethics tests and the Firm failing to act with integrity, withholding the conduct, and making misleading statements during the government's efforts to investigate it. The continuation of similar unethical behavior related to this matter and others represents one of several violations of the cease-and-desist provision under that settlement and, given communications made to leadership, indicates the Firm falsified its annual certifications made as to compliance with the settlement.

79.     Howie urged EY to exit these and other high-risk relationships to protect the Firm and uphold its legal obligations. Instead, EY leadership strongly resisted his recommendations. EY refused to appropriately deal with the legal risk situations identified in which EY professionals would be found responsible based on their work for these publicly traded clients.

80.     As a result of Howie's repeated insistence to respond to these and other risks, Firm leadership began limiting Howie's access to audit teams and key discussions. For example, EY US Americas Area PPD Jim Estes requested that Howie be excluded from Area PPD meetings after Howie's work repeatedly revealed that NOCLAR risks were not being appropriately addressed and that the U.S. audit practice was not complying with Global policies on NOCLAR, PACE/A&C, Accountability, and related matters.

81.     Unfortunately, rather than taking action to address the misconduct or reevaluate these high-risk client relationships, EY leadership reacted to Howie with hostility. They were more upset with Howie for exposing these legal risks than with the teams and leaders responsible for engaging and serving high-risk clients.

82.     Howie complained about these issues in emails and during meetings with senior leadership. This included those in which he presented his findings and proposed policy changes to prevent the Firm more broadly from enabling organized criminal activity. In response, senior leaders, including EY Global Risk Management Leader Joe Watt ("Watt"), acknowledged the underlying problem but noted that the business leadership would resist changes because high-risk clients "pay better," and exiting them would require a fundamental shift in EY's culture away from its focus on growth.

83.     Further, Howie pointed out to EY leadership, including Kane, Global Deputy Vice Chair of Professional Practice Kurt Hohl ("Hohl"), Global Deputy Vice Chair of Professional

Practice Eric Spiekman ("Spiekman"), Savage, and EY Global Assurance Quality Leader Diane Larsen ("Larsen"), that EY's internal actions contradicted its external messaging to regulators and the public, particularly its promises to strengthen audit quality and client due diligence. In practice, Howie saw leadership repeatedly interfere with or fail to support necessary changes and audit procedures when a threat was posed to the Firm's relationship with the client and/or might result in exposing failed audits, further damaging the Firm's reputation in the market or increasing legal exposure.

**B.    Howie Discovers EY Willingly Engaging with Publicly Traded SEC Registrant Clients Controlled by Chinese Mafia Groups Engaged in Criminal Acts**

84.    Among the high-risk client exposures identified by Howie and the Risk COE and reported to EY leadership was a group of clients closely connected to organized crime, primarily in the casino industry. The volume of associated criminal activity was staggering: over $100 billion. The criminal activity included crimes committed by Alvin Chau ("Chau") and Levo Chan ("Chan"), two EY clients who were both in partnership with EY client casino groups and others and ran illegal activity through junket operations and VIP rooms the casino groups allowed them to control. Some of the companies involved were controlled by one of three alleged Chinese Mafia-connected families. Other companies were found to be working closely with members of organized crime groups and facilitating their activities.

85.    Howie was particularly alarmed to learn that at least five companies linked to organized crime were U.S. SEC registrants, with three SEC registrants being EY clients. All five companies were connected to the same family. U.S. registration provided these companies credibility and access to U.S. capital markets and international banking systems at the same time the companies allegedly were engaging in criminal activity.

86.    Howie reported to the Firm that at least 16 EY clients were implicated in this network, including both companies controlled by families allegedly closely linked with criminal groups and the companies facilitating their activities. In fact, it appeared EY had the largest concentration of such connections among the Big 4 firms.

87.    The most prominent U.S.-registered company that allegedly facilitated criminal activity was EY client Registrant 3. The two most prominent US registrants allegedly controlled by the families closely associated with organized crime were casino operators Registrant 1 and Registrant 2.[14]

88.    The controlling shareholder's family office of Registrant 1 also sponsored two Special Purpose Acquisition Companies ("SPAC"). The first SPAC merged with another EY audit client, Registrant 5, which is also facing fraud allegations. The second SPAC was registered in mid-2024. Another relative completed a U.S. initial public offering ("IPO") in 2024. This indicates the network continues to access U.S. capital markets unabated.

89.    EY's connections to Chinese organized crime particularly worried Howie. Chinese organized crime groups (also referred to as Triads or Chinese Mafia), are widely recognized as dangerous criminal enterprises. Triad activities include murder, extortion, drug and human trafficking, fraud, and money laundering. In fact, the U.S. government has identified Chinese organized crime groups and the money laundering services they provide as such a threat that combating them has been declared a matter of national security.[15] Therefore, connection to these crimes exposed EY, its employees, and its clientele to substantial risk, and placed investors at risk,

---

[14]    Registrant 2 is a separate registrant controlled by Registrant 1.
[15]    See U.S. Department of the Treasury, "2024 National Money Laundering Risk Assessment," (Feb. 2024), https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.

including because these associations were not appropriately disclosed in EY's audits or client filings with which EY was associated.

90.     As the evidence Howie accumulated grew, he identified to EY leadership three families alleged to be members of, or at least closely associated with, Chinese Mafia groups, that he found to be behind many of the businesses involved in the client network. The families were all wealthy, having net worths in billions of USD, and all politically influential. Howie identified key connections and cooperation between the families. He also noted all were connected to multiple other alleged members of organized crime and criminal groups, including Chau and Chan, as discussed below. Howie shared the following with EY leadership, after compiling it from reporting and investigation documents. The version shared with EY was not anonymized.

91.     **Family A:** Their patriarch was widely known in the global gaming industry as "the Godfather of Macau." Family A has long controlled a substantial portion of the casino market in Macau. The founder was repeatedly denied gaming licenses in several jurisdictions, including the United States and Australia, due to his well-documented ties to organized crime. However, he was never charged or convicted and denied criminal associations. As his reputation increasingly limited expansion opportunities, he installed his wives and children in key leadership roles within his network. His son was named CEO of Registrant 1 prior to its U.S. IPO, while his daughters were placed in leadership of Listed Company 7, a major casino operator, and participated as a joint venture partner with Registrant 6 (not an EY client) in Macau. Family B and Family C representatives have long been on the Listed Company 7 and/or related companies' boards. Registrant 1 opened its casinos in Macau through a partnership with the substantial shareholder of Crown Resorts and invested directly in Crown Resorts. Registrant 1 provided input into Crown Resorts' selections of junkets/VIP room operators, which later were shown to include key

organized crime figures, including Chau, Chan, and others as well as associated companies. Howie also noted Registrant 1 connections to Registrant 3.

92.     **Family B:** The leader of this family has a reported long history of arrests and well-known associations with organized crime, that have made him a widely recognized figure in Chinese Triad circles. His reported ties were so numerous that a Google search for his name would often autocomplete with the word "Triad."  In fact, he sued Google for defamation.  Family B controls a vast business empire, including Hong Kong's largest movie production company as well as a major brokerage and foreign currency trading firm. A representative of Family B is on Listed Company 7's board.

93.     **Family C:** The patriarch of this family built one of the world's largest retail jewelry empires. Family C held a significant stake in Star Entertainment's casino group in Australia and Private Company 1's casino in Vietnam. Both casino operations had reported links to organized crime, including Chau, further elevating concerns around money laundering and criminal infiltration of regulated markets. A Family C representative is on Listed Company 7's board. Howie also noted Family C connections to Registrant 3.

94.     The longstanding and well-documented ties between these individuals and organized crime have been the subject of public regulatory proceedings[16] and key convictions. The global crackdown on the casino junket and VIP room industry, which helped bring these figures to prominence, further confirmed their deep connections to high-profile, publicly traded gaming companies, including multiple EY clients in the U.S. and abroad.

---

[16]     See State of New Jersey Department of Law and Public Safety, "Special Report of the Division of Gaming Enforcement to the Casino Control Commission on its Investigation of MGM Mirage's Joint Venture with Pansy Ho in Macau, Special Administrative Region, People's Republic of China," (May 18, 2009), https://www.nj.gov/oag/newsreleases10/031710-DGE-Report-MGM-Macau-Joint-Venture.pdf.

95.     Family A and Family C are also connected to Registrant 3 through its subsidiary, Listed Company 3. A board member from a Family C company has served for many years on the board of Listed Company 3. Additionally, Family A's company, Registrant 1, received its license for gaming under Registrant 3/Listed Company 3's license shortly after Registrant 3 entered the Macau market in 2007. This arrangement through its subsidiary made Registrant 3 jointly responsible for Registrant 1's regulatory compliance, including probity checks and other elements of AML compliance, until 2023, when Registrant 1 obtained its own gaming license.

96.     Despite these deep-rooted ties to organized crime, neither Registrant 3 nor EY, as Registrant 3's auditor, disclosed in Registrant 3's financial statements or related filings the risks associated with Registrant 1's connections to organized crime, a recurring concern raised by Howie to EY leadership every year between 2021-2024.

## C.     Howie Discloses EY Audit and Financial Reporting Clients, Including Publicly Traded Companies, Partnering with Organized Crime Figures and Facilitating Criminal Activity

97.      EY clients found to be connected to organized crime include those that allegedly facilitated the criminal activity, such as U.S. Registrants including Registrant 3 and Registrant 7, which has a long history of connections to criminal activity and Know-Your-Client ("KYC") violations. Registrant 7 served as the lead underwriter for Registrant 1, Registrant 2 and others, across APAC and the U.S. As an investment bank, Registrant 7 is subject to strict BSA/AML requirements. Other EY clients, both listed on foreign exchanges and privately held, also fell into this category of those who facilitated the criminal activity.

98.     Howie also found that EY's work for these clients violated professional standards and the auditor's gatekeeper role. Howie expressed concern to various members of EY leadership that the clients' actions, and EY's complicity, likely broke SEC laws and similar laws and regulations in other countries.

99.     For years, EY possessed significant information about alleged criminal activity and associations tied to its clients, including information raised by Howie from 2021 to 2024. Further, given the nature of the casino business and the volume of transactions flowing through VIP rooms controlled by criminal groups and through the casino groups' bank accounts, EY could not reasonably ensure that its fees were not paid with proceeds from illegal activities. Howie raised serious concerns about potential anti-money laundering ("AML") violations by EY, not just the clients.

100.     Howie concluded that the EY clients with ties to organized crime were likely submitting fraudulent disclosures (e.g., falsely disclosing effective AML programs, omitting disclosure of business arrangements with members of organized crime and the effect on revenue and contingent liabilities, etc.) in violation of the Securities Act of 1933 and the Securities Exchange Act of 1934, and violating the Bank Secrecy Act and related AML laws. These clients' AML programs were obviously inadequate and their business activity, including securities offerings, involved use of the U.S. banking system. After Chau and Chan's arrests, Howie noted the EY clients' involvement with Chau and Chan confirmed the clients were connected to organized crime and the illegal activity that had been reported was taking place.

101.     In his efforts to report these issues to EY between 2021-2024, Howie repeatedly showed evidence that there were significant connections between EY clients and organized crime to various members of EY leadership including Kane, Hohl, Paulson, Savage, Spiekman, Watt, Larsen, EY's Global Head of Litigation Steven Young ("Young"), EY's Asia Pacific Assurance Professional Practice Director Chris George ("George"), EY's Global Capital Markets Leader Alan Millings ("Millings"), EY's Las Vegas Assurance Partner Ryan Cupersmith ("Cupersmith"), EY's Americas Deputy Vice Chair Professional Practice Nancy Salisbury

("Salisbury"), EY's Global PPG Risk Leader Laney Doyle ("Doyle"), and EY's Global Financial Crime and Global Compliance Leader Catherine Vaughan ("Vaughan").

### D.    EY's Criminal Clients Alvin Chau and Levo Chan Are Convicted

102.    Starting in 2021, Howie raised concerns with Paulson by sharing emails containing links to media reports, excerpts from Australian regulatory investigations, and supporting documentation outlining EY's connections to Chau and other EY clients with ties to organized crime.

103.    During these communications with Firm leadership, Howie consistently reported the allegations and confirmed illegal activity committed by Chau and Chan, both before and after their arrests. He provided information from Australian regulatory investigation reports from 2020 forward about Chau's involvement with Crown Resorts ("Crown") and The Star Entertainment ("The Star") and adverse media alleging Registrant 1 and Chau's Triad links going back to 2014. On multiple occasions, with Kane, Hohl, Savage, Young, Paulson, Larsen and others, he conveyed the need for EY to use the information from the Australian investigations to inform its approach to assessing the impact of the organized crime connections, for clients involved with Chau, Chan and others, across the connected client group (i.e., he stressed the need to share information and address the risks consistently).

104.    Chau and Chan, who controlled several EY clients, were even highlighted in reports from the United Nations Office on Drugs and Crime in January 2024[17] and October 2024[18] which

---

[17]    See United Nations Office on Drugs and Crime, "Casinos, Money Laundering, Underground Banking, and Transnational Organized Crime in East and Southeast Asia: A Hidden and Accelerating Threat," (Jan. 2024), https://www.unodc.org/roseap/uploads/documents/Publications/2024/Casino_Underground_Banking_Report_2024.pdf (last visited Jan. 8, 2024).

[18]    See United Nations Office on Drugs and Crime, "Transnational Organized Crime and the Convergence of Cyber-Enabled Fraud, Underground Banking and Technological Innovation in Southeast Asia," (Oct. 2024), https://www.unodc.org/roseap/uploads/documents/Publications/2024/TOC_Convergence_Report_2024.pdf (last visited Jan. 8, 2024).

detailed their alleged and apparent criminal activity. The October report described their prosecution as "one of the most prolific money laundering and underground banking cases in recent history." It further noted that Chau's junket company, Suncity, reportedly remained under investigation for alleged connections to drug trafficking and cyber-enabled fraud networks, and other criminal organizations.

105.    The scale of criminal activity tied to Chau's alleged criminal connections was massive. In Macau alone, convictions confirmed over $100 billion in illegal activity. Globally, the total is estimated in the hundreds of billions of U.S. dollars when factoring in related activity across multiple countries, subsequent investigations, and the likely scope of undiscovered schemes and illegal transactions.

106.    Prior to Chau's arrest in November 2021, Howie repeatedly alerted EY leadership, including Kane, Hohl, Paulson, Savage, Cupersmith, Pippolo, and others, to Chau's alleged criminal ties and urged the Firm to exit related client relationships. Despite these warnings and Chau's subsequent arrest, EY continued to maintain their relationships with EY client companies Chau controlled.

107.    Even after Chau's arrest, Howie urged EY leadership including Kane, Hohl, Paulson, George, Spiekman, Doyle, Cupersmith, Salisbury, Millings, Larsen, Savage, Watt and Vaughan that EY still needed to critically examine any clients connected to Chau because the integrity issues involved with these clients were still present and needed to be investigated and addressed. He also raised concerns as to the audit teams' approach to NOCLAR and addressing the fraud risks present. He was particularly focused on communicating concerns around the audits of Registrant 1, Registrant 2, and Registrant 3. Except for Listed Company 6 (the company Chan operated), Howie was not aware of any of the EY clients engaging an independent third party to

conduct a proper NOCLAR investigation.

108.    Chau's core business was operating junkets—highly lucrative ventures that provided travel, credit, collections, and entertainment (reputedly including prostitutes) for wealthy gamblers who often wagered millions per hand. His company, Suncity Group, ran private VIP rooms in top casinos across Macau, Australia, and the Philippines, including those of EY clients like Registrants 1-3. Reports show Registrant 3 entered into business with Chau by allowing him to open his initial VIP room to operate his business in their Macau casino in 2007. Ultimately, it is believed their casinos provided the platform for some of Chau's largest VIP operations. VIP rooms provided an ideal environment for large-scale money laundering, evading China's currency controls, and other financial crimes.

109.    Chau was a globally dominant figure in the junket and VIP room industry, supplying major casino groups—including U.S. registrants Registrant 3, Registrant 1, and Registrant 2—with a steady stream of high-stakes gamblers. While casinos often used multiple junket operators, Chau's operations came to control 45 to 50 percent of the market, making his VIP rooms a key driver of the casino groups' explosive growth.

110.    Chau's client/business partner base was extensive and included many EY-audited companies. At the height of his operations, his business partners included major U.S. gambling brands like Registrant 3 (EY client), Registrant 6, and Registrant 8 as well as large Asia-based groups such as Listed Company 7, Registrant 1 (EY client), Registrant 2 (EY client), Listed Company 6, Listed company 1 (EY client), Crown Resorts (EY client through 2020), and Star Entertainment (EY client), many of which were publicly listed in the U.S., Hong Kong, or Australia. In addition, Chau owned a significant stake in and controlled the gambling operations

of Private Company 1 (owned by Company 3, an EY client), a private Vietnamese casino resort, and held control over the Company 4 casino in Vladivostok, Russia and other companies.

111.    Chau's rapid growth and increasing public visibility in the junket and VIP room industry ultimately attracted scrutiny that should have been considered by EY. In 2019, investigative journalism in Australia[19] revealed that Crown and The Star—both publicly listed casino operators audited by EY—had for years maintained business relationships with junket operators, including Chau and his company Suncity Group, known to have ties to Chinese organized crime. Chau and his associate Cheng Ting Kong were identified in the regulatory investigations as senior members of one of the largest organized crime groups in Asia, the 14K Triad.[20]

112.    From 2021 through 2024, Plaintiff Howie shared the media, videos, regulatory investigation links and excerpts and other information as he raised these concerns internally at EY to Kane, Hohl, Paulson, Doyle, Savage, Salisbury, Cuppersmith and others, noting that Chau's high roller business represented a material portion of Crown and The Star's financial performance, which EY audited. He noted similar material links to the Registrants and other clients.

113.    Howie provided information showing the criminal links and significant business relationships that should have been known to EY leadership and teams in APAC and the U.S. previously. He also questioned why EY was still connected, or at least why this was not appropriately acknowledged in the PACE forms, audit approach, and filings. For example, in September 2020, public investigations confirmed that Chau had been identified by AUSTRAC,

---

[19]    See 60 Minutes Australia, "EXCLUSIVE: Crown Casino Exposed. Sex trafficking, drugs, money laundering | 60 Minutes Australia" (Jul. 28, 2019), https://www.youtube.com/watch?v=9PuHjyny9lE&ab_channel=60MinutesAustralia (last visited Jan. 8, 2025).

[20]    See United Nations Office on Drugs and Crime, "Casinos, Money Laundering, Underground Banking, and Transnational Organized Crime in East and Southeast Asia: A Hidden and Accelerating Threat," (Jan. 2024), https://www.unodc.org/roseap/uploads/documents/Publications/2024/Casino_Underground_Banking_Report_2024.pdf (last visited Jan. 8, 2024).

Australia's top Anti-Money Laundering and Terrorist Financing regulator, as a Politically Exposed Person ("PEP") with a substantial criminal history in 2017. As a result, AUSTRAC sought information from Crown about their internal assessment of Chau.[21]

114.    These investigations also revealed that Crown, like others seeking probity information, ran Wealth-X searches around the same time which indicated that Chau had a criminal history and links to the 14K Triad. Despite these revelations, Crown and the other EY clients in business with Chau all failed to disclose their involvement with Chau in their filings. Further, EY failed to take issue with what Howie believed were fraudulently deceptive disclosures across the clients involved. Moreover, EY decided to maintain Chau-controlled companies and those closely connected to him and other organized crime figures as audit clients, even after their links to organized crime became increasingly irrefutable.

115.    Further, Howie noted to EY leadership that EY accepted the audits of Family A's controlled Registrant 1 linked to Chau. EY also accepted the audits of two companies Chau controlled, Listed Company 4 (after PricewaterhouseCoopers resigned) and Private Company 1, all in 2017. In 2018, EY supported the IPO of Registrant 1's subsidiary, Registrant 2, including by reauditing prior periods, thereby avoiding the need for prior auditor, Deloitte ("DT"), to consent.

116.    In a follow-up to earlier messages about Family A and Registrant 1, Howie emailed Paulson in 2022, raising concerns that the IPO disclosures were inadequate, noting, in part: "I did a quick flip of the [NAME REDACTED] IPO F1 in 2018 … I found no disclosure/mention/assessment of [NAME REDACTED]'s reputation, Suncity business relationships, or other adverse media, which again was significant at the time …."

---

[21]    See Independent Liquor and Gaming Authority of NSW, "Inquiry Under Section 143 of the Casino Control Act 1992 (NSW)" (Sep. 29, 2020), https://www.liquorandgaming.nsw.gov.au/__data/assets/pdf_file/0016/1042126/29_September_2020_-_Transcript_for_Day_33. PDF (last visited Jan. 8, 2025).

117.    Around the time EY was becoming more involved with Chau, other institutions were distancing themselves from him. In 2018, the Hong Kong Jockey Club barred Chau from membership, citing in an internal security report that "Suncity clearly involves a number of criminal enterprises…hidden in more obscure legitimate businesses."[22] Chau was further linked to numerous high-profile organized crime figures, including his mentor Wan Kuok-koi ("Wan"), also known as "Broken Tooth Koi," a senior member of the 14K Triad. [23] Wan served a prison sentence in Macau and was later sanctioned by the U.S. government in 2020 for his criminal activity.

118.    Ultimately, the business relationships maintained by Crown and The Star with Chau and other Chinese organized crime groups facilitated the expansion of transnational criminal activity within Australia. These relationships enabled organized crime to move beyond casino-based money laundering and drug trafficking into broader national security concerns, including espionage, a VISA fraud scandal, and attempts to gain illicit political influence. Public reporting also implicated Chinese President Xi Jinping's nephew, further escalating diplomatic tensions between China and Australia.

119.    Public reports, including those shared by Howie from the Australian investigations, indicate that Chau began his criminal career as an "enforcer" for the 14K Triad under the leadership of Wan, who later established Chau in the junket and VIP room business before serving a prison sentence. Chau was subsequently linked to numerous high-profile criminal figures and

---

[22]    See Independent Liquor and Gaming Authority of NSW, "Inquiry Under Section 143 and 143A of the Casino Control Act 1992 (NSW)" (Aug. 31, 2022), https://www.nsw.gov.au/sites/default/files/2022-09/Review%20of%20The%20Star%20Pty%20Ltd%2C%20Report%2C%20Volume%202.pdf (last visited Jan. 8, 2025).

[23]    See The Wall Street Journal, "The Elusive Crime Boss Linked to Billion-Dollar 'Pig Butchering' Scams" (Dec. 29, 2024), https://www.wsj.com/world/china/china-mafia-broken-tooth-wan-kuok-koi-online-fraud-scam-70c09afb?st=ATRCS4 (last visited Jan. 8, 2025).

organizations, including the Sam Gor syndicate, one of Asia's largest drug trafficking networks, with ties to a wide range of serious criminal activity extending beyond his convictions in Macau.

120.    Howie provided EY with further evidence of Chau's criminal network. He provided reports that funds from the 2016 Bangladesh Central Bank cyber-heist were traced to Suncity accounts at EY client Listed Company 1's casino in the Philippines; links to a $40 billion money laundering operation in Australia; the smuggling of oil to North Korea in violation of sanctions; and associations with cyberfraud syndicates[24] operating out of Cambodia's Sihanoukville Special Economic Zone (another EY client). All of this material was relevant even after Chau's arrest because EY maintained relationships with companies he controlled. Further, EY was not correctly reassessing its audit approach (past and present) or properly assessing the extent of failings of its clients' AML and other programs. Nor was EY reassessing the implications on disclosures, controls, and management integrity for clients involved.

121.    As one example, given the volume of public reporting and official government records detailing Chau and Chan's criminal ties, it beggars belief that the casino groups that partnered with them could sincerely support attesting that their AML programs were adequately designed or effectively operated, if they permitted Chau and Chan to pass properly conducted probity checks and conduct such large-scale illegal activity within EY clients' casinos. Law enforcement agencies worldwide have long connected the junket and VIP room industry to organized crime in Asia. So, that part of the business is known to be high-risk for money laundering and other illegal activity. Chau and his associates were readily identifiable as members or affiliates of these organized crime groups through government sources and even basic online research, years

---

[24]    See Royal United Services Institute for Defence and Security Studies, "North Korean Activity in the Casino and Gaming Sector: How Do Jurisdictions Respond?", pg 8 (Sep. 2024), https://static.rusi.org/north-korean-activity-in-casino-gaming-industry_0.pdf (last visited Jan. 8, 2025).

before their arrests.

122.    As early as 2014, mainstream media in Australia reported on the connections between high rollers, junket and VIP room operators, and organized crime.[25] These reports identified key figures and detailed criminal ties in the joint venture between Crown Resorts and Registrant 1. Chau's Suncity Group and its owners were specifically flagged for links to Mafia organizations.

123.    Howie noted to Savage that at Crown, EY's non-audit fees were multiples of the amount they charged Crown as audit fees, which could further indicate compromised auditor independence. Howie showed EY leaders other red flags that had been readily available to APAC leadership and the audit teams. The presentations he provided noted that whistleblowers and industry executives also raised concerns consistent with his own media and regulatory findings, specifically warning about the involvement of organized crime groups in Macau casinos, including EY clients, and identified Chau and his business partner and pointed to their roles in junket and VIP room operations.

124.    Howie repeatedly alerted EY leadership to these issues in an effort to persuade the Firm to act ethically and in accordance with its legal obligations. From the start and subsequently, he specifically recommended that EY terminate its relationships with clients alleged to be under mafia control, including Registrant 1, Registrant 2, Private Company 1, and others.

125.    Beginning in June 2021 and continuing through 2024, Howie emailed Kane, Paulson, Hohl, Cupersmith, Salisbury, Savage, and others and held discussions with them

---

[25]    See Crime Inc., "High Rollers High Risk" (Aug. 30, 2015), https://www.youtube.com/watch?v=ckF7SwTEFrg&ab_channel=KathlineSol (last visited Jan. 8, 2025).

emphasizing the integrity concerns in the information he provided as well as the misleading disclosures and statements made by these clients.

126.    For example, in one email sent to Paulson, George, Millings, Savage and others, Howie noted: "The extent of the alleged association with organized crime both on their own and through Chau raises significant integrity issues for Party 1 and his companies, making it difficult to overcome for purposes of the audit as well as raising questions about why EY should associate its brand with him." In another email in 2023 responding to Paulson regarding a discussion with Kane to remind him again about the organized crime links across the client portfolio, Howie noted, "The extent of the links raise significant integrity issues for all of the clients involved."

**E.    EY's Response Prioritizes Commercial Interests Over Professional Obligations and Ethics Even When Presented with Overwhelming Evidence of Large-Scale Criminal Involvement by Publicly Traded Clients and EY Itself by Proxy**

127.    In response to raising these concerns, EY downplayed the issues and sought to rationalize EY's and its clients' involvement with Chau and other organized crime-linked figures. They characterized the concerns as unproven media allegations, dismissed the extensive regulatory investigations in Australia or arrests in Macau as speculative or politically motivated, and incorrectly asserted that no relevant parties had been arrested, despite multiple convictions already having occurred.

128.    Howie continued to express concern about how this information and other Risk COE information, especially involving NOCLAR allegations, was being treated in EY audits. By way of example only, Howie noted that Alvin Chau was a significant shareholder and exercised operational control over Private Company 1, an EY audit client that owned a resort and casino in Vietnam. On June 22, 2021, Howie emailed Jay Paulson adverse media reports on Chau, including excerpts from the Crown regulatory investigation, which identified Chau as a member of the 14K

Triad. Paulson forwarded the information and asked Howie to raise these concerns with Private Company 1's lead audit partner, Anthony Le Duong ("Duong"). However, despite the evidence presented, neither Paulson nor Duong agreed to exit the client relationship.

129.    Afterwards, Howie reviewed the Private Company 1's continuance memo dated July 10, 2021, attached to the PACE report, which outlined the audit team's response to adverse media flagged by Howie and the Risk COE. The audit team dismissed the media and regulatory investigation findings by writing, "we assessed that the news does not provide any evidence about the allegations that Mr. Chau is linked to organized crime which [is] in the past and currently has been refuted by Suncity and Alvin."

130.    Upon reviewing the memo, Howie informed Paulson, Hohl, Savage, and others that the memo failed to substantively address the underlying allegations, lacked appropriate NOCLAR audit responses, and relied excessively on management representations from the very clients accused of close criminal ties. Despite the extensive evidence and regulatory warnings, Paulson, APAC Risk Management Leader Claire Cardno ("Cardno"), APAC Accounts Leader Walter Tong ("Tong"), APAC Assurance Managing Partner Mike Wright ("Wright"), and APAC Managing Partner Pat Winter ("Winter") approved the continuation of EY's relationship with Private Company 1 and Chau, just five months before his arrest.

131.    Ultimately, Private Company 1's audit team was recklessly negligent in executing the audit, including through deficient procedures to address the NOCLAR, fraud risks, and regulatory compliance risks for AML and other matters. EY's leadership, including the PPD group, were recklessly negligent for failing to provide proper oversight and monitoring of this team and other teams of clients linked to the Mafia groups; facilitating the teams' failures to comply with professional standards; and for their approving to continue with clients with severe integrity issues.

132.    Howie performed a similar review of Registrants 1 and 2's related audit memos and confirmed similar conclusions. Knowledge of the criminal links and the severity of the deficiencies noted in these and other materials resulted in EY being a cause of the registrants' and others' securities laws violations, including potential violations of SOX-covered securities laws. Howie reported that this was a common failure by audit teams and PPD among the clients identified. As a result, Howie again expressed his concerns and disappointment in how the teams and Firm leadership were responding to Risk COE findings to Paulson, Hohl, Larsen, Savage, Vaughan, and others.

133.    On July 28, 2021, Howie and Larsen provided an STC project update to the Global Risk Management Executive Committee ("RMEC"). He provided a presentation document and discussed results of STC's evaluation and the Risk COE's work to date, including missing risks in PACE and his findings around the Mafia-connected and other high-risk clients. He noted in part, "We have audit clients with strong links suggesting involvement in or association with organized crime, state capture, criminal activity, etc. with no risk rating change/acknowledgement and no mechanism to accumulate them or monitor."

134.    On November 2, 2022, Howie emailed Paulson and George about Registrants 1 and 2 as part of a Global Watch List update. In that email, he stated: "I continue to believe we should exit these given the findings and implications for owners/execs…The founder, Party 2, was on US DOJ and Canadian law enforcement lists as far back as 1988 for Triad associations…[Registrant 1] loaned Chau's girlfriend $11.7mm in early November 2021 before his arrest later that month so it appears they had a relationship beyond the casino business…I did a quick flip of the [Registrant 2] IPO F1 in 2018….I found no disclosure/mention/assessment of Party 2's reputation, Suncity business relationships, or other adverse media, which again was significant at the time…."

43

135.    Shockingly, EY continued its relationship with Company 3 and other Chau-controlled companies even after Chau's arrest, despite additional allegations linking the other principal Private Company 1 shareholder, Family C, to organized crime and Chau's transfer of control to Suncity's Chief Investment Officer, a move likely to preserve the existing criminal network. After Chau's arrest, in an unfortunate effort to justify their continued relationship with these clients, EY leadership, including Paulson, began arguing that any links to organized crime were no longer relevant because Macau casinos had ceased using junket and VIP operators. At the same time, they inconsistently claimed that Chau's arrest was not dispositive of the issue, since he had not yet been convicted. None of them felt compelled to require independent NOCLAR investigations by third parties into how the casino group clients could justify their relationships with Chau. Nor did EY leadership investigate the extent of these and other involvements with Chau, Chan, or other reputed members of organized crime, including that they maintained relationships with Chau and Chan up until the time of their arrests despite widespread coverage of their criminal ties for years.

136.    Howie repeatedly emphasized that Chau was merely an example and his arrest did not resolve the underlying integrity concerns, audit scope deficiencies, or misleading disclosures by the various clients identified. He stressed this was especially true for clients like Registrant 1 and Registrant 2, where supporting evidence indicated control by Family A, who had a longstanding history of direct involvement with organized crime members and groups.[26]

---

[26]    See State of New Jersey Department of Law and Public Safety, "Special Report of the Division of Gaming Enforcement to the Casino Control Commission on Its Investigation of MGM Mirage's Joint Venture with Pansy Ho in Macau, Special Administrative Region, People's Republic of China" (May 18, 2009), https://www.nj.gov/oag/newsreleases10/031710-DGE-Report-MGM-Macau-Joint-Venture.pdf (last visited Jan. 8, 2025).

137.    Additionally, Howie stressed that the client risks also impacted Registrant 3 and other EY clients that had partnered with individuals that EY knew or should have known were members of organized crime. In fact, Howie reported that Registrant 3 partnered with Chau to establish the initial Suncity VIP room at Registrant 3's subsidiary in Macau in 2007, shortly after the casino opened.[27] Thus, Registrant 3 had significant ties to Chau from the time Registrant 3 entered the Macau market.

138.    As noted above, Registrant 3 also had significant ties to Family A through the gaming subconcession (gaming license) it granted Registrant 1 to operate in Macau, and Family A was connected to Chau in multiple ways. Chau had significant relationships with Family A through VIP arrangements with Registrants 1 and 2, Listed Company 7, and others, joint investments in the Philippines, an investment in a casino in Russia, and other nations.

139.    From 2021 through 2024, Howie continued to raise concerns about EY's connections to organized crime not only to Kane, Paulson, Hohl, Millings, Larsen, Savage, and others, but also directly to Salisbury and Cupersmith, the U.S. partner overseeing the Registrant 3 audit and EY's Global Gaming Leader. On November 26 and December 5, 2021, shortly after Chau's arrest, Howie emailed Cupersmith articles detailing Chau's criminal ties and highlighted Chau's involvement with Registrant 3 and other EY clients, including Private Company 1. Howie expected Cupersmith to recognize the severity of the issues and intervene.

140.    In his emails to Cupersmith, Howie clearly stated that, "Some of the article[s] online note Suncity ran junkets and VIP rooms in Macau at [Registrant 3] and others that may be in our client base. The relationship raises considerations for continuance, risk reassessment,

---

[27]    See State of NSW, "Review of The Star Pty Ltd: Inquiry under sections 143 and 143A of the Casino Control Act 1992 (NSW)" (Aug. 31, 2022), https://www.nsw.gov.au/sites/default/files/2022-09/Review%20of%20The%20Star%20Pty%20Ltd%2C%20Report%2C%20Volume%202.pdf (last visited Jan. 8, 2025).

potential audit approach changes, etc. including risk from this business. Suncity was mentioned in the prior Crown and The Star regulatory investigations in Australia along with others ICW money laundering and organized crime links."

141.    Afterwards, Howie spoke with Cupersmith and reiterated his concerns. In response, Cupersmith acknowledged his awareness of the issues but downplayed the significance of Chau's involvement with Registrant 3, characterizing it as a routine customer matter related to accounts receivable collectability. Howie disagreed, stating that Chau's long-standing business relationships with Registrant 3 and other casino clients raised serious integrity and compliance (e.g., BSA/AML) concerns. As suggested to Paulson, Hohl, Savage and others, Howie told Cupersmith that EY should leverage what was being learned in the Crown and The Star investigations as the Firm considered the other clients connected to organized crime. Unfortunately, Cupersmith, Salisbury, and others in the U.S. were noncommittal as to actions they would take in response to these issues.  Therefore, given the information available to him and his dual role as Global Gaming Leader and lead partner on the Registrant 3 audit, Cupersmith continued to act with reckless negligence in issuing unqualified audit opinions on Registrant 3's financial statements and on the effectiveness of its internal controls, and to allow those to be included in filings that contained materially misleading disclosures and hid significant compliance deficiencies, including anti-money laundering and regulatory failures. Cupersmith, Salisbury, Paulson and others in the EY PPD group also failed to properly monitor, provide oversight, or take appropriate action across EY's broader casino client portfolio, particularly regarding the audits of U.S. Registrant 1, Registrant 2, and Registrant 3. Instead, Cupersmith continued to approve his and other teams' faulty risk assessments and continuance of these relationships in PACE.

142.    Howie showed Kane, Spiekman, Doyle, Savage, and other EY leaders that investors

and others repeatedly raised concerns about Registrant 3's ties to Chau, Suncity, and other junkets linked to organized crime. However, Registrant 3's founder and its management consistently denied these connections, falsely emphasizing strong AML compliance programs. In fact, they even suggested that the Triads were not at all organized crime groups, claiming "…they're not gangsters or bums, they're businessmen."[28] At the time, U.S. law enforcement openly objected to Registrant 3's attempts to downplay the risks the Triads presented.

143.    Ultimately, Registrant 3 failed to correct the misleading disclosures upon Chau and Chan's arrests and convictions. Instead, they simply claimed that they had ceased using junkets/VIP operators. However, their 2023 disclosures revealed that Registrant 3 has started using junkets/VIP operators again, which Howie also noted as a concern within EY. Registrant 3 did not disclose whether it conducted an internal investigation or whether it changed controls as a result of its VIP arrangements or other involvement with Family A (including Registrant 1 and Registrant 2), Chau, Chan or others. It is believed a proper independent investigation of the NOCLAR allegations was not required by EY nor conducted by Registrant 3 in the relevant periods.

144.    During discussions, EY offered as a potential mitigating factor that many in senior management at Registrant 3 resigned or have been replaced in connection with other matters after Chau's arrest. However, the current CEO of Registrant 3 was on the Board of the Macau subsidiary at relevant times, as were certain current Board members of the Macau subsidiary. So, despite senior management turnover, key members of management and the Board who would at least have been aware of its involvement with Chau, Chan and others at the time have remained in place.

---

[28]    See The Guardian, "How China's Macau crackdown threatens big US casino moguls" (Apr. 23, 2015), https://www.theguardian.com/world/2015/apr/23/how-chinas-macau-crackdown-threatens-big-us-casino-moguls-sheldon-adelson#:~:text=%E2%80%9CIn%20Macau%20there%20is%20an,of%20the%20casino%27s%20official%20oversight.%E2%80%9D (last visited Jan. 8, 2025).

145.    Even after the public arrests of key business partners, Registrant 3, Registrant 1, and Registrant 2 failed to disclose the associated risks or update federally required financial statements and related filings. Further, these omissions were materially misleading given that the overall revenues and stock price of Registrant 3, Registrant 1, and Registrant 2 dropped significantly after Chau and Chan's arrests and analyst and others' discussion of their connections.

146.    By 2024, all of Chau's appeals had been denied, eliminating any remaining argument that the charges were unproven. Chau was convicted on more than 100 counts, including membership in an organized crime group, illegal gambling, illegal online gambling, and money laundering. He was fined $3.2 billion and sentenced to 18 years in prison.

147.    In addition to Chau, Howie informed EY that Levo Chan, the owner of the second-largest junket and VIP room operator was also involved with multiple EY clients, including Registrant 3. Chan also served as CEO of HK-listed EY client, Listed Company 6, which operated several casinos on behalf of Listed Company 7, the company controlled by Family A.

148.    Ultimately, Chan was also convicted for similar crimes as Chau, including being a member of an organized crime group. He was sentenced to 14 years in prison in Macau.

149.    After Howie detailed the extensive connections between multiple EY clients and organized crime, Kane refused to collaborate with Howie to ensure EY exited these relationships or took proper audit actions to address the NOCLAR risks and integrity implications. Instead, Kane reiterated his longstanding stance since early 2022, which was to stop investigating it and leave the matter to EY's GCO group.

150.    Unfortunately, Kane ignored Howie's repeated concerns that it was not GCO's role to ensure audit compliance or quality assurance. Thus, despite GCO's alleged involvement since 2021, EY neglected to appropriately address the NOCLAR implications in its audits and falsely

continued issuing clean opinions on misleading filings. Howie had and has reason to suspect GCO's actions form a pattern of behavior which undermines compliance and audit quality. EY's GCO seemed to him to be more focused on concealing and/or being willfully blind to current and prior year issues to avoid or minimize liability rather than supporting EY's gatekeeper responsibilities.

151.    In response to Howie's continued, well-founded concerns about EY's connections to organized crime, Kane issued directives directly to Howie during meetings on or about October 28, 2023, and January 21, 2024 to suppress further exposure of EY and its clients' links to criminal activity. Specifically, Kane demanded that Howie immediately stop all investigations and presentations related to these publicly traded clients' ties to organized crime.

152.    Additionally, in direct retaliation for repeatedly expressing his concerns regarding EY and their clients' criminal ties, Kane threatened Howie with loss of his Risk COE leadership role by pressuring him to take a non-leadership position on less significant matters.

### F.    EY and Its Clients Benefitted from Their Connections with Organized Crime at the Expense of their Investors

153.    Junket and VIP high roller operations, which Chau and Chan helped expand, were material to the casino group clients and investors. Increased high roller activity boosted stock prices before the arrests, motivating Registrant 3 and other public clients to work with Chau and Chan despite the legal risks. Executives at Registrant 3, Registrant 1, and Registrant 2 profited millions from revenue growth driven by high roller activity tied to Chau, Chan, and other Mafia-linked junket operators.

154.    In contrast, investors lost over $1.5 billion in market capitalization following Chau's arrest and the public revelation of his Mafia ties.[29] However, these losses were even greater if measured from 2019, when media coverage in Australia increased exposure of Chau's criminal links.

155.    Aside from the significant financial loss to investors, allowing organized crime to control public companies undermines U.S. capital markets and falsely legitimizes bad actors. This allows them continued access to U.S. banking and capital markets, which fuels drug trafficking, human trafficking, fraud, cybercrime, and money laundering on a massive scale. These risks underpin AML, KYC, and audit disclosure requirements that EY ignored.

156.    Ignoring these integrity issues was extremely profitable for EY. Registrant 1 and Registrant 2 generated some of the largest audit fees for EY Hong Kong, while the Macau subsidiary of Registrant 3 also brought in substantial fees. Furthermore, Crown and The Star were major clients for EY Australia. Finally, when including other Mafia-controlled clients and facilitators, including EY client Registrant 7, which served as the lead underwriter for Registrant 1, Registrant 2, and others, across APAC and the U.S., the economic benefits to EY were significant.

###    G.    Laws, Rules, and Regulations Violated due to EY's Refusal to Address Connections with Organized Crime

157.    Due to EY's refusal to meaningfully address their clients' connections with organized crime, the casino group registrants' disclosures were materially misleading across multiple periods, affecting securities offerings and routine annual and interim filings such as S-1s,

---

[29]    This loss is measured conservatively, as it focuses just on pricing immediately before and after Chau and Chan's arrest in Macau. Investor losses are multiples of this if one considers the period from when Chau's criminal involvement became more prominent through the Australian press investigative reports starting in 2019. Registrant 1 related losses are even more severe than those of Registrant 3.

10-Ks, 10-Qs, F-1s, 20-Fs, and 6-Ks.

158.    By way of example only, Registrant 3 filed its 2020 10-K on February 26, 2021, without disclosing its involvement with criminal activity or the regulatory investigations into key business partners, Chau and Chan, in China and Australia. The filing also omitted the likelihood that law enforcement arrests and regulatory actions would curtail or possibly halt the VIP and junket arrangements that had driven significant revenue.

159.    Further, Howie believes Registrant 3 falsely claimed effective AML compliance programs and disclosure controls and internal control over financial reporting in their Form 10-Ks under Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934 for relevant periods. These violations also occurred in securities offerings that included or referenced the casino groups' annual and periodic filings, which contained fraudulent disclosures that misled investors by misstating or omitting material facts.

160.    Howie believes Registrant 1 and Registrant 2's violations would be similar with the added omission of disclosures related to its own history of links to organized crime. As such, he is concerned EY's casino group clients repeatedly violated Section 17(a) of the Securities Act of 1933 in connection with securities offerings and Section 10(b) of the Securities Exchange Act of 1934 in their routine annual and quarterly filings by providing misleading disclosures and omitting material information.

161.    These misleading disclosures demonstrated that the casino groups knew, or were recklessly negligent in supposedly not knowing, that they were facilitating criminal activity[30] by providing Chau, Chan and others' control over portions of their casinos and the ability to launder

---

[30]    See Reuters, "Suncity closes its Macau VIP gaming rooms after CEO's arrest" (Dec. 1, 2021), https://www.reuters.com/markets/europe/shares-macau-gambling-group-suncity-halted-second-time-3-days-2021-12-01/#:~:text=HONG%20KONG%2C%20Dec%201%20(Reuters,of%20the%20situation%20told%20Reuters (last visited Jan. 8, 2025).

funds and conduct other illegal activity for organized crime groups.

162.    Howie believes EY at least in part caused and abetted the Registrants' securities law violations and is concerned that EY has similarly violated SEC rules and regulations and engaged in professional misconduct by willingly issuing, and consenting to reissue, unqualified audit opinions and review reports over and despite the Registrants' inaccurate financial statements and control environment assessments. Howie also is concerned that the severity of the apparent violations involved could lead to EY being found in violation of laws in the US and multiple other jurisdictions, including laws related to AML and fraud, due to the Firm's practice of repeatedly and willingly allowing the filing of audit and controls opinions in securities filings that the Firm knew or was reckless in not knowing/ignoring that they were, misleading to investors and regulators.

**H.    Howie Reports Legal and Regulatory Violations to EY's Leadership**

163.    As detailed above, from 2021 through 2024, Howie repeatedly reported that the casino group facilitators, such as Registrant 3, were also in violation of U.S. securities laws because they materially misled investors by misstating or omitting material facts concerning their ties to organized crime and implications on their AML program controls and processes. Even after Chau and Chan's arrests, the casino group facilitators failed to update key disclosures or reveal serious compliance and control failures. Further, Howie noted EY's role in enabling these violations.

**I.    Howie Presses Kane To Deal with the Organized Crime Issues and Suffers Additional Retaliation**

164.    In the summer of 2023, Howie reported and complained to Savage that he no longer trusted assurances from EY leadership including Kane and Hohl, that GCO would appropriately address the legal violations he had raised. He also reported and complained that he had grown

frustrated with the Firm's continued inaction on these and other issues. ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████

165.    In the fall of 2023, while reviewing a draft presentation detailing organized crime links involving EY's casino clients, Savage remarked to Howie, "This is really bad." However, as the support for Howie's findings grew, Savage's support for advancing the issues waned. Howie felt Savage and GCO were attempting to suppress the information and undermine the credibility of Howie's research. Savage insisted on delaying disclosure until the material was fact-checked, which EY's India Forensics Partner and Risk COE Member Pawan Masand ("Masand") did with no substantive changes. Savage also involved members of the Risk COE team to "assist" with revising the presentation, but they removed much of the content. Savage also repeatedly changed his feedback regarding presentation format and claimed the materials were not ready to share with Kane, in an apparent attempt to delay escalation of the matter.

166.    Although Savage wanted to delay, Howie was concerned that another round of EY audit signoffs was approaching, particularly for U.S. registrants. In September 2023, he organized a call with Spiekman, Doyle, and Savage to present a slide deck titled ***"EY Clients with Involvement in or Close Association with Organized Crime or Criminal Activity."*** The presentation focused on criminal connections within EY's gaming industry client portfolio, the issues Howie had been raising since 2021. Spiekman and Doyle appeared hesitant to respond to Howie's concerns and stated that the matter would need to be addressed by Kane. Kane repeatedly delayed scheduling a discussion despite the urgency of the topic.

167.    Around October 28, 2023, Howie briefly presented the slide deck to Kane in a separate call. However, Kane was unwilling to engage in a full discussion and repeatedly attempted to shorten the meeting, in line with his prior behavior in 2021, 2022, and earlier in 2023 during preparations for the International Forum of Independent Audit Regulators ("IFIAR") meeting.

168.    During their call, Kane instructed Howie to leave the matter with the APAC GCO and stated that he would pass Howie's concerns on to relevant personnel. He also directed Howie to stop working on the matter and not to conduct any similar research regarding EY or EY client connections to organized crime without his explicit approval.

169.    Thereafter, Kane redirected the conversation by instructing Howie to reduce his involvement in Risk COE matters and instead shift the majority of his time to environmental, social, and governance ("ESG") work. This reassignment was clearly retaliatory because Howie had no prior experience with ESG engagements, which represented only a minor segment of EY's business, particularly in the United States. As such, Howie objected to the reassignment, but Kane laughed and responded dismissively. In fact, even after Howie identified more appropriate candidates for the ESG work, Kane and others rejected them.

170.    In response, Howie told Kane that he was not comfortable leaving the matter with the APAC GCO, given that the issues had persisted for years and EY continued to maintain client relationships and issue audit opinions without making any disclosure changes.

171.    Howie also conveyed his suspicion that EY's APAC leadership was well aware of the criminal connections. He told Kane a retired founding member of EY Hong Kong served on the boards of Registrant 1 and Registrant 2, and that a former EY Australia partner had served on the board of Crown. Howie informed Kane of EY connections across the current partners involved as EY partners overlapped with multiple clients that were allegedly controlled by organized crime

groups and that one of the partners was also linked to Registrant 12, a client with suspicious growth, public allegations of money laundering, and that was on the Risk COE's suggested watchlist for the past several years.

172.    Howie reminded Kane that U.S. Registrants, including Registrant 3, were involved and that unfortunately, despite Howie's repeated requests, EY's U.S. practice had consistently refused to place Registrant 3 on the "global watch list" to avoid added scrutiny and monitoring. Instead, EY continued to issue unqualified audit opinions on Registrant 3's consolidated annual financial statements and allowed them to be included in filings from 2007[31] through 2024 that did not disclose their established ties to organized crime groups and falsely disclosed controls and processes that were compliant with AML program requirements.

173.    After the call with Kane, Howie shared his concerns about the discussion with Doyle and Savage. Specifically, Howie expressed to Doyle and Savage that he did not trust EY GCO to appropriately deal with the situation and that he was very concerned that EY continued to issue unrevised audit opinions on these problematic accounts, including Registrant 1, Registrant 2 and Registrant 3. Howie also noted that the Risk COE continued to circulate media reports detailing Registrant 1 and 2 and Family A's alleged and apparent links to organized crime, yet EY maintained its business relationships with Registrants 1 and 2, Private Company 1, and other related clients without taking corrective action. Finally, Howie told Doyle that Kane's decision to reassign him to ESG was retaliatory.

174.    ███████████████████████████████████████

███████████████████████████████████████

---

[31]    For clarity, EY has been Registrant 3's auditor since 2006 and the VIP business arrangements started in its casinos in 2007. Although Howie's disclosures began in 2021, media, whistleblowers and other information about criminal connections was readily available to Registrant 3 and EY previously. EY's audit failures include not requiring the restatement of the years prior to 2021 to correct the misleading disclosures in those periods as well.



175.

176.

- 

177.    Thereafter, in response to Howie's updated January 2024 submission, Kane

directed Howie to stop investigating the connections to organized crime, to cease researching

similar concerns involving high-risk clients—a core responsibility of the Risk COE—and to refrain from discussing the matter further with anyone. He again instructed Howie to leave the issue entirely to EY GCO and threatened to reassign Howie to support ESG initiatives. Howie voiced his concern that the year-end audits for several of the clients involved were already well underway.

178.    However, Kane remained undeterred and continued his retaliatory campaign which culminated in EY's decision to remove Howie's duties, roles and titles at EY in late June 2024, and force his early withdrawal from the partnership in May 2025 for disclosing some of this same information in his OSHA filing.

179.    After his meeting with Kane, Howie updated both Savage and Doyle, but they too provided no assistance in getting EY leadership to address the concerns, despite the seriousness of the issues and Howie's repeated efforts to escalate them through appropriate channels.

180.    Even after Howie's detailed submissions to EY leadership in October 2023 and January 2024, EY continued to issue audit and internal control opinions on these problematic accounts, including Registrant 1, Registrant 2, and Registrant 3, that failed to disclose the companies' connections with organized crime and the related accounting and control implications, including the companies' false statements as to compliance with AML requirements and other impacts. EY's failure to conduct the proper NOCLAR and other procedures under PCAOB standards and knowing issuance of inaccurate financial statement and controls opinions across the relevant periods, all of which falsely stated the audit was conducted in accordance with the standards of the PCAOB, makes the Firm a cause of the Registrants' securities law violations and clear violation of SEC law, rules and regulations, including but not limited to, Rule 2-02(b)(1) of Regulation S-X.

### III.  FURTHER INFORMATION REGARDING EY CLIENTS TIED TO ORGANIZED CRIME AND HOWIE'S COMMUNICATIONS WITH EY LEADERSHIP ABOUT THE RISKS AND VIOLATIONS IMPLICATED

181.    In the fall of 2021, Howie compiled a list of client relationships identified by the Risk COE that may have potential involvement with organized crime, government corruption, bribery, fraud, and other illegal activity. The list included clients in a host of industries. █████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

182.    In January 2022, Howie presented these findings to Kane, Hohl, Watt and Vaughan to alert them to the problematic client relationships identified within the audit portfolio and to emphasize the urgent need for critical process and policy improvements to mitigate associated risks. By way of example only, below are just some of the high-risk clients he identified:

- **Isabelle Dos Santos and Angola's former President José Eduardo dos Santos** - EY audited Private Company 3 and multiple companies involved in the alleged multi-year, multi-billion dollar government corruption/state capture schemes in which Isabelle and her father controlled or were closely linked to stealing over $13 billion USD from the Angolan government. After her father lost power and died, Isabelle was subject to a worldwide asset freeze, sanctioned, and on law enforcement's most wanted list. EY client

Private Company 4 and its subsidiaries (e.g., Private Company 5) were also heavily involved.[32]

- **Kudakwashe Tagwirei and President Emmerson Mnangagwa in Zimbabwe** - Companies audited by EY were used in derivative trades and other government corruption/state capture transactions with these men and others that contributed to the collapse of Zimbabwe's economy. EY client Private Company 4 and its subsidiaries (e.g., Private Company 5) were also involved.[33]

- **Private Company 4/Private Company 5/Global** - A Swiss client with a long history of charges and large settlements for bribery, government corruption, environmental crimes, fraud, and other misconduct around the globe, including high-profile scandals in Angola (Dos Santos), Zimbabwe (Tagwirei), Brazil (Petrobras), and Mexico. EY has a long-term relationship with Private Company 4 (non-audit) and Private Company 5 (audit and non-audit) through the present.

- **Registrant 1/Registrant 2-** As detailed above, Howie provided extensive supporting evidence indicating that these companies were controlled by Family A, who had a longstanding history of direct involvement with members of organized criminal groups.

- **Listed company 4 –** The founder of this Hong Kong-listed company was convicted of financial statement fraud and was reported to be running the company from prison through his family. It took more than a year after the Risk COE notified leadership before EY exited the audit, yet EY continued to maintain a non-audit relationship. The founder was also linked to Family A who were reported to have helped launder his money through casinos prior to the founder's arrest. Listed company 4 was also connected to Registrant12.

- **Private Company 6 –** This EY client is alleged to have been involved in a large-scale scheme to fuel opioid sales which helped drive the crisis in the U.S. EY has kept them as a private client for

---

[32] See BBC, "Isabel dos Santos: Africa's richest woman 'ripped off Angola'" (Jan. 19, 2020), https://www.bbc.com/news/world-africa-51128950 (last visited Jan. 8, 2025). Financial Times, "Trafigura paid $390m in share deal with Angola's 'General Dino'" (Sep. 27, 2021), https://www.ft.com/content/a9698d07-1c4f-4642-8218-70d43a87d20a (last visited Jan. 8, 2025). Africa News, "Angola: '$24 Billion lost under Dos Santos' says president Lourenco" (2020), https://www.africanews.com/2020/10/12/angola-24-billion-lost-under-dos-santos-says-president-lourenco/ (last visited Jan. 8, 2025).

[33] See Financial Times, "The offshore hive of Zimbabwe's 'Queen Bee'" (Jul. 2, 2021), https://www.ft.com/content/af8f3546-1b9b-40f1-afb1-5e7ce3b011da (last visited Jan. 8, 2025). Financial Times, "Inside a murky Zimbabwean mining hive" (Oct. 4, 2021), https://www.ft.com/content/70aa5b83-a043-49c7-98f7-7171ab5c8663 (last visited Jan. 8, 2025).

many years, including before and after the crisis became public, after significant adverse media and bankruptcy proceedings indicated severe issues with the ethics and integrity of the founding family.

- **Listed Company 4** - EY stepped in to be the auditor of Listed Company 4 in 2021. At the time of acceptance, it was known that members of the group's founding family (senior executives) were being charged with war crimes by the Swedish government. The alleged crimes were abhorrent, including being complicit in the Sudanese government's slaughter, rape and torture of thousands of Sudanese people and the displacement of hundreds of thousands of individuals, all to secure oil production rights.

- **Private Company 7** – This client is one of the largest online live porn streaming businesses in the world, with an electronic payment processor all based in Europe. In 2021, given the nature of the business, Howie noted to Heller, Hohl, Paulson, and others that it was highly unlikely the audit team would be able to sufficiently evaluate whether human trafficking or AML violations were involved. EY ignored these concerns for years, before the relationship with the client ended in 2023.

183.    Howie discussed and reported to members of EY's leadership and senior management that these relationships indicated a systemic problem and demonstrated that EY auditors and leadership showed a broad lack of skepticism and objectivity when faced with high-risk clients and NOCLAR. Based on the analysis completed and their own experience, others involved with the STC projects shared his views and assisted in drafting or reviewing the presentations.

184.    ████████████████████████████████████████████

████████████████████████████████████████████

████████

- ████████████████████████████████████████
████████████████████████████████████████





- 

- 

- 

- 

185. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

186.    In addition to the foregoing, additional examples of unidentified or ignored client risks and deficient audit responses provided by Howie between 2022-2024 included the below list of current and former clients, among them high-profile names under sanction or involved in extensive efforts by global law enforcement:

- **Riad Salameh, Banque du Liban, Byblos Bank, Bank Audi and related banks in Lebanon** - EY's audits of the Central Bank of Lebanon (Banque du Liban or BDL) through 2018 allegedly failed

to detect a multibillion-dollar fraud scheme—now estimated at $8 billion—and the embezzlement of hundreds of millions of dollars by the central bank's governor. Key audit failures reportedly included the lack of physical verification of BDL's largest assets, such as gold reserves, and inadequate scrutiny of round-trip transactions involving related parties. Despite these red flags, EY rated the engagement as low risk through 2018. Deloitte served as joint auditor. Both firms are now under investigation.[34] The collapse of BDL was a major factor in the 2019 meltdown of Lebanon's financial sector, which led to depositors losing access to their savings, the collapse of the local currency, and over 80 percent of the population falling into poverty. The World Bank has described the crisis as one of the worst economic collapses globally since 1850. The governor's assets have been frozen in multiple countries. Additionally, EY continues to audit several Lebanese banks—such as Byblos Bank and Bank Audi—that have been cited by Swiss courts for allegedly helping the governor launder and conceal the stolen funds.

- **Sihanoukville Cambodia Special Economic Zone** – EY audits entities linked to the Special Economic Zone (SEZ) in Sihanoukville, Cambodia, a region widely reported as a hub for global online scam operations run by organized crime groups. These operations have relied on forced labor and have generated billions in illegal profits, according to United Nations crime reports and multiple media investigations. Recent reports include the rescue of over 100 Indian nationals held in slave-like conditions.[35] The SEZ and related entities have also been tied to Chinese organized crime figures, including "Broken Tooth" Koi, Alvin Chau, and others.

- **Listed company 2** - Numerous allegations of large-scale stock price manipulation, financial statement fraud, government corruption, and

---

[34]    See The National News, "New fraud allegations hit Lebanon's central bank over $8 billion scheme" (Apr. 9, 2024), https://www.thenationalnews.com/news/mena/2024/04/09/lebanon-central-bank-fraud-allegations-8-billion/ (last visited Jan. 8, 2025). The National News, "Embezzlement at the Lebanese central bank: Did auditors overlook alleged fraud?" (May 15, 2023), https://www.thenationalnews.com/mena/lebanon/2023/05/15/embezzlement-at-the-lebanese-central-bank-did-auditors-overlook-alleged-fraud/#:~:text=At%20least%20%24326%20million%20worth,to%20Salameh%20and%20his%20relatives. (last visited Jan. 8, 2025); U.S. Department of the Treasury, "Joining Partners, U.S. Treasury Sanctions Former Central Bank Governor of Lebanon and Co-conspirators in International Corruption Scheme" (Aug. 10, 2023), https://home.treasury.gov/news/press-releases/jy1687 (last visited Jan. 8, 2025).

[35]    See United Nations Office on Drugs and Crime, "Casinos, Money Laundering, Underground Banking, and Transnational Organized Crime in East and Southeast Asia: A Hidden and Accelerating Threat" (Jan. 2024), https://insightcrime.org/wp-content/uploads/2023/08/Casino_Underground_Banking_Report_2024_compressed.pdf (last visited Jan. 8, 2025). The New York Times, "They're Forced to Run Online Scams. Their Captors Are Untouchable" (Aug. 28, 2023), https://www.nytimes.com/2023/08/28/world/asia/cambodia-cyber-scam.html (last visited Jan. 8, 2025).

bribery involving Listed company 2 and related companies have been raised by Hindenburg Research and mainstream investigative media. In 2023, an EY employee expressed serious concerns and sought to resign over these issues. DT did resign. Instead of reevaluating its position, EY expanded its relationship with Listed company 2. This occurred despite an active DOJ investigation into bribery involving both Listed company 2 and former EY client Registrant 4. During the audit, EY identified multiple issues that corroborated key aspects of the short-seller allegations, yet the Firm proceeded to issue an unqualified audit opinion.

- **Registrant 5** – Registrant 5 became an SEC registrant through a SPAC controlled by an EY client - [Party 1] of Registrant 1—who has reported ties to organized crime. Short-sellers and investigative journalists have alleged significant financial statement fraud within Registrant 5. The company has responded by using law enforcement in Vietnam to arrest or intimidate critics. Despite these serious allegations, EY issued audited financial statements for 2023 and 2024 before the claims were fully investigated. Ongoing inquiries have uncovered evidence that corroborates several of the fraud allegations. Internal EY teams, including Forensics, raised additional concerns, including before the initial 2024 opinion was issued. For example, revenue was recorded from vehicles supposedly sold to third parties that were simply moved to public parking lots, such as bus stations. A warehouse manager confessed to the scheme but implausibly claimed to have acted alone. There are indications that some of this information may have been known to Registrant 5's internal audit teams before the audit opinions were issued. EY was aware of deficiencies in its audits, including that they were issued before the work was completed. Discussing the PCAOB inspection of EY's work for the 2023 audit of Registrant 5, members of the Global QEL group noted the PCAOB "did not catch the [Registrant 5] fraud risk response and journal entry work issues." Howie raised concerns to Larsen, Savage and others about Registrant 5's revenue accounting, noting allegations in the media in January 2024. EY issued the opinion in April 2024 despite the incomplete work. Later in 2024, it restated to correct revenue errors but did not admit to fraud. These circumstances raised serious doubts as to whether proper skepticism was applied, whether fraud was present that EY ignored, and whether it falsely issued unqualified opinions or provided consents prior to the completion of fully assessing the NOCLAR and other matters raised both internally and externally. Controversy continues around Registrant 5, with deaths from the use of its product in the US and a whistleblower exposing significant, unsafe design and

manufacturing    flaws    and    further    allegations    of    fraud.

- **Registrant 9** – In 2024, Howie raised multiple concerns about the Registrant 9 audit to Doyle, Savage, and EY Americas Vice Chair – Professional Practice, Katrina Kimpel ("Kimpel"). Drawing on his prior experience in EY's U.S. Central Region PPD group, Howie noted Registrant 9's history of whistleblower allegations involving potential NOCLAR issues and advised that prior complaints may be connected to current issues. He also flagged concerns about the audit partner, citing concerns of a pattern of insufficient skepticism and objectivity. As reported, the DOJ is also actively investigating Registrant 9 for alleged financial reporting fraud, including misstated segment disclosures. He circulated relevant articles internally to the group, including short-seller allegations that Registrant 9 made misleading disclosures about links to forced labor in China and environmental violations. In early 2024, Registrant 9 filed with a correction of its segment information. However, by the fall, the company announced a restatement of the same periods for similar issues, amid a broader DOJ investigation. The Registrant 9 audit represents another instance of poor audit quality at EY, particularly in failing to exercise professional skepticism regarding NOCLAR matters and control implications. Howie's recommendations were apparently not followed, raising further concerns about EY's diligence and its potential involvement in the underlying misstatements. EY appeared to be overly accommodating to Registrant 9 in downplaying the significance of the first correction filed that later had to be restated. Public reports indicate the DOJ is also reviewing EY's role in the whole matter.

- **Private Company 2** – Howie and the Risk COE raised serious concerns about the background of key board and executive team members at Private Company 2, including one individual who served as the chief money launderer for the Ferdinand Marcos regime in the Philippines. This individual admitted in court to helping launder more than $5 billion in stolen government funds for Marcos, whose regime was responsible for widespread human rights abuses, including torture, killings, and political imprisonment. Howie emailed the Area PPD team re Private Company 2 as well as the team working on the US IPO, "While there are other findings on the company and key execs, the most significant finding involved the Executive Chairman, [NAME REDACTED]. Articles show he was the key banker over many years that aided former Philippine dictator Ferinand Marcos and his wife Imelda, in stealing, laundering, and hiding money and assets from the country. He testified to this in an immunity deal to avoid prosecution." Yet, the APAC Area PPD member responded with "…it's probably cleanest

to drop the really old stuff," requesting Howie delete that information from the Risk COE presentation forwarded. Howie declined. Despite the severity of [NAME REDACTED]'s conduct and its long-lasting impact on the Philippine economy, EY continued to support Private Company 2's planned U.S. IPO, pointedly (and notably) dismissing the concerns as "old news." However, given the significance of the criminal conduct, it would be difficult to properly overcome the integrity issues raised.

187.    After Howie's meeting with Watt in 2022, Watt informed EY Global Managing Partner Andy Baldwin ("Baldwin") about the legal issues and risks Howie identified. Watt later emailed Howie that, "Andy [Baldwin] confirmed (I didn't forward the deck) there needs to be a business lens applied to the recommendations, which is what I expected he'd say…" Thereafter, Baldwin contacted Global Assurance leader Marie-Laure Delarue ("Delarue"), who became upset that the information had been presented outside of the Assurance practice despite its direct relevance to firmwide risk management and compliance obligations. Delarue contacted Kane, who in turn called Howie and expressed his frustrations that Howie was broadcasting these issues to key leaders within the Firm.

188.    On November 10, 2022, Howie also shared his presentation with Eric Spiekman to solicit his support and discussed the issues as part of his on-boarding to replace Hohl. To Howie's knowledge, Spiekman took no actions to ensure the matters were appropriately addressed and failed to follow-up until Howie arranged meetings to discuss the matter further in 2023.

189.    Howie repeatedly brought these issues to EY's attention to implement a formal policy and framework for assessing high-risk client relationships, exiting existing engagements that posed serious concerns and legal/regulatory risks to the Firm and the clients' shareholders, preventing the acceptance of similar clients in the future, and establishing special monitoring protocols to ensure that appropriate personnel were involved and that audit procedures were tailored to address the unique risks presented.

## IV.    EY REFUSES TO ADDRESS HOWIE'S CONCERNS ABOUT LISTED COMPANY 2 AND REGISTRANT 4 AUDITS

190.    On September 9, 2022, Howie shared a Bloomberg article with Kane, Hohl, Savage, Global Quality Enablement Leader Ira Fitlin ("Fitlin"), and Isabelle Tracq-Sengeissen ("Tracq-Sengeissen") about allegations that Listed Company 2 was inappropriately awarded government contracts and engaging in greenwashing.

191.    Thereafter, Howie and the Risk COE team repeatedly raised serious concerns to senior EY leadership about the Listed Company 4 audits, including the lack of a properly scoped, independent investigation, inadequate responses to NOCLAR issues and audit findings, and numerous red flags related to management integrity. The Risk COE team also placed Listed Company 4 on a list to monitor for further action. However, these warnings were consistently ignored.

192.    On January 24, 2023, well before the March 31 deadline to submit their audit opinion on Listed Company 4 and affiliated companies, Howie emailed senior EY leadership,

including Kane, Spiekman, Hohl, Heller, Savage, Larsen, and Fitlin, a report from U.S.-based short seller Hindenburg that detailed serious allegations of fraud involving the relevant Listed Company 4 companies. The report accused Listed Company 4 and affiliates of market manipulation through undisclosed related party stock transactions, including offshore entities. These entities allegedly traded Listed Company 4 and affiliates shares to artificially inflate stock prices, enabling the controlling family to borrow against the inflated value.

193.    That same day, Howie emailed Savage that they "should suggest to Bernard [Heller] that the team run doc authenticity [a proprietary technology tool designed to identify potentially fake or altered documents], JEFRA, etc. and plug in forensics since the report triggers NOCLAR. This one will get ugly, but we should have a very complete response it seems. The green energy sub is on the watch list and it and maybe others tripped the zombie or debt lists."

194.    Shortly after the Hindenburg report was made public, Listed Company 4 and affiliated companies' share prices collapsed, with estimated losses exceeding $92 billion in market value within a week. The scale of the decline and Hindenburg's strong track record drew widespread media attention and raised serious concerns about investor harm.

195.    In June 2023, Howie provided senior EY personnel, including Heller, Spiekman, Fitlin, Larsen, and Savage, with a set of articles and reports indicating that U.S. regulators were actively reviewing Listed Company 4 and affiliates and its disclosures to U.S. investors. Howie also informed them that Norges Bank, one of the world's largest institutional investors, had placed Listed Company 4 affiliates on its ethical exclusions list due to findings of human rights violations.

196.    DT served as the auditor for several entities affiliated with Listed Company 4, but resigned in 2023 following the publication of the Hindenburg report. Before resigning, DT issued a qualified opinion on the entity it audited, citing concerns over related party transactions and the

company's refusal to provide an independent investigation into serious allegations.

197.    In contrast, EY issued unqualified opinions that did not warn investors of the potential harm. In fact, EY India even expanded their audits to include other affiliated companies of Listed Company 4 in 2023. Given the nature and scope of the NOCLAR allegations, Listed Company 4's refusal to mandate an independent investigation should have constituted a scope limitation for EY too or at least, a qualification of the auditor's opinion similar to DT.

198.    EY's failure to do so was not appropriate under the circumstances. Howie raised these concerns to Hohl, Savage, and others after learning that the EY India audit team and PPD were not requiring an external investigation. Further contrasting EY's approach with DT's, Savage noted in discussions with Howie that the EY India audit team had even allowed key parties associated with Listed Company 4 management to draft part of its audit opinion language discussing the government investigation into the company. This was a highly inappropriate display of EY's lack of independence and itself an apparent violation of relevant standards and regulatory requirements concerning audit reports to be used in publicly filed financial reports.

199.    After the publication of the Hindenburg report until Howie's removal in June 2024, Howie shared investigative articles and raised audit strategy concerns during calls with leadership including Kane, Hohl, Spiekman, Doyle, Savage and others. India's securities regulator, SEBI, also launched an investigation and the Financial Times published further articles detailing suspected fraud by Listed Company 4 and/or affiliated companies, including coal transaction irregularities and a secret paper trail that corroborated key parts of Hindenburg's allegations.

200.    In fact, throughout 2023 and 2024, Howie repeatedly raised legal and regulatory issues involving Listed Company 4 and affiliated companies with EY leadership including Hohl, Doyle, Kane, Savage, Larsen and others. By way of example, Howie told Savage and Hohl that

issuing opinions for the Listed Company 4 and affiliated companies in 2023 without a proper external independent investigation was not appropriate.

201.    Additionally, during the 2023 audit, Savage informed Howie that EY's forensic team discovered Listed Company 4 management had provided falsified documents in response to audit procedures designed to test specific allegations. Using EY's Document Authenticity Tool (DAT), the team found that documents submitted by Listed Company 4 and affiliates to support certain transactions had actually been created after EY requested them. However, when EY confronted management about the falsified documents, management responded by adjusting the financial statements to remove the specific transactions identified to mislead auditors and conceal fraudulent reporting. Howie was shocked the audit team would accept this without raising the resulting serious integrity issues and audit implications, which posed legal and regulatory risk to the Firm and, Howie believed, placed EY in violation of SEC regulations and laws and applicable auditing standards and codes of conduct. Savage too was frustrated but was familiar with the approach, saying it was "India's playbook to unwind bad [fraudulent] entries [discovered in the audit] and leave it at that."

202.    Furthermore, Pawan Masand, a member of EY Forensics and the Risk COE, provided assistance to EY India's forensic and audit teams on the Listed Company 4 and affiliated engagements and identified undisclosed related party revenue transactions. Some of these transactions appeared to involve funds that round-tripped back to Listed Company 4 and affiliated companies. These findings were separate from, but consistent with, the Hindenburg report's allegations regarding fabricated revenue. Kane, Hohl, Heller, Savage, and others were aware of these issues.

203.    As a result of these issues, Howie would periodically remind Global PPG and Savage of EY's obligations under SEC Regulation 10A which imposes mandatory reporting responsibilities on independent auditors when they uncover illegal acts during an audit. In response, Savage dismissed Howie's concerns.

204.    Despite EY's attempts to undermine their reporting obligations, Howie told Savage that EY's failure to appropriately handle the Listed Company 4 and affiliates' audits would demonstrate that no meaningful progress had been made since the Wirecard failure and would expose the Firm to severe legal and regulatory consequences. In response, Hohl expressed frustration with Howie's continued concerns and said he had reviewed the 2023 Listed Company 4 and affiliates audit approach. However, Howie reiterated that EY's approach to the Listed Company 4 and affiliates' audits was inadequate, citing the lack of an independent investigation, fake documents provided to the audit team, undisclosed round-tripped revenue and unresolved management integrity issues.

205.    Ultimately, Hohl said it was EY India's decision and mentioned tensions with EY Global after Project Everest (i.e., EY's attempt to split the Firm's audit and consulting businesses into two separate entities) collapsed. Notwithstanding, Howie urged escalation to the Global Executive, stressing that EY Global had the authority and responsibility to hold EY India accountable for their inadequate audit response in this high-profile situation. Both Hohl and Howie had discussed agreements between EY Global and its network member firms that gave EY Global the ability to force compliance with policy and professional standards on member firms under the threat of removal from the network (this was also disclosed in EY's annual Transparency Reports). Howie also told Hohl that if things had changed such that EY Global's position was now to act only as an advisory body, the Firm was obligated to inform regulators and update public

72

documents, including the Transparency Reports, to reflect that in contrast with the Firm's current marketing concerning EY Global's oversight role.

206.    On January 3, 2024, Howie had a similar conversation with Doyle in which she noted broader issues with the U.S. and Firm in general saying that EY seemed to operate different at the global level than the other Big 4 firms, especially after Project Everest's collapse. Doyle said EY Global now seemed to be deferring all client matters to member firms. In response, Howie also told Doyle that if EY Global had in fact become purely advisory at that point, EY needed to inform regulators and revise its Transparency reports, because this was not how EY previously presented itself, including in IFIAR discussions post-Wirecard and in its ISQM 1/SQM framework.

207.    On March 16, 2024, Howie emailed Doyle a Bloomberg article about a U.S. bribery probe into Listed Company 4, writing, "A truly independent investigation will be critical." A few days later, he followed up with another article noting that "the company is not coming across as very transparent," after the controlling shareholder for Listed Company 4 and affiliates and management shifted its narrative from initially denying any probe to then claiming it involved an unrelated third party, presumably referring to Registrant 4.

208.    In late 2024, the DOJ and SEC indicted the ultimate controlling owner and executives of Listed Company 4 and affiliates and others for conspiracy to commit securities and wire fraud, as well as substantive securities fraud. The charges stemmed from a multi-billion-dollar scheme to defraud U.S. investors and global financial institutions using false and misleading statements related to Listed Company 4 —one of several affiliated entities audited by EY.

209.    The indictment included direct evidence such as phone messages and photographs describing bribe arrangements and communications between the ultimate controlling beneficiary

of Listed Company 4 and related executives discussing a U.S. government subpoena and a DOJ investigation, while at the same time they denied the existence of any investigation to underwriters and investors during a debt offering. The indictment also charged former executives of Registrant 4 along with former employees of Private Company 8, a Canadian institutional investor, with conspiracy to violate the Foreign Corrupt Practices Act in connection with a bribery scheme orchestrated by the ultimate controlling beneficiary of Listed Company 4 and related executives related to one of the world's largest solar energy projects. Listed Company 2, Registrant 4, and Private Company 8 were all EY clients in relevant periods.

210.    However, well before the indictment, EY also knew that their client, Registrant 4, faced significant allegations, including whistleblower claims regarding bribery of government officials by its executives. In fact, Howie raised concerns with EY leadership about its associations and approach to that NOCLAR situation prior to its resignation from the engagement. Furthermore, even after EY resigned, Howie also raised concerns that in Registrant 4's SEC filing regarding EY's resignation, EY failed to adequately inform investors of the Firm's concerns.

211.    As part of those discussions, Howie reiterated EY's obligations under SEC Regulation 10A, particularly in audits where management was resisting cooperation. Further, Howie noted that EY India's 2021 PACE form for Registrant 4 documented serious management integrity concerns, including alleged bribery of government officials. As a result, certain EY India partners recommended resignation from the engagement. However, EY India leadership replaced those partners, switched the engagement to another EY India member firm, and continued the client relationship. This was also the case on the ultimate controlling beneficiary of Listed Company 4, as reported in a Bloomberg article.

212.    However, EY India's judgment may have been impacted by conflicted government relationships with respect to Listed Company 2 and its affiliates and Registrant 4. There were allegations that SEBI's Chairperson had connections to the same entities those controlling Listed Company 4 allegedly used in questionable transactions.

213.    Ultimately, some Listed Company 2 and affiliated entity board members were reportedly hesitant to provide EY with standard representation letters in the form typically required. The board revised EY's usual language to make it less explicit regarding their knowledge of the allegations and related matters. EY is understood to have accepted diluted representations.

214.    After EY issued its 2024 audit opinion, those controlling Listed Company 2 appeared to have been validated and it and others were admitted to the India Market Index, expanding its investor base, which boosted its stock price. Howie told Savage that inclusion in the index would trigger automatic purchases by index funds. He noted that had EY properly fulfilled its audit responsibilities, Listed Company 2 and affiliates might not have qualified for index inclusion. At one point during their discussions, Savage remarked to Howie that meaningful change at EY would likely require regulatory intervention, such as action from the SEC or PCAOB, suggesting he believed internal reform alone was unlikely or would be insufficient to resolve these issues.

## V.    EY's BROADER HISTORY OF FAILED AUDITS AND UNETHICAL CONDUCT

215.    The unethical and unlawful conduct described herein reflects a broader, longstanding pattern at EY. This is indicated by repeated high-profile audit failures, missed frauds, compliance breakdowns, and a culture marked by unfair and retaliatory treatment of employees who speak out and raise violations, particularly in writing and after being told to quiet down. The following examples illustrate that these issues are not isolated but part of a systemic problem

spanning many years. EY's termination of the Plaintiff and other whistleblowers for engaging in protected activities also stands in stark contrast with EY's treatment of partners who have violated securities laws and professional standards resulting in significant legal and brand risk and exposing EY to disreputable conduct which is prejudicial to EY's interests, as detailed below.

216.    In 2010, after the collapse of Lehman Brothers ("Lehman"), the New York Attorney General alleged that EY helped Lehman manipulate its balance sheet by approving the removal of tens of billions of dollars of debt near quarter-ends, making the firm appear less leveraged than it was. EY later agreed to pay $10 million to settle the case. Separately, EY agreed to pay $99 million to resolve a class action lawsuit brought by investors who alleged that EY's audit reports enabled Lehman to conceal material financial information. The lead partner on Lehman at the time of its collapse also served in a leadership role in EY's banking and capital markets group and later was assigned to lead the high-risk audit of Deutsche Bank. See Reuters, "Ernst & Young settles with N.Y. for $10 million over Lehman auditing," (Apr. 15, 2015), https://www.reuters.com/article/us-ernst-lehman-bros/ernst-young-settles-with-n-y-for-10-million-over-lehman-auditing-idUSKBN0N61SM20150415 (last visited Jan. 8, 2025).

217.    In 2016, the SEC took an enforcement action against EY for negligence in the auditing of Weatherford International plc ("Weatherford"). The SEC found that "Ernst & Young engagement personnel did not understand the basis for the dividend exclusion adjustment each year and failed to seek sufficient competent evidential matter to discern the purpose, nature, and extent of the dividend exclusion adjustments and the related phantom income tax receivable on the financial statements.  Instead, oral representations by Weatherford's tax manager were the sole basis for Ernst & Young's conclusions that the dividend exclusion adjustments were reasonable . . . The audit team failed to take appropriate action in response to red flags regarding Weatherford's

evolving and inconsistent reasoning behind its dividend exclusion adjustments." Ernst and Young LLP and the professionals involved were found to have violated PCAOB standards and they and the Firm were considered a cause of Weatherford's securities law violations. The lead partner, Craig Fronckiewicz, was barred from appearing or practicing before the SEC. Despite the significant reputational damage caused by Fronckiewicz, EY did not dismiss him for cause. Instead, it allowed him to retire in 2021 – five years after the SEC order. See In the Matter of Ernst & Young LLP, SEC File No. 3-17628 (Oct. 18, 2016), available at https://www.sec.gov/litigation/admin/2016/34-79109.pdf.

218.    In January 2020, EY issued a "comfort letter" in connection with a stock and bond offering by Luckin Coffee Inc. ("Luckin"), stating to underwriters that there were no concerns with the company's financial results. Less than a month later, an anonymous report surfaced alleging inflated sales figures. EY initially assured Luckin's board there were no problems, but later discovered that approximately $300 million in revenue had been fabricated.

219.    In March 2021, EY settled a whistleblower retaliation case in the UK brought by former partner Amjad Rihan.[36] Rihan had raised serious concerns during an assurance engagement involving Kaloti, a Dubai-based gold refiner, where he identified indications of money laundering and gold smuggling. When he sought to transparently report these issues, including the client's lack of compliance, EY leadership intervened. After the client and Dubai authorities objected, Rihan's superiors revised the report to remove or soften the concerns identified. Rihan sued after being forced out of the Firm and ultimately prevailed in court, with the UK judge finding that EY had "repeatedly breached the code of ethics for professional accountants at the highest levels of management." See Rihan v. EY Global Ltd. et al., Royal Courts of Justice,

---

[36]    See Financial Times, "EY drops appeal against $11m Dubai whistleblower case" (Mar. 28, 2021), https://www.ft.com/content/515d6f73-928d-4fa2-82cf-01faf1d1e20c (last visited Jan. 8, 2025).

https://www.judiciary.uk/wp-content/uploads/2020/04/Rihan-v.-EY-Global-Ltd-and-others-Approved-Judgment-17-April-2020.pdf (last visited Jan. 8, 2022).

220.    In 2021, EY agreed to pay approximately $10 million to settle SEC charges that it violated auditor independence rules. The SEC found that EY partners compromised their objectivity by improperly influencing a public company's auditor selection process. A senior official at the company shared confidential information with EY, including competing firms' bids, undermining the integrity of the Audit Committee's audit proposal process. The SEC order barred one of the lead partners, James Herring, who was found to have engaged in unprofessional conduct, from appearing or practicing before the SEC. Despite the significant reputational damage caused by Herring, after the SEC Order, EY promoted him to be the Americas Value & Growth Leader, a senior markets leadership role responsible for driving the expansion of audit-related services (e.g. cybersecurity, initial public offering readiness) with EY's audit clients. EY allowed Herring to retire in 2024 – three years after the SEC order and nearly 10 years following his improper professional conduct. See Reuters, "Ernst & Young, auditors to pay over $10 mln to settle SEC charges," (Aug. 2, 2021), https://www.reuters.com/business/finance/ernst-young-auditors-pay-over-10-mln-settle-sec-charges-2021-08-02/ (last visited Jan. 8, 2025).

221.    In 2022, the SEC imposed a $100 million fine against EY, the largest ever levied against an audit firm, after regulators found that hundreds of its employees cheated on ethics exams between 2017 and 2021. These exams were required for obtaining or maintaining professional licenses. EY admitted that it falsely stated in a submission to the SEC that it had no current issues with cheating, despite having already received reports of potential misconduct. However, even after confirming that cheating had occurred, EY failed to update or correct its submission. As such, the SEC concluded that EY failed to take adequate steps to prevent or stop the misconduct. See

New York Times, "Ernst & Young to Pay $100 Million Fine After Auditors Cheated on Ethics Exams," (Jun. 28, 2022), https://www.nytimes.com/2022/06/28/business/ernst-young-sec-cheating.html. (last visited Jan. 8, 2022).

222.    As part of the settlement, EY was required to retain an independent consultant to investigate the roles of senior lawyers, executives, and compliance personnel in the Firm's failure to update its disclosure to the SEC. EY's U.S. General Counsel, Ann Cook, departed the Firm in August 2023, around the time the investigator's report was expected to be released. [37]

223.    EY's repeated audit and ethical failures, both past and present, demonstrates that the Firm has willfully abandoned its duty to serve the public interest. Instead, EY has prioritized commercial gain over its responsibilities as an independent gatekeeper, in clear violation of its obligations as a public accounting firm.

## VI.    EY US LEADERSHIP AND GCO DEMAND DELETION OF RISK INFORMATION FOR GLOBAL WATCHLIST AUDITS

224.    After Wirecard collapsed in 2020, EY initiated and has maintained a Global Watchlist ("GWL") process, intended to identify the highest-risk audit engagements in each country for heightened monitoring, panel review, and support, including from the Global PPD, Capital Markets, and Global QEL groups. However, EY leadership was concerned that regulators might focus on these same high-risk audits and knew their quality would not withstand regulatory inspection. So, EY intentionally withheld information about the GWL from its regulators. Despite inquiries from oversight bodies regarding how EY identified and monitored its riskiest audits, the Firm did not disclose and took deliberate steps to conceal the existence and operation of the GWL process.

---

[37]    See Financial Times, "EY's US general counsel quits" (Jul. 25, 2023), https://www.ft.com/content/82399d67-cda9-45bf-8164-6a3e0e433691 (last visited Jan. 8, 2025).

225.    Instead of disclosing the GWL to regulators, EY continued to represent that its "close monitoring" accounts were its riskiest audits, a limited set of engagements with largely known risks. Internal discussions and emails between Howie, Larsen, and others reflected concerns that the PCAOB might uncover the GWL, request the list, and scrutinize those audits. For example, in one email Larsen sides with Lam in the U.S. and acknowledges EY is not disclosing the GWL process to its regulators, writing, "We have not told our regulators about this-if we did, I'm sure it would be the first account they would want to look at…" For years, Howie urged Hohl, Larsen, Fitlin, and others that EY should stop hiding the GWL process and instead improve the process and quality of the audits so they could withstand regulatory scrutiny and be seen as a model of effective risk oversight.

226.    Starting in March of 2023, the Area PPDs, Global QELs and Risk COE discussed the planned approach to the GWL and FPI accounts for the 2023 program. From the beginning, consistent with prior years, the Americas PPD group was highly resistant to including the use of forensic professionals and tools or receiving Risk COE analysis on U.S. GWL accounts. They limited the number of U.S. accounts assigned to the GWL to a minimal number. However, they did not voice exception to the final plan presented in the fall by email or provide feedback in Area PPD meetings in December prior to the Risk COE GWL materials being distributed.

227.    ███████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████

228. ██████████████████████████████████

229. ██████████████████████████████████

230. ██████████████████████████████████

███████████████████████████████████████████

████████████████████████

231.  ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

232.  ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

233.  ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

234.    As GCO's intervention and pressure increased, on January 2, 2024, Howie again cautioned Doyle by emails that he "really want[s] to be careful GCO isn't overinfluencing." In response, Doyle stated that she understood his concern.

235.    

236.    

Through this time of increasing pressure and frantic action by EY leadership, it became even more clear to Howie that EY would go to surprising lengths to ensure that regulators did not see GWL information that highlighted client risks that may have been unaddressed, including NOCLAR, or anything that might enable regulators to critically evaluate audit team decisions.

## VII.    EY'S INEFFECTIVE ISQM1/SQM PROGRAM

237.    The International Auditing and Assurance Standards Board's ("IAASB") International Standard on Quality Management 1 ("ISQM 1") requires firms to design, implement, and operate a system of quality management to manage the quality of audits and other assurance engagements. Other firms consider the conclusions from a firm's ISQM 1 program when evaluating their ability to rely on the Firm's work over components/subsidiaries. Regulatory groups also consider the ISQM 1 program conclusions which are often published in the Firm's Transparency or audit quality reports. Publicly acknowledging deficiencies could harm a firm's

reputation and expose it to increased regulatory scrutiny or be used by attorneys pursuing litigation for audit failures. So, the overall conclusions have practical implications and are meaningful and considered by stakeholders, even more so for firms under scrutiny for poor quality in the past and touting marked improvements. The System of Quality Management ("SQM") is the actual framework or system utilized by EY to comply with ISQM 1.

238.    From 2022 to 2024, Howie expressed concerns that the Firm's ISQM1/SQM program was masking issues and lack of improvement in known areas under regulatory and other scrutiny. He noted EY's SQM had significant problems because inspections, testing, and internal feedback pointed to significant audit quality issues, control gaps, and evidence that remediation plans were not working sufficiently. As such, Howie informed EY leaders including Hohl, Doyle, Larsen, Savage, EY's Global SQM Monitoring and Analysis Leader Maggie Dennis ("Dennis"), EY's Global Client Assurance Partner Paul Steih ("Steih"), and EY Global & EMEIA SQM Operational Leader Christina Lopez Alverez ("Alvarez") that the Firm was failing to reach an appropriate overall conclusion about the effectiveness of its quality management environment, which could mean EY was knowingly providing false or misleading information to regulators and the investing public about the strength of its audit quality, the impact of its improvement initiatives, and the true effectiveness of its internal control environment. This would mean significant additional remediation costs would be required and would call into question leadership's commitment to audit quality and overall improvements.

239.    Unfortunately, Howie's concerns were ignored or left largely unaddressed and became an increasing source of animus and antipathy on the part of EY leadership against Howie until the time he was removed from his roles. A few of Howie's areas of concern are discussed below.

### A.    **Independence**

240.    Independence is key to auditors being effective gatekeepers. Auditors (both individuals and the firms) are required to be independent to perform an audit. All EY audit opinions positively state that the Firm is independent. Therefore, both audit and non-audit services professionals and teams are supposed to confirm both as individuals and for the Firm that the work being accepted is not in violation of independence rules applicable to EY's audit practice before engagements are accepted and can begin.

241.    For audit firms that faithfully try to comply with the independence requirements, this can be a significant barrier to sales and revenue growth for their non-audit service groups, like consulting and tax. Eliminating this barrier was an advantage noted behind EY's decision to attempt to separate its businesses through the IPO of consulting and other service lines under Project Everest from 2022 to 2023.

242.    Accurately confirming its independence requires the Firm to maintain global systems to hold complete and accurate lists of the clients EY audits, their subsidiaries and connected companies, and work performed, all marked to indicate the various types of independence restrictions, conflicts, auditor time on engagements for rotation requirements, etc. across the applicable jurisdictions. These systems are key to allowing individuals and teams to confirm personal and Firm independence requirements are met, including permissibility of work they plan to sell to properly evaluate independence compliance.

243.    In the fall of 2022, Howie, Larsen, and a small group were tasked with evaluating issues related to the Firm's independence. Their review identified serious problems with EY's independence compliance processes in key systems such as the Global Independence System ("GIS") and the Global Rotation Tool ("GRT"). These systems did not reconcile with each other

or with PACE. Further, the team found a substantial backlog—tens of thousands of discrepancies, particularly between GIS and PACE—that had remained unresolved for extended periods, in some cases for years. The relevant discrepancies also included a large number of entities in PACE, for which engagements had been approved, that were not included in GIS, such that if a person or team checked to see if there were restrictions, none would be listed (e.g., it might appear the service or involvement was permissible when it was not).

244.    After discovering these issues, Howie learned that several clear solutions to these problems had previously been rejected by EY leadership because they did not want to slow down the acceptance process for new or ongoing work. Leadership also resisted allocating sufficient budget or resources to resolve the problems and complete the independence evaluations timely.

245.    Notwithstanding EY's repeated insistence to ignore these system quality issues, Howie again proposed a simple change to the systems to not allow approval of an acceptance in PACE whenever an existing or prospective client was missing from GIS or there was an unresolved discrepancy between GIS and PACE (i.e., a STOP). This suggestion would have prevented acceptance or continuance of any work until the systems were updated, and the information and assessment of independence/permissibility of the work was complete. It would also require reconciliation between systems and a full independence assessment, promoting better monitoring. However, EY leadership repeatedly refused this request.

246.    By 2025, EY had still not allocated adequate resources or resolved the issues with GIS. For example, in January 2025, the U.S. Independence leader sent an email to U.S. partners writing, "GIS currently has approximately 20,000 unresolved action items; these unresolved actions expose you and EY to risk and can jeopardize the trust our clients have in us."

247.    In addition to the foregoing, another major problem Howie identified in ensuring independence compliance was EY's inability to produce a complete and accurate list of all clients for which it issues audit opinions, as well as a full inventory of the opinions themselves. This issue was made worse by EY's practice, especially in the U.S., of allowing audit teams to group multiple engagements under a single PACE form for approval without itemizing each entity and report. This practice resulted in major data gaps, including missing entities in GIS, and created opportunities for abuse. For example, audit teams could "group" impermissible engagements with those that are permissible, or group entities in a way that made it difficult to detect independence violations.

248.    To address the issue, Howie pushed for a change in the PACE policy to require either a separate form for each entity or, at a minimum, detailed listing of all relevant entities and reports within a single form in a structured format that would allow the missing data to be captured. However, the Americas Financial Services Organization ("FSO") PPD and others resisted even this basic step, arguing it would be too "burdensome" for audit teams to list all entities and reports, especially when large numbers were involved. Despite the clear risks, they offered no viable alternative, reflecting a troublingly lax attitude toward independence compliance.

249.    In 2022, on a call with Larsen and representatives from EY US, Howie told the group that EY "needed an end-to-end review of all independence issues, look at how they interrelate and build a plan on the total. Make sure all is included in communications to regulators, open kimono, not let people take a piece-by-piece approach." Howie told the U.S. representatives on the call that this should be conveyed to Denise Pelli. ██████████████████████

██████████████████████████████████████████

██████████████████████████████

250.    Howie suspected EY leadership had not supported robust independence systems and processes because it would hamper growth in non-audit services during the years leading up to when the Firm was trying to grow revenue to bolster its valuation in its IPO as part of Project Everest. Howie also suspected EY US was not transparent with the PCAOB or other regulators about the extent of its issues and did not appropriately assess the ISQM 1/SQM implications.

251.    On May 8, 2023, after more than six months without any agreement or consensus among EY leadership to meaningfully improve processes and controls around independence compliance, Howie escalated his legal, regulatory, and ethical concerns in an email to EY's Global Independence Leader Rich Huesken ("Huesken"), attaching a presentation outlining the findings and in the email outlining the aforementioned issues and requesting Huesken's assistance in driving further analysis and pushing for agreed solutions. In response, Huesken agreed to a meeting and acknowledged Howie's concerns. Although the information in the presentation largely came from members of Huesken's group, he expressed much of what it contained was "not something I have ever seen or heard." He also wrote "if there are 25,000 to 35,000 audits not listed in GIS then there are a very large number of audit partners that have signed off on audit opinions without the completed required audit program steps. I am not aware of Audit sanctioning any partner for that." This is revealing when noting the number of GIS issues still present as discussed in the Americas 2025 email referred to above. With respect to GRT, Huesken wrote "audit has never properly assigned sufficient resources to the development of the tool and has not properly trained either its local administrators or the service line professionals on the use of the tool." Howie was largely sidelined from the project shortly after sending that email and it moved forward primarily with Larsen in charge.

252.    A myriad of other important issues were also noted by Howie, including broad failures by non-audit professionals to correctly complete key information, improper use of subcontracting forms, and processes which avoided more robust independence processes and monitoring, among others.

253.    As a result of these issues, Howie repeatedly raised concerns between 2022 and 2024 in discussions with Kane, Hohl, the Area PPDs, Larsen, and others about EY leadership's refusal to address serious deficiencies in independence compliance. He emphasized that rejecting proposed fixes had significant ISQM 1/SQM implications and created an obligation to be transparent with regulators about the weaknesses in EY's compliance and controls. Howie also warned that this failure could render audit opinions misleading or even fraudulent, since each one positively asserts that the Firm is independent, something EY often would not have the proper basis to truthfully represent for all of its audits, given the state of its systems and failed oversight.

254.    Finally, Howie warned that these issues required not only immediate remediation but also a retrospective evaluation of their impact on prior audits. Despite these warnings, EY failed to act transparently or effectively.

255.    Thereafter, several high-profile audit failures—such as those identified in the NMC Health trial and recent UK Financial Reporting Council ("FRC") sanctions—have exposed longstanding independence and rotation violations, rooted in insufficient skepticism and objectivity.

256.    In fact, it was recently announced that Shell will amend its regulatory filings with the SEC for 2023 and 2024 due to partner rotation breaches that directly violated U.S. and U.K. independence rules.[38]

257.    These breaches occurred well after Howie and others had raised internal alarms to senior leaders, including Hohl and Huesken.

258.    Furthermore, whistleblower allegations from former EY tax partner Sayantani Ghose in 2022 had already highlighted red flags related to the Shell audit, including audit team bias and disregard for material tax concerns.[39]

259.    Ultimately, the Shell case underscores EY's pattern of retaliation against whistleblowers and willful neglect of independence safeguards, resulting in preventable regulatory breaches and reputational harm.

**B.    Client and Engagement Acceptance and Continuance ("A&C")**

260.    The A&C process is intended to ensure that high-risk clients or engagements are identified in a timely manner and are either not accepted or continued or are appropriately managed with added support and monitoring. Audit teams are required to assess and document relevant risks in the PACE system during audit planning, providing necessary information for reviewers and approvers to make informed A&C decisions. The response to these risks is then to be reflected in the team's audit approach.

---

[38]    See Financial Times, "EY broke US audit rules on Shell mandate two years in a row," (July 2, 2025), https://www.ft.com/content/3c64ed46-fc82-4ce3-ae63-7d26036e2cec?accessToken=zwAGOV8kom3Ikc88ZO1G_IJM49OuY30mA24s7A.MEQCIGaAXMXyetUloa1L9ue5PMLi0WYAbqJlMa1pttyj2-tZAiBCKzwrmjFAQVquzH3GtVZrWFA9AEXvVh6DJI1fwPOIwA&sharetype=gift&token=a5318be4-60ec-4ac1-a374-4cc7e3c10407 (last visited July 7, 2025).

[39]    See Tax Notes, "Former EY Transfer Pricing Partner Files Whistleblower Suit," (September 14, 2022) https://www.taxnotes.com/research/federal/court-documents/court-petitions-and-briefs/former-ey-transfer-pricing-partner-files-whistleblower-suit/7f3vd (last visited July 7, 2025).

261.    Howie served as the Global A&C/PACE Leader for Assurance until his unlawful removal in June 2024. In that role, Howie repeatedly communicated his conclusions that EY's A&C process is ineffective, especially as it relates to identifying high-risk clients. The Firm engaged in consistent and widespread violations of PCAOB Auditing Standard 2110, including failing to properly identify significant risks related to NOCLAR, such as elevated fraud risks, and failing to perform adequate risk assessments and responsive procedures. This was especially problematic for high-risk clients, where allegations with clear integrity implications were either ignored or inadequately addressed.

262.    As detailed above, these deficiencies resulted in the Firm servicing high-risk publicly traded clients who were allegedly members of organized crime groups; engaged in criminal acts; and/or facilitating criminal activity and noncompliance with regulatory requirements. Furthermore, the Firm compounded these violations by failing to qualify its audit opinions to identify potentially fraudulent or misleading disclosures made by clients in SEC filings and audited financial statements.

263.    As a result, Howie repeatedly alerted EY leadership about these failures, both in connection with specific engagements and as a systemic issue across the audit portfolio. By way of example only, as extensively detailed above, Howie presented detailed evidence to EY leadership—including Kane, Hohl, Watt, Paulson, Larsen, Millings and others—demonstrating that the Firm had knowingly accepted and continued engagements with clients facing credible allegations of money laundering, tax fraud, war crimes, government corruption and state capture, illegal activities for authoritarian regimes, and deeply embedded corporate corruption. EY's Leaders knew there were problems with EY culture and its impact on A&C controls. For example, in a discussion about inappropriate approval of high-risk audits and the need for a revised policy

91

to avoid enablement of crime, Watt noted that, "APAC and EMEIA have very thin Area RM teams…and they have a lot on already. There should be a perspective submitted to the AMPs about additional resources needed to support this…with so many signoffs sometimes I feel people sign off because everyone else did, and there is a lack of specific or shared accountability."

264.    However, the Firm continued to disregard these serious concerns, which prompted Howie to increase the pressure and escalate his concerns with more intensity to senior EY leadership in FY 24. As part of those efforts, he frequently pointed to data from the PACE Bias chart, an analysis maintained by the Global Quality Enablement Leaders ("QEL") Group and updated by the PACE team. For the past four years, this chart consistently showed that most EY member firms reported identifying little to no risk in their audit engagements. In fact, Howie observed that even U.S. audit teams frequently understated engagement risk in their PACE forms underscoring the unreliability of the data provided to regulators and used by the Firm for monitoring. This directly impacted EY audits, as the unidentified risks often corresponded to missing audit procedures, especially for fraud risks.

265.    In 2024, EY's Global Fraud Working Group observed the seriousness of the issues that remained even after all the efforts of STC after the Wirecard scandal. In a meeting, Larsen noted that, "We ran analysis on Canvas re who does and does not have a fraud risk (FR). Terrible answers. US was the biggest culprit with no FR… Our root cause [for quality issues and missed frauds] is lack of skepticism."  Other members of EY leadership admitted that the organization suffered from confirmation bias and needed outside help in learning to welcome and exercise skepticism in the audit function.

266.    In its review of EY's work on NMC Health, it has been reported by the UK's audit regulator, the FRC, that EY's audits "demonstrated a complete lack of skepticism." This has been

noted in multiple missed frauds and inspections. Yet, despite such prominent remonstrations, the Firm continued to fail to take action to fix it.

267.    For years, the PACE Bias chart offered further evidence that audit teams serving high-risk clients often exhibited little skepticism and as a result were failing to conduct appropriate risk assessments and were not accurately completing the PACE forms. This was significant because PACE data is used to monitor audit quality, determine inclusion on the GWL, support internal inspections, and may be shared with regulators to inform their risk-based inspection selections, making the integrity of this data critically important.

268.    In response to these identified deficiencies, Howie suggested several key improvements along the way to enhance the reliability of PACE and the quality of risk assessments, but these were rejected by Firm leadership. Instead, EY and PPD leadership under Doyle, promoted the implementation of a "Simplified PACE form," which shortened the process by asking fewer questions. At the same time, they launched a broader "PACE Rewrite" project. This initiative, sponsored by Verbeck, was largely focused on efficiency and cost reduction—specifically, minimizing audit team time spent on PACE by profiling engagements and cutting down the overall length of the form, again by removing approval escalations (even in the casino industry) and by removing questions that had been added for recognized fraud and other risks by Howie, Larsen and the STC project teams.

269.    In response to these newfound initiatives, Howie warned EY leadership that reducing the number of questions and the time spent on PACE would likely worsen an already ineffective process, further weakening risk identification and assessment and compounding existing issues with inaccuracy and incomplete data. However, Howie's concerns and reports were dismissed, overshadowed by leadership's focus on cost reduction.

270.    As a result of Howie's repeated complaints about these issues, beginning in January 2024, Doyle began holding meetings on A&C and PACE without including Howie, despite his role as Global PACE Leader. This exclusion was another clear act of retaliation, reflecting EY's unwillingness to acknowledge Howie's legitimate and continuing legal and regulatory complaints and concerns and the Firm's continuing deficiencies.

C.    **Audit Quality Reviews ("AQR")**

271.    EY's AQR program, which involves the internal inspection of completed audit engagements, is perhaps the most important monitoring program in EY's SQM. The AQR program utilizes an evaluation framework in which the inspection results of completed audits are categorized as: (i) compliant engagements with no areas for improvement identified ("1-rated audits"), (ii) compliant engagements with areas of improvement identified ("2-rated audits") and (iii) deficient engagements ("3-rated audits").

272.    The Firm's AQR program has been deeply flawed as noted by the PCAOB in their 2019 inspection report (dated December 17, 2020). Specifically, the PCAOB claimed that, "The inspection results indicate that the firm's system of quality control related to monitoring does not provide reasonable assurance that the firm's internal inspection program is suitably designed and is being effectively applied (QC20.20). The firm's internal inspection program is one of the firm's mechanisms to assess compliance with firm policies, procedures, and applicable professional and regulatory standards. The PCAOB reviewed five issuer audits that had also been inspected under the firm's internal inspection program. In two of these audits where that same areas were reviewed, the PCAOB identified Part I.A. deficiencies that were not detected by the internal inspectors."

273.    The ineffectiveness of the program is evidenced by the Firm's AQR results, which failed to reflect the same level of poor audit quality identified by the PCAOB. Specifically, the

gap between EY's internal AQR failure rates and the much higher PCAOB inspection failure rates highlights that the AQR program has not been effective in identifying audit quality issues.

274.    The discrepancy between the Firm's poor audit quality findings and the PCAOB's findings were part of ongoing discussions, including in the Global QEL weekly update meetings attended by Howie, Fitlin, Larsen, and the QEL group.

275.    For example, on July 12, 2024, during the Global QEL Weekly Update meeting, Larsen provided an update and noted that AQR results were showing a sharp increase in the number of "3"-rated audits in the U.S. compared to previous years. ██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

276.    Large gaps also were present between the Global AQR's minimal failure rates noted and elevated failure rates noted in inspections by the PCAOB. A simple comparison by key country shows Global AQR revealing minimal failures particularly problematic in countries where EY knew it had quality issues, such as China (e.g., AQR shows little compared to a PCAOB failure rate of 75% in the most recent 2023 inspection).

277.    Larsen said the Americas PPD and QEL leadership felt the elevated failure rates in the US AQR program were the result of its AQR teams now being too conservative and overstating the number of "3"-rated audits in the U.S. She noted that U.S. Quality and PPD leadership, including Kimpel, Salisbury and others, were also pushing back on the high percentage of "3"-

rated audits, and Larsen intended to assist their efforts by reviewing the list of "3"-rated audits to assess whether some could be downgraded to "2"-rated audits.

278.    In response to Larsen's comments about pushing to downgrade "3"-rated audits, Howie offered an alternative explanation for the rise in "3"-rated audits. For several years, EY US's AQR results showed significantly fewer failures than PCAOB inspections, yet much higher failures than those found within EY Global's AQR program. Therefore, Howie repeatedly challenged these discrepancies, questioning why EY had not previously scrutinized these results when EY US consistently produced unrealistically low failure rates despite clear quality concerns highlighted by the PCAOB and why EY Global consistently produced unrealistically low failure rates especially when compared to EY US's AQR program results. The different results could not be logically explained. Howie suggested that Firm leadership's tone on these issues and their desired approach was artificially suppressing the results by depressing the rigor of both the US and Global AQR programs.

279.    Howie suggested to Larsen that the increase now being experienced in "3"-rated audits might actually be a positive sign indicating that the US AQR program was becoming more rigorous, objective, and effective at identifying quality issues. Finally, Howie warned that EY US leadership's intention to review and potentially downgrade "3"-rated findings was inappropriate and posed a serious risk. He cautioned that retroactively challenging completed inspection conclusions undermined the integrity of the AQR process and set a dangerous precedent. He noted the importance of AQR to ISQM 1/SQM for the US and Global.

280.    Howie's concerns were later validated. ███████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

281.    The whistleblower also concluded and reported internally that the severity of the matters rendered EY's 2024 U.S. AQR program ineffective. They reported broader implications for EY's overall conclusion of its SQM program, considering the importance of AQR to the evaluation and the senior positions of D'Egidio, Kimpel, Salisbury, Kascmar and others and the other controls and processes they heavily influence. The whistleblower also noted these matters raised in 2024 indicated the conclusion in the 2023 US AQR program was inappropriate and held implications for SQM.

282.    The evidence the whistleblower presented to EY is believed to be comprehensive and irrefutable. Nonetheless, EY responded by attempts at intimidation and retaliation, ultimately forcing the whistleblower's early withdrawal from the partnership under onerous terms, similar to their actions against Howie. Displaying a pattern of behavior that has become common, EY appears to have taken no meaningful actions against the leaders involved in the unethical conduct the whistleblower reported.

### D.    "Root Cause" Process

283.    A properly structured and objectively administered root cause evaluation process is essential to supporting sustainable audit quality for clients, investors, and regulators. The integrity of the root cause analysis is crucial to identifying systemic weaknesses, enforcing accountability, and developing effective remediation. Critically, EY's root cause process must include a consistent

and documented assessment of leadership's role in any audit quality failure. It is understood that EY's process rarely identified leadership's contribution to audit quality failures.

284.    In the summer of 2023, Howie again provided specific examples and raised concerns that EY's ongoing ISQM 1 assessment process was materially deficient. He reported deficiencies across several key categories, including A&C, Independence, AQR, leadership Accountability, Risk Assessment, IT staffing, etc. He specifically questioned why known and significant deficiencies, including those identified herein, were not being adequately incorporated into the Firm's evaluation of its system of quality management.

285.    However, despite repeated internal reports, no appropriate action was taken to remediate or disclose these deficiencies because: (1) he was told by Hohl and others that these deficiencies were merely Howie's opinion; and (2) the Firm took credit for supposed <u>future</u> plans to address known deficiencies even though the issues in question involved ongoing risks, violations, and disclosure failures and had not been acknowledged as deficiencies with specific remediation plans assigned.

286.    Throughout 2024, Howie continued to raise concerns to senior leadership, including Hohl, Dennis, Steih, Larsen, Doyle, and Spiekman, regarding EY's improper treatment of known audit quality and compliance failures in its ISQM 1 assessments. He specifically challenged the Firm's assertion that it could rely on "future plans" to remediate existing deficiencies without first formally acknowledging the known deficiencies, assigning accountability, and defining and committing to a corrective action plan. However, despite the severity of Howie's concerns, EY failed to follow up with Howie to better understand or attempt to address these issues. Instead, they continued to falsely report that EY's SQM program provided reasonable assurance of audit quality across the network, with only minor exceptions.

E.    **Leadership Accountability Policy Failures**

287.    EY's global policy for leadership accountability for audit quality contains major design flaws. Back-testing revealed significant misalignment between region leaders' quality results and their performance ratings. It is understood that this misalignment also has resulted in minimal impact to leadership compensation for deficiencies in quality. Required approvals and documentation were often missing or untimely. In FY 2024, the Country and Region leadership accountability policy was not approved by the Global Executive (GE) until January 2024, six months into the fiscal year. This lag in approval was common in prior years as well. Fitlin confirmed the draft policy was submitted in April 2023, but approval was delayed before ultimately getting approved due to regulatory pressure.

288.    These issues were discussed on a January 15, 2024, Global Talent team call with Howie, Fitlin, Larsen, EY's Associate Director for the Global Assurance Talent Team Neil Fishwick ("Fishwick"), and Dilek Cilingir ("Cilingir"), EY Global Talent leader for Assurance Services (promoted to the Global Forensic & Integrity Services Leader later in 2024). Leadership accountability gaps were highlighted for at least 8 AMPs, 10 QELs, and 21 PPDs, many in the U.S. Further, during the call, Fishwick confirmed similar failures in the previous three years.

289.    Howie raised that these ongoing failures represented serious design and operational deficiencies under ISQM 1/SQM, especially concerning EY's work for publicly traded clients. Specifically, Howie identified the untimely approval of policy; failure to document misalignments; lack of performance-compensation linkage; and continued rejection of a meaningful leadership accountability model, including for country leaders and support services (e.g., IT, Tax, SaT). He continued to express the belief that this was a key root cause behind EY's audit quality and compliance issues.

290.    In response, Cilingir and Fitlin stated it was "too late" in the fiscal year to make changes, which was a repeated excuse used in prior years. As of June 30, 2024, major gaps remained in the leadership accountability framework, including no policy for Area leaders and no formal process for non-audit support leaders. Despite ongoing issues, EY still failed to acknowledge deficiencies in the leadership accountability framework.

## VIII.  **EY LEADERSHIP WAS WELL AWARE OF HOWIE'S COMPLAINTS**

291.    Howie raised specific, well-founded concerns regarding apparent legal and regulatory violations of federal securities laws and potential fraudulent activity by EY and its clients. He did so both formally—through detailed written complaints, presentations, and PowerPoint materials—and informally in numerous internal discussions. These concerns (only partially summarized here) were raised directly with multiple members of EY leadership and U.S.-based personnel, including but not limited to:

- **Adam Defour**, Global Capital Markets MD. Defour attended most calls with Millings on the same subjects of Howie's complaints discussed above.

- **Aime Allegro** - Senior Manager in the Global QEL Group. Ms. Larsen is based in the US and works closely with Diane Larsen. As such, she is intimately familiar with the conflicts between the EY US and EY Global and issues involving EY's AQR program, milestones, AQIs/metrics, staffing issues, and root cause problems.

- **Alan Millings,** Global Capital Markets leader. Millings was involved in the GWL process and received briefings and updates including in December 2023 on the organized crime matter from Howie as Registrant 1 and Registrant 2 are foreign private issuers and fall under his group's oversight. He was also alerted to Registrant 5 (another FPI) due to their links to Family A and Party 1. Millings also was involved and aware of concerns regarding EY client Registrant 12 in 2021 and later, including concerns that Registrant 12 was involved directly and indirectly with distribution of counterfeit products or other illegal goods and other activities.

- **Andy Baldwin**, former EY Global Managing Partner-Client Service (retired).  Baldwin was informed by Watt about an organized crime deck prepared by Howie and the issues it highlighted in January 2022.

- **Anke Kirchheim**, Germany Senior Manager and Risk COE member. Kirchheim assisted Howie with some of the research and preparation of materials on the organized crime matters, particularly in 2023.

- **Bernard Heller**, EMEIA Area PPD, stepped in as interim Global Vice Chair PPD in the Summer of 2024.

- **Bethany Lineberry,** Global PACE Administrative Leader in Watt's Risk Management Group involved in PACE issues including independence system differences.

- **Carlo Pippolo**, former America's Director of Region PPD (retired June 30, 2023). Pippolo regularly participated in meetings with Howie between 2020 and 2023 related to the Strengthening Trust and Confidence Initiative, Risk COE matters, Accountability efforts, and A&C/PACE projects. In these meetings, Howie consistently raised concerns about high-risk clients, including the need for policies to prevent acceptance of clients linked to organized crime, issues with the design and execution of EY's A&C process, and the U.S. firm's repeated failure to comply with key Global policies beginning as early as Summer 2021.

- **Carol Palmer-Winig,** experienced forensics partner in the US. Ms. Palmer Winig was involved in US NOCLAR client matters and interacting with PPD and the Assurance and Forensics leaders.

- **Catherine Vaughan**, Global FinCrime leader (in Watt's Risk group). In 2021, ███████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ Vaughan also received various updates on those subjects subsequently through 2024, including emails around an attempt by Howie to resurface the discussions on a policy and strategy to avoid enablement of organized crime.

- ██████████████████████████████████████████ ████████████████

- **Chris George**, APAC Area PPD (former Deputy until Paulson transferred out). George also received Howie's concerns on the organized crime matters in multiple years, including as part of the Global Watch List (GWL), including in 2022-2024. George also approved the PACE form and continuance decision for The Star casino in Australia during certain relevant

years. George was an Area PPD rep on the PACE working group for most years.

- **Dante D'Egidio**, Americas Vice Chair-Assurance. D'Egidio is familiar with the debate on Risk COE materials and decisions to take steps to avoid the PCAOB becoming aware of EY's GWL process and certain risks in the EY portfolio. ██████████████████████████████████████

- **David Kane**, Global Vice Chair of Professional Practice. Howie and Kane had multiple discussions on the above-discussed clients and other legally concerning topics ████████████████████████████████████████ Crucially, Kane, including in or around October 28, 2023, and January 18, 2024, **instructed Howie to stop investigating the organized crime matters and to stop communicating about them. On both occasions, Kane threatened to reduce his Risk COE role significantly and forced him to work on ESG matters instead, displaying retaliatory animus and showing him the implications if Howie did not comply and drop his complaints and concerns**.

- **Diane Larsen**, Global QEL starting July 1, 2024, previously the Deputy QEL. ████████████████████████████████████████ Larsen was also heavily involved in crafting the IFAIR discussion points, the Independence matters, and EY's data issues. ████████████

- **Eric Spiekman**, Global Deputy Vice Chair of Professional Practice (July 2023 forward). ████████████████████████████████████████

- **Ira Fitlin**, Global QEL, retired June 30, 2024. Fitlin took part in multiple discussions that included Howie about the presence of and risks posed by organized crime in the EY client portfolio. █████████████████████████ ███████████████████████████████████████████

- **Jay Paulson**, former APAC Area PPD. Paulson was heavily involved in most matters as the Global QEL and leader of STC, then as APAC Area PPD, ████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████ aulson was an Area PPD rep on the PACE working group for most years. ████████████████████████

- **Joanne Mayernik**, US Independence Group. Mayernik was involved in multiple discussions with Howie regarding Independence compliance issues, proposed changes to PACE, and related concerns involving high-risk clients. These included EY's failure to reconcile key Independence systems, leadership's refusal to implement a stop in PACE until data was complete and reconciled, and unresolved client information that raised legal and regulatory exposure.

- **Joe McGrath**, Americas Director of Regional PPD. McGrath participated in monthly A&C/PACE meetings throughout 2023 and into spring 2024, as well as Risk COE and Watch List discussions during FY 2024. These included the 2023 Year-End Watch List review, PACE modifications needed to address Independence concerns, and other meetings where Howie raised concerns about high-risk clients, Risk COE assessments, PACE control deficiencies, and Global Watch List (GWL) matters.

- **Joe Watt**, EY Global Risk Management Leader. █████████████████ ████████████████████████████████████████

- **Jonathan Wright**, who works for Vaughan in the FinCrime group, provided risk-related information on Alvin Chau and others for Howie to use in order to compare it to what he observed regarding the clients' and EY's apparent legal and regulatory violations and exposure, including violations, risk and fraud impacting investors in publicly traded companies that were and are clients of EY. Wright was informed of the matter and well aware of Howie being the person leading the charge on making these concerns known so they would be addressed and the risk to clients, EY, and investors could be addressed and mitigated. Howie was asked and

participated in FinCrime Steerco and other working group meetings arranged by Wright.

- 

- **Katrina Kimpel,** Americas Vice Chair Professional Practice.  Kimpel is familiar with the debate on Risk COE materials ██████████████████ ████████████████████████████████████████

- **Kurt Hohl**, Global Deputy Vice Chair of Professional Practice (retired June 30, 2023 but continued in Global PPD on a consulting basis). Hohl was Howie's main supervisor until Hohl's retirement. Therefore, Howie briefed Hohl on the violations and fraud issues concerning these clients many times right up until Hohl retired in 2023 and included him on emails and materials thereafter. ████████████████████████████████████████████ ███████████████████████████████████████████ nd subsequent discussions with Kane, on-boarding discussions with Eric Spiekman, Global Deputy Vice Chair of Professional Practice (who took Hohl's role July 2023 forward), and other relevant discussions and meetings. Hohl, Dennis and Howie discussed the organized crime and other key Risk COE and PACE matters, including  as part of Howie's concerns around deficiencies in controls and his certification of "PACE" controls in the summer of 2023. Hohl also showed indifference and hostility to Howie's concerns, including those around the organized crime and other high risk client matters such as Listed company 2 and related affiliate audits, telling him that his concerns "are just your opinion" and that there was a case to be made for why such companies should be EY clients. Dennis downplayed Howie's concerns and consistently failed to engage in follow-up to understand the issues.

- **Laney Doyle**, Global PPG Risk leader. In 2023, Doyle participated in an "on-boarding" discussion arranged by Howie, including a presentation including material from the high-risk client/organized crime deck prepared by Howie.  Howie and Doyle were also both involved in frequent discussions after that, including an updated discussion in September 2023 focused on clients (including several prominent publicly traded clients) tied to organized crime in the casino industry matters and numerous update calls on PACE and control matters.

- **Linda Lam**, retired, former America's QEL for relevant periods. Lam was aware of the organized crime concerns raised in prior years, including efforts by Howie and the Risk COE team to place Registrant 3 on the Watch List. From 2021 through 2023, Lam, along with PPD leadership, repeatedly rejected a significant number of the Risk COE's recommendations, including the proposed inclusion of Registrant 3, despite the serious risk indicators and concerns presented. ██████████████████████████ ████████████

- **Lori Bin**, Independence Group. Bin participated in multiple discussions with Howie from 2022 to 2024 regarding EY's Independence compliance issues, including unresolved client data, systemic reconciliation failures, and leadership's refusal to implement necessary stops in PACE until Independence risks were remediated. These discussions involved high-risk clients and reflected broader concerns about legal and regulatory exposure under applicable SEC rules.

- **Maggie Dennis**, Global ISQM 1 Lead (Operations). Dennis was involved in discussions with Hohl and Howie over concerns around control matters under ISQM 1, particularly A&C, Independence, and overall approach issues and conclusions.

- **Marie-Laure Delarue**, Global Vice Chair, Assurance. ██████████ ████████████████████████████████████████ Kane told Howie that Delarue was upset that the concerns had been shared with people outside of the Assurance practice, showing an aversion to publishing and discussing (much less addressing) these matters.

- **Martin Korte**, Germany Forensics partner and Risk COE member. Korte provided limited assistance with some of Howie's research and preparation of materials on the organized crime matters, particularly in 2023.

- 

- **Mike Savage**, Global Forensic leader for audit and Co-leader of Risk COE with Howie. Savage interacted directly with high-risk client teams as part of the forensics response, particularly for Registrants 4, 5, 7, 12, Listed company 2, and others. He was very involved in all Risk COE matters, including the organized crime and high-risk client matters, reviewed drafts of Howie's decks and participated in discussions with senior leadership about the organized crime and violation/risk issues raised by Howie.

- **Nancy Salisbury**, Americas Deputy Vice Chair Professional Practice.  On November 29, 2022, Salisbury was made aware by Howie of the connection of EY clients to organized crime and criminal activities, including information about Alvin Chau and others' involvement with Registrant 3. That same day, Howie sent Ms. Salisbury an email which included a link to a relevant news video that noted the extensive organized crime links in the casino industry. She also participated in PACE working group and PPD meetings and emails in which Risk COE and Global Watch List discussions were held as well as proposed risk responsive procedures. She heavily resisted involving forensic professionals and tools as part of EY audits, including the GWL.

- **Paul Steih,** Global ISQM 1 Project Team Leader.

- **Pawan Masand**, India Forensics partner and Risk COE member. Masand assisted Howie with research and preparation of materials regarding the organized crime matters, particularly in 2023.

- **Reinder Bursma**, GCO group MD and Risk COE member. Bursma provided limited assistance to Howie in the preparation of materials on the organized crime matters, particularly in 2023.

- **Richard Huesken**, Global Independence Leader/Global SEC Independence Center Leader. Mr. Huesken was involved with independence matters and decisions on implications for ISQM 1.

- **Rivka Bachrach**, US PPD group (works for McGrath).  Bachrach was involved in calls on A&C/PACE working group matters and part of the debates on addressing independence issues in PACE, risk ratings, and other compliance matters involving Howie's complaints during 2023-2024.

- **Ryan Cupersmith**, Global Gaming Leader, Las Vegas Managing Partner and Registrant 3 coordinating partner.  Mr. Cupersmith is another partner with whom Howie had several calls and communications regarding EY gaming clients' connections to organized crime and the involvement by Registrant 3, Registrant 1, Registrant 2, The Star and Crown in such high-risk and unlawful activities, as well as about gaming policies and various A&C issues at EY. For example, Howie sent Cupersmith an email on December 6, 2021, alerting him to Alvin Chau's arrest and noting Registrant 3 and other casino client links and held discussions about various risk and policy matters in 2021, 2022, and 2023.

- **Taryn Vollmer,** Global QEL group member ███████████ ███████████████████████████

- **Tricia Lavalle**, Executive Director ███████ ████████████████████████████████████ ███████████

293.    EY's indifference and hostility to Howie's complaints and clearly stated concerns is illustrated by the awareness of a large number of senior Global and US-based EY officials of his legally protected complaints coupled with the failure to address them and efforts to suppress those complaints.

## IX.    EY REMOVES HOWIE FROM THE CERTIFICATION PROCESS AND TERMINATES HIS EMPLOYMENT

294.    Around June 24, 2024, in direct retaliation for expressing his legally protected concerns, Verbeck informed Howie that he was being removed from all Global Leadership titles and roles, including as the control operator for certification over PACE days before the end of the fiscal year, to which the certification applied. EY's decision to remove Howie from his leadership roles at EY Global, deliberately prevented Howie from using the certification process to further expose control deficiencies at the Firm. It also prevented him from pursuing proper resolution of the organized crime matter and other high-risk client NOCLAR issues involving other clients (e.g., Registrants 5 and 13, Listed company 2, etc.).

295.    On or around June 25, 2024, Howie notified Doyle, his immediate supervisor, that his abrupt removal from his titles and roles was in retaliation for the concerns he had raised, including regarding EY clients' ties to organized crime and other high-risk client matters and findings related to controls.

296.    On or around June 27, 2024, Kimpel and EY's General Counsel Dana Douglas ("Douglas") told Howie that he was being forced to retire early, effective August 1, 2024. This was an unusually short "notice" period and inconsistent with the contractual terms of his employment. Howie told Douglas he believed that he was being forced to retire early because of the legal concerns and violations he had raised to which he had been pushing the Firm to appropriately respond.

297.    Immediately following the call, Howie emailed Douglas and EY's Associate General Counsel Peter Cahill ("Cahill") of EY's GCO requesting the financial terms of his so-called "voluntary" separation and the draft release language EY expected him to sign, information they had refused to provide during the call. He also asked what the financial and other implications would be if he declined to "voluntarily" retire. EY delayed providing the financial terms until July 11, 2024, and withheld the release language for several more weeks, requiring Howie to make repeated follow-up requests.

298.    On July 11, 2024, Cahill attempted to mislead Howie into accepting a reduced retirement settlement. His email to Howie stated that, under a purportedly "voluntary" retirement effective August 1, 2024, Howie would receive only ███████—the present value discount caused by taking monthly retirement payments early compared to deferring receiving benefits until age 58.

299. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

300.    In short, EY not only failed to inform Howie of his contractual rights when asked, but also refused to answer his direct questions about the alternatives to "voluntary" retirement. Instead, rather than respond to Howie's inquiries, EY repeatedly pushed him to state that he was voluntarily retiring and to sign a broad general release.

301.    On July 23, 2024, Cahill sent revised terms shifting the proposed retirement date to November 1, 2024, and offering 12 months of pay—but still only at Howie's suppressed benefit level. The calculation was based on the early retirement formula applied before he turned 58, significantly reducing the present value of his entitled benefits. This reduction ignored the higher payout he would have received under normal circumstances had EY followed the proper partnership procedures. EY continued to condition the offer on Howie signing a broad general release, despite his ongoing concerns about being forced out in directed retaliation for his protected whistleblower activity.

302.    Later that same day, Cahill directed Howie to immediately stop attending Global Firm calls and cease all work on Global matters. Cahill gave this directive to Howie in an intimidating and threatening tone and manner, using pointed words and phrases that further demonstrated the retaliatory nature of the actions taken against him.

303.    In addition, this abrupt order forced Howie to abandon ongoing transition efforts related to significant projects, including NOCLAR matters, related to his global leadership roles, further damaging his professional reputation and preventing a proper handover of responsibilities

and resolution of the multiple concerns raised.

304.    Furthermore, this directive came without warning and just days after Howie reiterated his concerns on two critical issues in recent meetings. The timing underscores the retaliatory nature of EY leadership's actions and their direct connection to Howie's protected whistleblower disclosures.

305.    First, during a Global QEL group weekly update call, Larsen raised issues concerning the U.S. AQR program and proposed to challenge the internal inspection results to determine whether the number of audit failures could be reduced. In response, Howie objected to Larsen's proposal which focused on the integrity of EY's SQM program and the ethical implications of manipulating AQR outcomes. Unfortunately, Larsen offered no meaningful response to his concerns and no one from EY leadership followed up with Howie to address the issues he raised, nor were his objections reflected in the final control evaluation.

306.    Second, on a Risk COE team call, Howie expressed concern that his abrupt removal would have a chilling effect on other employees, suppressing their willingness to raise critical client risk issues, especially those involving high-risk clients he had been escalating. He highlighted ongoing delays and resistance within EY to addressing major risk matters identified by the Risk COE. Howie reassured his team that he would continue pressing to ensure that serious concerns, including organized crime links involving publicly traded clients in the casino industry, were not ignored or dropped.

307.    On August 23, 2024, EY escalated its retaliatory conduct against Howie by convening a meeting with three representatives from GCO and a Human Resources representative. During the meeting, they informed Howie that he was the subject of an internal investigation

concerning his Firm-issued laptop and the documents he had accessed or printed following removal from his Global roles.

308.    Thereafter, they demanded explanations for each document he had printed and questioned his intentions. Howie responded to each inquiry, explaining that the materials in question consisted primarily of training presentations from required courses and Risk COE documents directly tied to his transition responsibilities.

309.    In response, they claimed that Howie should not have been working on Global matters at all, referencing the July 2024 directive. However, Howie explained that given the scale and sensitivity of the Firm matters he had been overseeing and short notice he was given about his removal, a complete and responsible transition was impossible without continuing some involvement.

310.    Furthermore, Howie stated that, rather than investigating his printing activity, GCO's time would be better spent investigating EY's inadequate responses to the serious legal and regulatory issues he had been escalating. Howie also told GCO that his removal from his roles at EY Global and their directive to stop working on any projects, was retaliatory and directly tied to the extensive list of problematic audits he had raised, including EY's knowing involvement with clients linked to organized crime. Cahill remarked that none of that had anything to do with EY US Howie corrected him and said that was not true. The matters did involve US clients and leadership. Cahill asked no follow-up questions during or after the call to understand better nor did anyone else from EY. This represents another attempt by Howie to report serious matters to the EY's GCO group that the Firm chose to ignore.

311.    Additionally, Howie reiterated that it was unreasonable and irresponsible for EY to expect an immediate cutoff from all Global responsibilities without a proper transition plan, especially given the high-risk nature of the matters at issue.

312.    Ultimately, Howie found the entire encounter to be deeply intimidating. The focus on his computer activity, document access, and printing reinforced the perception that EY was attempting to pressure him into signing the Firm's release and settlement terms, and to deter him from continuing to raise protected concerns. Therefore, due to GCO's efforts to bully, manipulate, and trick Howie into accepting materially unfavorable retirement terms under false pretenses, Howie decided to retain legal counsel.

313.    After Howie engaged legal representation, EY suspended his full ejection from the Firm with his retirement funds and capital contributions held hostage, pending settlement of the terms of his retirement from EY. At the same time, EY continued to impose severe restrictions on Howie, which threaten significant financial penalties if he speaks publicly or discloses information. This situation left Howie in an ambiguous limbo, unable to secure his compensation or pursue new job opportunities without legal and reputational risk.

314.    On October 18, 2024, Howie also communicated his concerns regarding EY's willing involvement with clients linked to organized crime, securities law violations, unethical conduct by EY leadership, systemic audit failures and internal control deficiencies through a letter from his legal counsel to EY GCO. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

315.    Notwithstanding their failure to investigate these issues, EY made two public statements that directly contradict Howie's findings: On October 31, 2024, EY US issued its annual Transparency Report, asserting that as of June 30, 2024, its System of Quality Management provided "reasonable assurance" that the system's objectives had been achieved. In November 2024, EY US released its 2024 Audit Quality Report, which similarly disclosed no exceptions.[40]

316.    Although none of the previous discussions or documents from EY had mentioned Howie being removed for cause, on May 1, 2025, EY forced Howie to withdraw from the partnership of EY, and terminated his employment for cause, purportedly for "disclosing attorney-client privileged communications to OSHA and refusing to cooperate in any effort to remediate such improper disclosures." EY had been given ample notice of the OSHA filing in advance and had been informed previously that the matters Howie was reporting aligned with his internal communication and were protected whistleblower communications under SOX. This action by EY, again tied to legally protected activity, further demonstrates EY's retaliatory animus, motivation, and modus operandi against Howie.

317.    Further, Howie did not divulge any attorney-client privileged communications in his OSHA complaint. Part of Howie's protected communications involve what he has a reasonable basis to believe to be inappropriate intimidation, actions and intervention by members of EY GCO in audit matters that undermined necessary audit procedures and independent judgement, to the detriment of investors and in violation of audit standards and requirements. Most of the mentions of GCO in the OSHA complaint were used to illustrate that concern and none of them concerned legal advice or attorney work product.  Rather, the material generally concerned the lodging of complaints with in-house counsel by Howie, GCO's retaliation and animus against him in return,

---

[40]    See Transparency Report 2024 - EY US. (Last visited Jan. 8, 2025)

or the mere fact of communication between certain individuals on certain relevant general subjects. Plaintiff Howie notes that under professional standards, auditors are not permitted to subordinate their judgement to others. EY should not be permitted to hide behind wrongly asserted privilege arguments to mask GCO's involvement and blatant schemes to obscure unethical behavior and professional misconduct as the Firm seeks to limit its legal liability from failed audits and other actions.

318.    Most of the allegations cited by EY or EY Global do not even refer to a communication, let alone privileged communications with counsel.  Further, any communication that was with an attorney was not for the purposes of legal advice. Howie was largely reporting examples of members of EY GCO themselves being involved with EY leadership in inappropriate conduct in violation of securities laws, SEC regulations, and/or professional standards.

319.    Finally, even if these allegations did disclose attorney-client privileged communications, which they did not and do not, the facts alleged concern unlawful and fraudulent conduct that would fall squarely within various well-established exceptions to the attorney-client privilege.

320.    Howie fully expects that EY and its legal counsel will continue their efforts and attempts to retaliate against, intimidate, and bully him and his legal counsel, rather than simply address the Firm's fundamental compliance and cultural issues, which would benefit all concerned, including EY's clients.

321.    Ultimately, the communications at issue were necessary to assert Howie's whistleblower claims and are part of his legally protected activities. As such, EY's decision to terminate Howie for allegedly violating the attorney-client privilege, is nothing more than a

facially pretextual reason to retaliate against Plaintiff for filing his whistleblower complaint and seeking legal redress.

322.    Accordingly, Howie files this Complaint to assert his legal claims of unlawful retaliation, to seek redress for the substantial harm he has suffered, and to expose the systemic deficiencies within EY that threaten other employees who engage in legally protected whistleblowing activity. Plaintiff also brings this action to protect the employees, shareholders, and investors of the publicly traded companies referenced herein, and others, all of whose interests are placed at significant risk by the Firm's continued failure to identify, disclose, and appropriately respond to unlawful conduct within its client base, as well as by the Firm's own misconduct in its capacity as auditor, accountant, and provider of financial reporting services.

## **FIRST CAUSE OF ACTION**
### **(Retaliation in Violation of the Sarbanes-Oxley Act)**

323.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

324.    As set forth above, Plaintiff made multiple protected complaints to and engaged in protected activity known to Defendants concerning, *inter alia*, suspected, ongoing and imminent legal violations of SEC-promulgated and enforced rules and federal laws, including but not limited to EY's failure to adequately audit and/or report material red flags involving the direct and indirect involvement of Firm clients (e.g., Registrant 3, Registrant 1, Registrant 2, Listed company 2, Registrant 5, and Registrant 9) and their close business partners, in known or suspected criminal activity. The Plaintiff further raised concerns about EY's failure to ensure these issues were disclosed in legally required audit reports and financial statements. These violations implicated EY's ability to independently assess and report audit findings, evaluate client risks, and uphold its obligations under laws covered by the Sarbanes-Oxley Act. Further, these failures raised

substantial concerns of fraud (including but not limited to mail, wire, bank, and securities fraud and fraud against shareholders), fraudulent activity, and/or material misrepresentation, posing significant risks to publicly traded clients, including Registrant 3, Registrant 1, Registrant 2, Registrant 5, and Listed company 2, and harming the interests of their shareholders and investors. EY's actions and omissions, as described herein, constitute violations of legal duties owed under federal law, including but not limited to laws, rules, and regulations enforced by the SEC.

325.    Defendants violated the Sarbanes-Oxley Act by taking adverse employment actions against Plaintiff, including, but not limited to, retaliatorily changing the terms and conditions of his employment, including stripping him of all official titles and job duties, terminating his employment, forcibly withdrawing him from partnership, negatively affecting and denying him compensation,  as well as subjecting him to hostility, bullying, hyper scrutiny of his work performance, and pressuring him in order to and in a manner that inhibited his ability to do his job with integrity and to assist EY in providing audit and other services to publicly traded clients in compliance with SEC-related laws and rules.

326.    As a direct and proximate cause of Defendants' retaliatory conduct, Plaintiff has suffered, and will continue to suffer, financial harm, mental and emotional distress, hardship and injury, including loss of compensation, damage to his personal and professional reputation, reduced possibilities for career advancement and increased future compensation, loss of benefits, and other additional damages, including interest, attorneys' fees, costs, and disbursements.

327.    Defendants' conduct was in violation of federal, state, and local laws and regulations, including the Sarbanes-Oxley Act, entitling Plaintiff to an award of damages in an amount to be established at a hearing, plus interest, attorneys' fees, costs, and disbursements.

## PRAYER FOR RELIEF

Plaintiff is seeking the following relief:

A.      All available economic damages, including, as applicable, back pay, front pay, raises, and bonuses (including but not limited to any lost retirement, pension, and other benefits, equity and/or cash value of any equity, securities or the like that would have been granted or were lost as part of Plaintiff's compensation due to Defendants' conduct), various performance-based or deferred compensation, retirement and/or pension payments, other benefits, reinstatement (including of seniority and tenure), and all other orders and remedies necessary to make Plaintiff whole;

B.      An order relieving Plaintiff from his obligations under the various partnership agreements due to Defendants' conduct in violation of Plaintiff's rights, while maintaining full rights to all retirement and/or pension benefits and legal protections, as well as requiring Defendants to abate and refrain from any further violations of the whistleblower provisions of the Sarbanes-Oxley Act;

C.      An order prohibiting Defendants from disclosing any disparaging information about Plaintiff to third parties, including but not limited to prospective employers or professional organizations, or otherwise interfering with any employment Plaintiff may have or seek in the future;

D.      An order prohibiting Defendants from continuing to engage in the unlawful activity and securities violations discussed herein including but not limited to deficiencies in auditing NOCLAR, management integrity, and material disclosures.

E.      An order requiring the Defendants to disclose the contents of this Complaint deemed relevant by the Court to the DOJ, FinCen, SEC and PCAOB, along with an order requiring

117

Defendants to remediate the impact of their practices regarding the quality of their audits and retention of high-risk client relationships, and to correct the numerous control and compliance matters discussed herein;

F.      Compensatory monetary damages in an amount determined to be fair and equitable compensation for Plaintiff's physical and emotional distress and loss of reputation;

G.      Reasonable attorneys' fees for Plaintiff's attorneys and the costs of this litigation, including but not limited to reimbursement of all costs, including but not limited to deposition fees, witness fees, travel expenses, and other expenses to present, collect and produce evidence in this matter

H.      Such other further relief deemed just and proper by the Court, including but not limited to any punitive and/or exemplary damages that may be awarded under applicable law.


Dated:  July 21, 2025
     New York, New York          Respectfully Submitted,


**WIGDOR LLP**

By: _____
     Michael J. Willemin
     Lawrence M. Pearson
     Daniel J. Altaras

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
lpearson@wigdorlaw.com
daltaras@wigdorlaw.com

*Counsel for Plaintiff*