**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

JOE HOWIE,                                            :

                 Plaintiff,                    :     Case No. 1:25-cv-05973-RA

          v.                                      :

ERNST & YOUNG LLP, ERNST & YOUNG    :     Hon. Ronnie Abrams
U.S. LLP, AND ERNST & YOUNG
GLOBAL LIMITED,                                       :

              Defendants.                    :     **ORAL ARGUMENT REQUESTED**

-------------------------------------------------------- x


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS ERNST & YOUNG LLP'S**
**AND ERNST & YOUNG U.S. LLP'S MOTION TO DISMISS**

David A. Gordon (*pro hac vice*)
Abigail B. Molitor (*pro hac vice*)
Harry Dodsworth (*pro hac vice*)
Robert Johnson III (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
dgordon@sidley.com
amolitor@sidley.com
hdodsworth@sidley.com
robert.johnson@sidley.com

Eric G. Hoffman
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Tel: (212) 839-5000
Fax: (212) 839-5599
eric.hoffman@sidley.com

*Attorneys for Defendants Ernst & Young LLP*
*and Ernst & Young U.S. LLP*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT...................................................................................................1

BACKGROUND ........................................................................................................................1

I.      The Scope of SOX Whistleblower Protections....................................................................1

II.     The Parties. ...........................................................................................................................3

III.    Howie's Allegations. .............................................................................................................4

ARGUMENT ..............................................................................................................................6

I.      Standard of Review. ..............................................................................................................6

II.     Howie Was a Partner, Not an Employee, and Therefore Cannot Bring a SOX
        Whistleblower Claim. ............................................................................................................6

III.    Howie Fails to State a SOX Claim Against EY US. ...........................................................16

        A.      Howie Fails to Allege Protected Activity. ...............................................................17

                1.      Howie's Allegations That Are Unrelated to EY US's Role as a
                        "Contractor" Cannot Trigger SOX Liability.............................................18

                        a.      Allegations About EY Global. .......................................................18

                        b.      Allegations About Other EY Member Firms. ...............................19

                2.      Howie's Limited EY US Allegations Fail. .................................................19

                        a.      Allegations About Internal Firm Processes....................................19

                        b.      Allegations About Registrant 3......................................................21

                                (i)     Howie Did Not Report Fraud Relating to Registrant 3.....21

                                (ii)    Howie Has Not Identified Fraud by Registrant 3, Even
                                        After the Fact. ....................................................................23

        B.      Howie Fails to Allege a Causal Connection Between Any Plausible Protected
                Activity and Any Adverse Action. .........................................................................27

CONCLUSION...........................................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
    529 F. Supp. 3d 111 (S.D.N.Y. 2021)..........................................................................3, 18, 19

*Anthony v. Nw. Mut. Life Ins. Co.*,
    130 F. Supp. 3d 644 (N.D.N.Y. 2015)............................................................... *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................6

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)..................................................................25

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014)......................24

*Baskett v. Autonomous Rsch. LLP*,
    2018 WL 4757962 (S.D.N.Y. Sept. 28, 2018)................................................. *passim*

*Bechtel v. Admin. Rev. Bd., U.S. Dep't. of Labor*,
    710 F.3d 443 (2d Cir. 2013)..................................................................................16

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007).............................................................................................16

*Carpenter v. Oscar Health, Inc.*,
    2025 WL 722729 (S.D.N.Y. Mar. 6, 2025) ............................................................24

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002).................................................................................6

*Clackamas Gastroenterology Associates, P.C. v. Wells*,
    538 U.S. 440 (2003).........................................................................................7, 9

*Cronkhite v. Unity Physician Grp., P.C.*,
    2007 WL 1035091 (S.D. Ind. Mar. 30, 2007).......................................................13

*Dabney v. Hughes Hubbard & Reed LLP*,
    2023 WL 4399048 (S.D.N.Y. July 6, 2023) ............................................................8

*Feldman v. Mind Med., Inc.*,
    2024 WL 3471299 (S.D.N.Y. July 19, 2024) ........................................................27

*Fraser v. Fiduciary Tr. Co. Int'l*,
   417 F. Supp. 2d 310 (S.D.N.Y. 2006)....................................................................20

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)...................................................................24

*Gibney v. Evolution Mktg. Rsch., LLC*,
   25 F. Supp. 3d 741 (E.D. Pa. 2014) ..................................................................2, 20

*Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*,
   742 F.3d 42 (2d Cir. 2014)....................................................................................11

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
   2010 WL 2780927 (3d Cir. July 15, 2010).................................................8, 12, 13

*La Belle v. Barclays Cap. Inc.*,
   2024 WL 878909 (2d Cir. Mar. 1, 2024)...............................................17, 22, 25, 26

*Lawson v. FMR LLC*,
   571 U.S. 429 (2014).................................................................................1, 2, 6, 17

*Lemon v. Myers Bigel, P.A.*,
   985 F.3d 392 (4th Cir. 2021) .......................................................................*passim*

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   910 F. Supp. 2d 561 (S.D.N.Y. 2012)...................................................................26

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
   601 U.S. 257 (2024)..............................................................................................24

*Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*,
   531 F. Supp. 3d 673 (S.D.N.Y. 2021).....................................................................6

*Nielsen v. AECOM Tech. Corp.*,
   762 F.3d 214 (2d Cir. 2014)....................................................................2, 17, 23

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*,
   2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) ..........................................................19

*Reyher v. Grant Thornton, LLP*,
   262 F. Supp. 3d 209 (E.D. Pa. 2017) .....................................................................2

*Rodal v. Anesthesia Grp. of Cent. N.Y.*,
   2006 WL 208835 (N.D.N.Y. Jan. 23, 2006)..........................................................12

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..................................................................................24

*Segarra v. Fed. Rsrv. of N.Y.*,
   17 F. Supp. 3d 304 (S.D.N.Y. 2014) (Abrams, J.)..............................................16, 22

*Solon v. Kaplan*,
   398 F.3d 629 (7th Cir. 2005) ..............................................................................8, 12

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004)..................................................................................................26

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008).......................................................................................7

*Tellez v. OTG Interactive, LLC*,
   2019 WL 2343202 (S.D.N.Y. June 3, 2019) ........................................................2, 17

*Von Kaenel v. Armstrong Teasdale, LLP*,
   943 F.3d 1139 (8th Cir. 2019) ..............................................................................8, 10

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016)......................................................................18

**Statutes**

15 U.S.C. § 7233(b) ........................................................................................................26

18 U.S.C. § 1514A.............................................................................................2, 6, 16, 21

Defendants Ernst & Young LLP and Ernst & Young U.S. LLP (collectively, "EY US") respectfully submit this memorandum in support of their motion to dismiss Plaintiff Joe Howie's Amended Complaint with prejudice.

## PRELIMINARY STATEMENT

Joe Howie cannot bring claims in federal court against his former partnership under the Sarbanes-Oxley Act of 2002 ("SOX"), and no audit partner of his tenure and experience reasonably could think otherwise. For one, Howie was a senior, highly compensated, equity partner; SOX's whistleblower provision is designed to protect "employees," not him. Howie has also been an auditor since long before 2002; he knows full well that SOX's whistleblower provision was designed to prevent the kind of shareholder fraud that took place at Enron, not to resolve differences in judgment among accounting firm partners about client intake. And having been with EY US for more than three decades, including a multi-year rotation assigned solely to Ernst & Young Global Limited ("EY Global"), Howie understands EY US and EY Global are not the same. This last distinction is critical: SOX's whistleblower protections extend only to reporting by those at an entity that is a "contractor" of a registrant and only relating to firsthand knowledge of fraud at that registrant. Howie's 126-page Amended Complaint identifies just a single registrant for which EY US was a contractor (Registrant 3), only mentions that registrant in a handful of allegations, and those allegations plainly fail to state a claim. There is no legal basis for Howie's case. It does not belong before this Court, and it should be dismissed in its entirety, with prejudice.

## BACKGROUND

I.    **The Scope of SOX Whistleblower Protections.**

Congress passed SOX "[t]o safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation." *Lawson v. FMR LLC*, 571

U.S. 429, 432 (2014). One such safeguard was protecting a certain type of whistleblower: an "employee" who has been harmed "in the terms and conditions of employment." 18 USC § 1514A(a). And not just any employee will do. SOX protects "firsthand witnesses to the fraud." *Lawson*, 571 U.S. at 435 (quoting S. Rep. No. 107-146, at 10 (2002)). And, if those "employees" are not of the public company, but instead employed by its "contractor," SOX applies only if the contractor's employee reports fraud relating to that public company. *See Baskett v. Autonomous Rsch. LLP*, 2018 WL 4757962, at *7-8 (S.D.N.Y. Sept. 28, 2018). "[I]n enacting SOX, Congress was *specifically* concerned with preventing shareholder fraud either by the public company itself or *through* its contractors." *Gibney v. Evolution Mktg. Rsch., LLC*, 25 F. Supp. 3d 741, 747 (E.D. Pa. 2014).

Thus, SOX claims brought against "contractors" are circumscribed. Since *Lawson*, courts have dismissed SOX whistleblower complaints filed by contractor employees where the claims did not directly concern reports of fraud by the contracting public company. *See*, *e.g*., *Nielsen v. AECOM Tech. Corp.,* 762 F.3d 214, 223 (2d Cir. 2014) (upholding dismissal of complaint where connection between plaintiff's "claims and supposed fraud against shareholders [was] simply too tenuous"); *Tellez v. OTG Interactive, LLC*, 2019 WL 2343202, at *4 (S.D.N.Y. June 3, 2019) (entering summary judgment for defendant where "alleged fraud did not involve any activity by a publicly traded company"); *Baskett,* 2018 WL 4757962, at *8 (dismissing complaint regarding contractor's "internal structure rather than fraud committed by a public company or on its shareholders"); *Reyher v. Grant Thornton, LLP*, 262 F. Supp. 3d 209, 217 (E.D. Pa. 2017) (dismissing complaint absent allegation that "fraud [plaintiff] reported had any effect on her former employer's public company clients"); *Anthony v. Nw. Mut. Life Ins. Co.*, 130 F. Supp. 3d

644, 652 (N.D.N.Y. 2015) ("[Section] 1514A only covers contractors insofar as they are firsthand witnesses to corporate fraud at a public company.").

The statute and case law are clear—SOX's whistleblower protection provision covers only reports by **employees** of illegal activity relating to **a public company**.

## II.    The Parties.

Ernst & Young U.S. LLP and Ernst & Young LLP are US-based member firms in the EY professional services network. Both are limited liability partnerships organized in Delaware and headquartered in New York. (Amended Complaint ("AC") ¶¶ 28-29.)  For purposes of SOX, Ernst & Young LLP is a "contractor" to those public companies that engage it for audit services.[1]

EY Global is a United Kingdom company limited by guarantee. (AC ¶ 31.) Howie does not allege that EY Global provides audit (or any other) services to clients (because it does not). As such, EY Global cannot be a "contractor" within the meaning of SOX. Courts repeatedly have recognized that network coordinating entities—like EY Global—are distinct and separate entities from the member firms in those networks—like EY US—and that plaintiffs may not rely on a network affiliation to support a claim against one entity for the conduct of another. *See*, *e.g.*, *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 158-59 (S.D.N.Y. 2021) (collecting cases).

Joseph Howie is a former EY US audit partner. (AC ¶¶ 24, 26.) During the entire period of Howie's purported protected activity, Howie served exclusively on rotation at EY Global. (*Id.* ¶ 58.)

---

[1] Despite being a long-term partner of both US firms, Howie alleges (incorrectly) that Ernst & Young U.S. LLP provides audit services. (AC ¶ 29.) Audit services are provided exclusively by Ernst & Young LLP. For purposes of this motion, however, the Court need not reconcile this inaccuracy.

### III.    Howie's Allegations.

Howie joined EY US as an employee 35 years ago. (AC ¶ 26.) In 2001, Howie became an EY US partner, and he remained a partner for the next 24 years. (*Id.*) In his time as a partner, Howie "worked on some of the largest audits at the Firm" and held roles in the "EY US Professional Practice and National Accounting groups" where he "consult[ed] on complex technical accounting[,] auditing[,] and Firm risk management matters." (*Id.* ¶ 25.)

Howie alleges he was "selected" in 2020 "to work … full-time" on an EY Global "initiative" to "evaluate policies" and "past" practices of member firms, with the "objective" of "improv[ing]" both audit quality and risk management." (AC ¶¶ 69-71.) Howie alleges that his role involved "frequent interaction with senior leaders from EY Global." (AC ¶¶ 69-70.) Howie also alleges that, while on rotation at EY Global, he "co-founded" and was "co-leader" of the Global Assurance Risk Center of Excellence ("Risk COE"), and led the Global Process for Acceptance and Continuance of Engagements ("PACE"). (*Id.* ¶ 24.) Howie's Risk COE work involved adverse media scraping, partnerships with external short research firms and academics, and forensic tools. (*Id.* ¶ 100.) Howie alleges he used these tools to identify "high-risk" clients. (*Id.*)

Notably, Howie *does not* allege any firsthand knowledge of fraud at any audit client. Howie instead claims to have identified certain "risks" through review of (public) "adverse media" reports, then compared that information with PACE forms, concluding that (in his opinion) the relevant engagement teams must have performed insufficient work. (*Id.* ¶ 104.) Nor does Howie allege that he had access to or reviewed any engagement team's workpapers, which include those teams' analyses of relevant risk factors.

Howie's allegations focus in particular on a group of gaming companies. (*Id.* ¶¶ 111-207.) He claims to have "accumulated" supposed "evidence" of these companies' alleged

associations with the "Chinese Mafia" though adverse media searches (*i.e.*, internet research). (*Id.* ¶ 117.) Howie alleges that he repeatedly reported these supposed criminal "connections" (and expressed his personal "concern") to "EY" between 2021-2024.[2] (*Id.* ¶ 128.) Howie's specific allegations, however, largely describe communications with various personnel at *EY Global*. (*E.g.*, *id.* ¶¶ 110, 128, 133-134, 318.) Howie alleges multiple instances in which his recommendations for "policy changes" were acknowledged and discussed, even if not ultimately adopted. (*Id.* ¶ 109, 155-156, 214.)

Only one of these gaming companies is an audit client of EY US—Registrant 3. In this one instance, Howie alleges he provided public information regarding the arrest of Alvin Chau, the founder of a third-party gaming promotion company used by Registrant 3, to Ryan Cupersmith, the EY US partner responsible for the Registrant 3 audit. (*Id.* ¶ 166.) Howie admits that Cupersmith already was aware of this information but disagreed with Howie's interpretation of it. (*Id.* ¶ 168.) Crucially, Howie does not allege that he informed Cupersmith or anyone else at EY US at the time that he believed Registrant 3 had engaged in fraud. To the contrary, Howie's *quoted communication* suggested only that Chau's arrest "raises considerations for continuance, risk assessment, potential approach changes, etc., including increased risk from this business." (*Id.* ¶ 167.) Nothing about fraud.

Howie's rotation at EY Global ended in mid-2024, at which point EY US offered Howie early retirement. (*Id.* ¶ 322.) ███████████████████████████ ████████████████ (*Id.* ¶ 338.)

---

[2] Howie does not allege to which legal entity "EY" refers. He mentions "various members of EY leadership" and lists 11 EY Global individuals, one EY Asia Pacific individual, one EY US individual, and one EY Americas individual. (AC ¶ 128.)

On December 17, 2024, Howie filed allegations of SOX violations with the Occupational

Safety and Health Administration ("OSHA"). (*Id.* ¶ 19.) Howie improperly disclosed attorney-

client privileged information in his OSHA complaint and refused to remediate his improper

disclosures.[3] (*Id.* ¶ 342.) On May 1, 2025, EY US withdrew Howie from the partnership for

cause based on his disclosure of attorney-client privileged communications and refusal to

remediate those improper disclosures. (*Id.*)

## ARGUMENT

### I.    Standard of Review.

To avoid dismissal, a complaint must "contain sufficient factual matter, accepted as true,

to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(cleaned up). A court generally must accept all well-pleaded factual allegations as true,

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), but "naked assertions" of fact

or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice," *Iqbal*, 556 U.S. at 678 (cleaned up). Moreover, Federal Rule of Civil

Procedure 8(a)(2) "is violated where a plaintiff, by engaging in 'group pleading,' fails to give

each defendant fair notice of the claims against it." *Monterey Bay Mil. Hous., LLC v. Ambac

Assurance Corp.*, 531 F. Supp. 3d 673, 728 (S.D.N.Y. 2021) (citation omitted).

### II.    Howie Was a Partner, Not an Employee, and Therefore Cannot Bring a SOX Whistleblower Claim.

Howie cannot bring a whistleblower claim because he was a partner, not an employee.

On its face, SOX covers only an "employee" harmed "in the terms and conditions of

employment." 18 USC § 1514A(a). The Supreme Court agrees. *Lawson*, 571 U.S. at 442-43.

---

[3] These improper disclosures are a subset of the paragraphs implicated in the Parties' briefed dispute regarding the redactions in the Amended Complaint; notably, Howie omitted some of the disputed information in his OSHA submission from his federal filings. See Dkts. 5, 10, 13, 18, 24, 25, 32, 37, 38, 42, 45, 46.

Anyone who is not an "employee" cannot bring a SOX claim. This is the end of Howie's claim. Howie concedes that he "is a former Partner in the U.S. Professional Practice Director group" who has been "forcibly withdrawn from EY partnership." (AC ¶ 24.) Howie was a long-standing partner, admitted to the EY US partnership in 2001 and remaining partner for 24 years.[4] (*Id.* ¶ 26.) His assignments were those of an experienced partner: he worked on "some of the largest audits at the Firm," and had "partner assignments" in EY US's National Accounting group. (*Id.* ¶ 25.) And Howie alleges he was not just a partner, but also a leader—*i.e.*, the "co-found[er]" and "co-leader" of the Global Risk COE and the "leader" of the Global PACE program. (*Id.* ¶ 24.)

Howie further admits that the EY US Partnership Agreement governs his relationship to EY US. (*Id.* ¶ 73, Prayer for Relief B.) And he seeks to "maintain[ ] full rights" under that Agreement in his request for relief from this Court. (*Id.* at Prayer for Relief B.) It is only in asserting this claim, after two-and-a-half decades as a partner, that Howie asks to be called an "employee" again.

Howie's request has no basis in law. The Supreme Court's decision in *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440 (2003), settled the standard to determine whether a plaintiff is an "employee" (entitled to federal employment protections) or a partner (without such protections).[5] Howie is the latter. In the twenty years since *Clackamas*, four circuit courts—the Third, Fourth, Seventh, and Eighth Circuits—have concluded that an

---

[4] Howie *still* holds himself out as a "former partner" on LinkedIn. *See* Exhibit A, Joe Howie, LinkedIn, https://www.linkedin.com/in/joe-howie-78b870180 (last visited Oct. 9, 2025). Representations on Howie's social media account are judicially noticeable for the fact that Howie holds himself out as a former partner. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008).

[5] The *Clackamas* factors have been applied in a variety of statutory contexts where Congress, as in SOX, has used the term "employee" without further definition. *See Clackamas*, 538 U.S. at 449 n.7 (adopting guidance that the EEOC "applies across the board to other federal antidiscrimination statutes").

equity partner in a professional partnership is *not* an "employee." *See Lemon v. Myers Bigel, P.A.*, 985 F.3d 392, 398-99 (4th Cir. 2021); *Von Kaenel v. Armstrong Teasdale, LLP*, 943 F.3d 1139, 1144 (8th Cir. 2019); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 2010 WL 2780927, at *2 (3d Cir. July 15, 2010); *Solon v. Kaplan*, 398 F.3d 629, 634 (7th Cir. 2005). The designation "partner" in a large professional services firm is "not simply a title that carrie[s] no legal significance." *Von Kaenel*, 943 F. 3d at 1144.

To hold otherwise would turn the well-settled structures of large accounting, consulting, and law firms upside down. The *Lemon* Court observed that treating the plaintiff, "an equity partner in a conventionally-structured law firm, as an employee" would be akin to "single-handedly refashioning the foundation of a prevailing form of legal practice. *Clackamas* provides no warrant for it. Our common law tradition provides no warrant for it. Our sister circuits warn against it." 985 F.3d at 398-399 (citing *Solon*, 398 F.3d at 634, and *Von Kaenel*, 943 F.3d at 1144). Since *Clackamas*, we are unaware of a circuit court holding that an equity partner in a large professional services firm is an "employee."[6]

Considering Howie's allegations—that he was a senior partner with equity, exposure to the firm's profits and losses, leadership responsibilities, and a right to participate in firm governance—detailed analysis of the *Clackamas* factors is unnecessary to resolve this case. *See Dabney*, 2023 WL 4399048, at *7 ("[W]hile this inquiry is generally fact intensive and case specific, equity partners at law firms have received consistent treatment from other circuit courts which have considered whether such partners qualify as employees.").

---

[6] Although this question "has not yet been decided by the Second Circuit," at least one judge in the Southern District of New York recently agreed that professional services firm partners are not employees. *See Dabney v. Hughes Hubbard & Reed LLP*, 2023 WL 4399048, at *7 (S.D.N.Y. July 6, 2023).

That said, applying *Clackamas* here also makes it crystal clear that Howie was a partner, not an employee. The *Clackamas* factors are: (1) whether an organization can hire or fire the individual, or set the rules of their work; (2) whether the individual's work is supervised; (3) whether the individual reports to someone; (4) whether the individual is able to influence the organization; (5) whether the individual was intended to be an employee; and (6) whether the individual shares in the profits, losses, and liabilities of the organization. 538 U.S. at 440-50. This case is an easy one. All parties intended Howie to be a partner and treated him as such. He had equity and was compensated as a partner. He enjoyed substantial protection from termination. He possessed rights to participate in firm decisionmaking processes. He held leadership roles. He operated with autonomy, choosing where and how to devote his time. And his reporting roles were administrative and not indicative of employee status. Application of *Clackamas* makes clear that Howie was not an employee and cannot avail himself of SOX's whistleblower protections.

***First, Howie was not intended to be an employee: EY US treated Howie as a partner, and Howie held himself out as a partner.*** No one disputes this. Howie was an EY US partner. (AC ¶¶ 24, 26); *supra* at 3-4. Howie does not and cannot allege indicia of employee status; he does not and cannot allege he was party to an employment agreement or received a W-2 tax form, nor does he (nor could he) allege his compensation was treated as employment income. *See Clackamas*, 538 U.S. at 450. There is no question that all parties intended Howie to be a partner.

***Second, Howie shared in the profits and losses of the firm: he was compensated as a partner.*** Howie held an ownership interest in EY US and was compensated as a partner. Howie alleges that ███████████████████████████████████████████████████████████

(AC ¶¶ 76-77.) Howie does not allege he received a salary or other fixed compensation like an employee; he admits that ████████████████████████████████████████████
████████████████████████████████████████████████████████ (*Id.* ¶ 77.) He alleges ████████
██████ (*Id.*) He admits that ██████████████████████████████ (*Id.* ¶ 78.) Notably, Howie does *not* allege that his shares were *de minimis*, or that he was compensated at the level of an EY US employee ██████████████

Howie's attempt to avoid the inevitable conclusion that he was a partner reveals the weakness of his argument: he alleges that ████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████ (*Id.* ¶ 77.) Notably, Howie does not allege that he ever failed to receive his full distribution in any given year pursuant to the terms of the EY US Partnership Agreement. The fact that ████████████████████████████████████████
██████████████████████ does not undermine his partner status.

There is no requirement under the law (or practice) that partners be compensated on a lockstep basis based *solely* on dividing that partner's capital contributions by all partners' capital contributions, without consideration of other factors. *See Lemon*, 985 F.3d at 394 ("Like *all other partners*, [plaintiff] was compensated according to a *formula* whose output varied with the profits and losses of the firm") (emphasis added); *Von Kaenel*, 943 F.3d at 1144 (equity partner "benefitted in the firm's profits and was disadvantaged by its losses, albeit through a 'a complicated calculation'" to determine distributions) (emphasis added). As in *Lemon* and *Von Kaenel*, ████████████████████████████████████████████████████
████████████████████████████████████████████ *See* Ex. B, EY US Partnership

Agreement, § 7(d).[7] Howie's argument proves too much: it underscores that he did, in fact, share in the Firm's profits and losses.

Howie's final contention—██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████—is

even worse. (AC ¶¶ 76-77.) ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ To accept Howie's argument would be to upend US partnership law.

***Third, EY US could not "hire or fire" Howie or "set the rules" of his work unilaterally: Howie enjoyed substantial protection from termination.*** ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *See* Ex. B, § 4(b)(iii)(B). Howie

concedes that, ██████████████████████████████████████████████

████████████████████████████████████ (AC ¶ 325); Ex. B,

§ 11(b)(i). ████████████████████████████████████████████████

████████ Ex. B, § 11(b)(ii). Howie *admits* that he was withdrawn from the partnership "*for cause*" in May 2025 for "disclosing attorney-client privileged communications … and refusing" to remediate those "improper disclosures." (AC ¶ 342 (emphasis added).) Howie's conclusory statement that "management could hire or fire Howie at any time and without cause" (*id.* ¶ 73) is inconsistent with his own allegations: he concedes that he was permitted to remain at (and be paid by) EY US from June 2024 through May 2025 (nearly a year after his EY Global rotation

---

[7] The EY US Partnership Agreement is submitted as Exhibit B. The Amended Complaint includes extensive allegations about Howie's rights and obligations under the Partnership Agreement, and it therefore may be considered on a motion to dismiss. *See Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014).

ended, and thus well more than any six month notice period)—and concedes that his ultimate withdrawal for cause was only after his disclosure of privileged communications (and subsequent failure to remedy). (*Id.* ¶¶ 322, 342.) Numerous courts, including the Third, Fourth and Seventh Circuits, have found such protections to be persuasive indicia of partner status. *See Lemon*, 985 F.3d at 398; *Solon*, 398 F.3d at 633; *Kirleis*, 2010 WL 2780927, at *2.

Howie suggests that EY US "set the rules" of his supposed "employment," but fails to allege facts to support these threadbare assertions. He alleges that the firm "controlled the resources," "set deadlines," and "assigned projects." (AC ¶ 73.) These vague allegations merely describe someone who *works*, and in no way indicate he was an employee. *See Kirleis*, 2009 WL 3602008, at *21. Howie's apparent coup-de-grace is that he was expected to "work across multiple time zones and attend meetings outside of non-traditional [*sic*] business hours." (AC ¶ 73.) Howie accepted leadership roles as the *Global* PACE leader and *Global* Risk COE co-leader—did he think that all meetings with people around the globe would be done on his own Eastern Standard Time? Even absent his Global role, a senior, experienced partner in a large professional services firm is not automatically entitled to a nine-to-five schedule (quite the opposite). (*Id.* ¶¶ 24, 70); *see Rodal v. Anesthesia Grp. of Cent. N.Y.*, 2006 WL 208835, at *3 (N.D.N.Y. Jan. 23, 2006). Howie's allegations underscore that he was a senior partner with substantial responsibility.

***Fourth, Howie had the ability to influence the organization: he participated in firm decisionmaking.*** Howie admits 

(AC ¶¶ 75, 79.)

Ex. B, §§ 3, 21,

22(a). Yet he insists that because *one of* these rights ████████████████████████
████████████████████████████ (AC ¶ 79), all his other rights are irrelevant. He
is wrong. *See Kirleis*, 2009 WL 3602008, at *18.

Even where some decisionmaking is delegated to upper-level management committees,
no loss of partner status occurs. *See Lemon*, 985 F.3d at 398; *Cronkhite v. Unity Physician Grp.,
P.C.*, 2007 WL 1035091, at *9 (S.D. Ind. Mar. 30, 2007). Courts have rejected the idea that, to be
a partner, an individual *actually* must serve in management positions or *actually* must influence
firm matters. *See*, *e.g.*, *Cronkhite*, 2007 WL 1035091, at *9. Instead, the *ability* to serve or
influence is the indicator of partner status. *Id.* Accordingly, in *Lemon*, the Fourth Circuit
emphasized that, although the day-to-day affairs of plaintiff's law firm were managed by the
firm's Management Committee, "[n]o one had more of a right to run for election to the
Management Committee" and no one "ha[d] a superior claim on any of the Board's officer
roles." 985 F.3d at 397-398.

As in *Lemon*, ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████ The fact that other
partners had more personal influence—or that his peers may have disagreed with his professional
judgment—does not negate the fact that he had the ability to influence the firm and does not
transform him from a partner into an employee. *See id.* at 398; *Kirleis*, 2009 WL 3602008, at
*23.[8]

---

[8] ████████████████████████████████████████████████████
(*See* AC ¶ 79.)

***Fifth, Howie was not "supervised" like an employee; he ran audits, led initiatives, and exercised substantial autonomy.*** Howie handled "partner assignments" including having worked on "some of the largest audits at the Firm." (AC ¶ 25.) This shows autonomy; by PCAOB rules, an audit "engagement partner" like Howie "is responsible for the engagement and its performance." PCAOB AS 1201.03: *Supervision of the Audit Engagement; see also* AICPA Standard AU-C § 220. Audit partners *must* exercise autonomy, and cannot sign an audit opinion unless they are comfortable with it in their professional judgment. Unsurprisingly, because it would be inconsistent with his obligations as an auditor, Howie never alleges that he was "supervised" by EY US "executive leadership," nor any other member of the EY US partnership. After years as an audit partner, Howie then transitioned into a professional practice role, advising audit teams on what he characterizes as "complex" accounting and auditing matters. (AC ¶ 25.)

Howie continued to exercise autonomy in partner-level roles during his rotation at EY Global. Howie alleges that he co-founded and co-led the EY Global Risk COE and led EY Global's PACE efforts, (AC ¶¶ 24-25), roles that he admits involved "frequent interaction with senior leaders from EY Global." (*Id*. ¶¶ 70.) He even alleges he presented his proposals to "Firm leadership under the STC initiative and as part of [his] Risk COE role." (*Id*. ¶ 90.) According to Howie, he decided which perceived "client risks" to "investigate" through "adverse media scraping," how to present the public information he collected, and to which colleagues in "Firm leadership" he should present his ideas. (*Id*. ¶¶ 70, 90, 100 143, 152, 155, 161, 166-169, 201, 219-220, 234.) He even alleges he "objected to" a request from one of his alleged EY Global "supervisors" to shift his focus away from "Risk COE matters" and thereafter continued in his Risk COE role. (*Id*. ¶¶ 196-197.) Howie's *own* allegation is that he managed a team and directed it as he saw fit. (*Id*. ¶¶ 80, 210, 218, 257, 333.) Howie's conclusory contention that he "did not

have discretion to determine what projects or assignments he worked on, when he worked on those projects, or how long he spent working" is inconsistent with his own, more specific factual allegations. (*Id.* ¶ 73); *Lemon*, 985 F.3d at 397-98.

**Sixth, Howie's reporting roles were nominal and not indicative of subordination.** The fact that Howie worked with others at EY Global does not make him less of a partner. In *Lemon*, the Fourth Circuit held the plaintiff was not an employee, even though her "work was subject to review by other partners," because this requirement "applied equally to all shareholders" and "[t]he organization's supervision of her work was for quality-control purposes only and, ultimately, purely advisory in nature." 985 F.3d at 397-98 (cleaned up). A partnership, by definition, includes more than one person, working together. Notably, Howie does not even allege that he "reported" to anyone at EY US. And, in any event, even his allegations that, while at EY Global, he "reported to" senior leaders who "assigned and reviewed his work product," determined when those projects were complete, and instructed "which projects Howie had to work on next," (AC ¶ 74), are again inconsistent with his more specific allegations that he was the founder and co-leader of EY Global initiatives, roles in which he alleges that he was directing research and initiatives to address audit risk. (*See*, *e.g.*, *id*. ¶¶ 90-92, 94, 109, 272.) Howie's meager allegations about his "reporting" roles, especially when considered with the other indicia of partner status, do not suggest that he was an employee.

\*    \*    \*

The Amended Complaint makes clear that Howie was a partner. The *Clackamas* factors also make clear that Howie was a partner. And discovery could not remedy the clear deficiencies in his claim considering his undisputed allegations confirming his partner status. This Court should not countenance this kind of "basic deficiency," which "should … be exposed at the point

15

of minimum expenditure of time and money by the parties and the court." *Bell Atlantic v. Twombly*, 550 U.S. 544, 558 (2007) (citation omitted). Because Howie cannot state a SOX whistleblower claim, his Amended Complaint must be dismissed with prejudice.

## III.    Howie Fails to State a SOX Claim Against EY US.

The Amended Complaint fails to allege a SOX claim against EY US for additional and independent reasons. To allege a claim under 18 U.S.C. § 1514A, an employee must plausibly allege that (i) he engaged in protected activity, (ii) his employer knew he engaged in the protected activity, (iii) he suffered an unfavorable personnel action, and (iv) the activity was a contributing factor in the unfavorable action. *Bechtel v. Admin. Rev. Bd., U.S. Dep't. of Labor*, 710 F.3d 443, 447 (2d Cir. 2013). The Amended Complaint fails to allege that Howie engaged in protected activity or that such protected activity was a "contributing factor" to any adverse action.

The starting point for evaluating whether a plaintiff properly has invoked a whistleblower statute is the text of that statute; if the statutory language is not satisfied, the claim must be dismissed. *Segarra v. Fed. Rsrv. of N.Y.*, 17 F. Supp. 3d 304, 310 (S.D.N.Y. 2014) (Abrams, J.) (dismissing whistleblower complaint because allegations did not hew to statutory requirements). Here, SOX does not protect all "whistleblowing." Instead, following Enron, Congress designed § 1514A only to protect employees of public companies and their "contractors" who report conduct "reasonably believe[d]" to constitute one of six enumerated forms of fraud: (1) mail fraud (18 U.S.C. § 1341); (2) wire fraud (18 U.S.C. § 1343); (3) bank fraud (18 U.S.C. § 1344); (4) securities fraud (18 U.S.C. § 1348); (5) any rule or regulation of the SEC; or (6) any provision of federal law relating to fraud against shareholders. 18 U.S.C. § 1514A(a)(1).

To establish protected activity, an employee therefore must show both that (a) "he believed that the conduct constituted a violation" of one of the six laws or rules listed in the

16

statute and (b) "a reasonable person *in his position* would have believed that the conduct constituted a violation" of one of those laws or rules. *Nielsen*, 762 F.3d at 221 (emphasis added) (citation omitted). As alleged, Howie was a senior partner who spent decades at a Big Four accounting firm where he "worked on some of the largest audits at the Firm," and "consult[ed] on complex technical accounting[,] auditing[,] and Firm risk management matters." (AC ¶ 25.) Because Howie styles himself deeply experienced with these topics, the bar he must overcome to allege a "reasonable belief" rises accordingly. *Nielsen*, 762 F.3d at 221. Analysis of Howie's claims must be performed through a lens of a sophisticated, experienced audit partner.

Courts regularly dismiss SOX claims where a plaintiff raises complaints about matters outside SOX's six categories of fraud. *See id.* at 223; *La Belle v. Barclays Cap. Inc.*, 2024 WL 878909, at *2 (2d Cir. Mar. 1, 2024) (collecting cases). Courts also dismiss SOX claims where a plaintiff reports conduct relating to a "contractor" of a public company, not the public company itself. *See, e.g., Tellez*, 2019 WL 2343202, at *4; *Baskett*, 2018 WL 4757962, at *8. These requirements make sense; Congress passed SOX to curb public company fraud affecting shareholders, not to provide a cause of action to anyone who happens to work at or with public companies. *See Lawson*, 571 U.S. at 429; *Anthony*, 130 F. Supp. 3d at 652.

### A.    Howie Fails to Allege Protected Activity.

Howie fails to allege he engaged in protected activity for several reasons. First, Howie's allegations regarding separate legal entities—EY Global and other EY member firms—cannot form the basis of a SOX claim against EY US because those allegations are unrelated to EY US's role as a "contractor" under § 1514A. Second, Howie's limited allegations regarding EY US fail because (1) they largely relate to internal EY US matters, not public company fraud at an issuer for which EY US was a "contractor," and (2) even for the handful of allegations that do relate to

a public company for which EY US served as a contractor (Registrant 3), Howie does not allege

he reported fraud to EY US, and his allegations are unreasonable.

        1.      <u>Howie's Allegations That Are Unrelated to EY US's Role as a "Contractor" Cannot Trigger SOX Liability.</u>

        a.      Allegations About EY Global.

Howie was on rotation at EY Global from 2020 to June 2024—*the entire period* of his

supposedly protected activity. (AC ¶¶ 58, 320.) Accordingly, almost all of Howie's allegations

describe his work for EY Global or conversations with EY Global personnel. (*See*, *e.g.*, *id.* ¶¶ 69-

72, 82-165, 169-179, 191-317.) These allegations cannot form the basis of a SOX claim.

Although Howie alleges that EY US "offer[s] various services," (*id.* ¶ 29), he makes no such

allegation about EY Global. (*Id.* ¶¶ 31-55.) Nor can he: EY Global provides no professional

services, and therefore cannot be a "contractor" under § 1514A. Because EY Global is not a

"contractor," Howie cannot maintain a SOX claim concerning EY Global's activity.

Nor can these allegations support a SOX claim against EY US. Because EY Global is not

a "contractor," Howie's allegations about EY Global do not "relate to [a] contractor's provision

of services to [a] public company." *Anthony*, 130 F. Supp. 3d at 652; *see also Baskett*, 2018 WL

4757962, at *8. And they certainly do not relate to work performed by *EY US* as a "contractor."

Thus, for both reasons, Howie's allegations about EY Global (the majority of his allegations) are

inadequate to state a claim.[9]

---

[9] Nor does Howie allege any connection between his purported protected activity at EY Global and any action taken by EY US. To the extent he attempts to connect these allegations to EY US, he relies on impermissible group pleading and vague references to "EY" or "EY leadership" to mask the clear deficiencies in his Amended Complaint. *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016). Courts routinely reject attempts to collapse the legal distinction between an accounting firm network's coordinating entity (like EY Global) and its member firms (like EY US). *See*, *e.g.*, *Aegean Marine Petroleum Network*, 529 F. Supp. 3d at 158.

b.      Allegations About Other EY Member Firms.

The Amended Complaint also includes allegations about other EY member firms and

their audit clients, none of which relates to EY US's role as a "contractor." (*See* AC ¶¶ 83, 183,

192, 224-25.) With respect to *all but one* of the companies discussed in the Amended Complaint

(Registrant 3), Howie does not allege that any were EY US clients (they were not). Nor does

Howie allege that many of these clients are even public companies.

Howie's allegations related to other EY member firm audit clients fail. To the extent these

companies are not public, Howie cannot allege a SOX claim relating to them. *Anthony*, 130 F.

Supp. 3d at 652; *Baskett*, 2018 WL 4757962, at *8. To the extent the companies are public,

another EY member firm—not EY US—is the "contractor" under § 1514A. The Amended

Complaint provides no basis to hold EY US liable for activity at another EY member firm, and

for good reason, as courts repeatedly have recognized that an accounting firm in a global

network is not vicariously liable for the conduct of other firms in the network. *See, e.g.*, *Aegean

Marine Petroleum Network*, 529 F. Supp. 3d at 158; *Nuevo Mundo Holdings v. Pricewaterhouse

Coopers LLP*, 2004 WL 112948, at *3 (S.D.N.Y. Jan. 22, 2004).

2.      Howie's Limited EY US Allegations Fail.

What is left, then, are Howie's limited allegations about EY US, which also fail to allege

SOX protected activity, though for different reasons. Howie asserts two categories of allegations

against EY US: (1) allegations relating to internal firm processes—the Audit Quality Review

("AQR") process and the inclusion of EY US clients on the Global Watchlist ("GWL")—and

(2) allegations regarding Registrant 3. Both categories fail.

a.      Allegations About Internal Firm Processes.

*AQR Program*. Howie's claims about the AQR program, (AC ¶¶ 298-309), fail because

they "concern the Firm and its internal structure rather than fraud committed by a public

company or on its shareholders." *Baskett*, 2018 WL 4757962, at *8. To be protected, "whistleblowing must relate to the contractor's provision of services to the public company." *Anthony*, 130 F. Supp. 3d at 652. None of Howie's allegations about the AQR program relates to the provision of services to a public company.

Howie's allegations about the AQR program fail for several other independent reasons, too. For one, they do not relate to EY US. Howie's AQR allegations describe conversations among *EY Global* personnel about the AQR program and do not explain how these conversations are SOX-protected reporting. (*See id.* ¶¶ 301-06.) Moreover, these conversations took place *after* EY US offered Howie retirement, meaning they could not have *prompted* a retaliatory retirement offer. (*Id.* ¶¶ 302-306, 322.) ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ (*Id.* ¶ 307); *see also*

*Fraser v. Fiduciary Tr. Co. Int'l*, 417 F. Supp. 2d 310, 322-323 (S.D.N.Y. 2006).

**Global Watchlist.** Howie makes allegations about ████████████████████

████████████████ (AC ¶¶ 254, 257-59, 262.) To start, Howie's allegations make clear that (unsurprisingly) the *Global* Watchlist was maintained by EY *Global*. (*Id.* ¶¶ 251-53.) His claims about the GWL therefore fail because they do not relate to EY US's work as a contractor for a public company. *See Baskett*, 2018 WL 4757962, at *8; *Anthony*, 130 F. Supp. 3d at 652; *Gibney*, 25 F. Supp. 3d at 744.

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

(AC ¶¶ 254-256.) ████████████████████████████████

████████████████████████████ (*id.* ¶ 255-56), ████████████████████████████

█████████████████████████████████████████████ Most importantly, Howie

makes no effort to allege how ███████████████████████████████████████████

███████████████████████████████████ amounted to reporting a reasonable belief of a

violation of one of the six enumerated categories of fraud. § 1514A(a)(1).

      b.      Allegations About Registrant 3.

All that remains are allegations about a single public company audited by EY US, for

which EY US may be a "contractor": Registrant 3.[10] These allegations also fail.

      (i)      *Howie Did Not Report Fraud Relating to Registrant 3.*

Howie fails to allege that he ever reported *fraud* at Registrant 3 to anyone at EY US.

Indeed, his specific allegations demonstrate otherwise. The Amended Complaint alleges that,

"[o]n November 26 and December 5, 2021, shortly after Chau's arrest, Howie emailed [EY US

partner] Cupersmith articles detailing Chau's criminal ties and highlighted Chau's involvement

with Registrant 3." (AC ¶ 166.) In the email, Howie asserted that "[t]he relationship raises

*considerations* for continuance, risk reassessment, potential audit approach changes, etc.

including risk from this business." (*Id.* ¶ 167 (emphasis added).) Cupersmith discussed the

matter with Howie, and Cupersmith "acknowledged his [pre-existing] awareness" of the

information but explained his view that it was "a routine customer matter related to accounts

receivable collectability." (*Id.* ¶ 168.) The Amended Complaint does not allege that Howie

contested Cupersmith's view, nor, critically, *ever alleges* that he told Cupersmith that Registrant

3 or EY US *had violated any securities law* or committed any other type of fraud covered by

---

[10] As described above, audit services are provided exclusively by Ernst & Young LLP, not Ernst & Young U.S. LLP. *See supra* n.1.

§ 1514A. These are the *only* factual allegations regarding the reporting of concerns about Registrant 3 to anyone at EY US.

The Amended Complaint therefore alleges only that Howie forwarded publicly available news articles to an EY US partner who Howie admits already was aware of the information. Howie's emails, quoted in his Amended Complaint, further characterize his concerns as a risk assessment issue, and did not suggest that Registrant 3 was engaged in unlawful activity. (*Id.* ¶ 167.) This is not the kind of conduct that SOX protects. *See La Belle,* 2024 WL 878909, at *4. Indeed, because Cupersmith already was aware of Chau's arrest, Howie cannot allege that he provided Cupersmith with previously unknown information. Nor did Howie identify any unlawful activity by Registrant 3. Therefore, separately, because there was nothing to "provide," Howie did not "provide information" about Registrant 3 within the meaning of § 1514A. *See Segarra*, 17 F. Supp. at 310 (plaintiff did not "provide information" within the meaning of the Federal Deposit Insurance Act).

Independently, Howie cannot allege fraud regarding Registrant 3 because he had no interactions with Registrant 3, and had no actual evidence that Registrant 3 was engaged in malfeasance of any kind, much less fraud. Howie does not allege that he provided any services to Registrant 3, visited its offices, communicated with anyone at the company, reviewed any audit workpapers, or had *any* involvement with the audit of Registrant 3. SOX "only covers contractors insofar as they are *firsthand witnesses* to corporate fraud at a public company." *Anthony*, 130 F. Supp. at 652 (emphasis added). Howie was not a firsthand witness to *any conduct* at Registrant 3; he is someone who read the news. The Court can dismiss his allegations concerning Registrant 3 for this reason alone.

Nor can Howie rely on vague allegations that, "from 2021 through 2024, Howie repeatedly reported that the casino group facilitators, such as Registrant 3, were … in violation of U.S. securities laws" or his barebones assertions that he raised unspecified "concerns" about unspecified "connections to organized crime … directly to [Nancy] Salisbury and Cupersmith," at unspecified times, in unspecified manners. (*Id.* ¶¶ 190, 166.) In these allegations, Howie does not say what he reported, how he reported it, when he raised concerns, or that he ever said that Registrant 3 violated securities laws, much less why. Conclusory allegations like these are not entitled to a presumption of truth and may be disregarded. *See Nielsen,* 762 F.3d at 223.

(ii)    *Howie Has Not Identified Fraud by Registrant 3, Even After the Fact.*

Howie's claims regarding Registrant 3 fail for another, separate reason: they do not amount to securities fraud at all. Howie raises a few theories of purported fraud related to Registrant 3 for the first time in this litigation. But, in addition to *never* having been "reported," these new allegations do not amount to "securities fraud," and no audit partner of Howie's tenure reasonably could believe they did. Howie invents three categories of purported violations to support his SOX claim: (1) allegedly deficient disclosures by Registrant 3, (2) purported violations of anti-money laundering laws, and (3) violations of PCAOB audit standards. None qualifies under SOX.

***Howie's Disclosure Theory***. Howie alleges that Registrant 3 included "material misstatements" in its SEC filings "from 2017 to 2023" by failing to disclose its supposed "involvement with criminal activity" and "the regulatory investigations into key business partners." (AC ¶¶ 7, 185.) He further alleges that, after Chau's arrest, Registrant 3 failed to correct these prior (and unspecified) disclosures. (*Id.* ¶ 170.) This theory fails for several reasons.

23

*First*, Howie needs to demonstrate *with specificity* why Registrant 3's disclosures were misleading. *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *Carpenter v. Oscar Health, Inc.*, 2025 WL 722729, at *5-7 (S.D.N.Y. Mar. 6, 2025). He has not done so. The mere fact that a person affiliated with a vendor of one of Registrant 3's casinos was arrested does not show that Registrant 3's disclosures were misleading.

*Second*, Registrant 3 could not have committed a securities law violation by failing to disclose information that was *already public*—investors already had access to, and could make decisions based on, the news of Chau's arrest. Indeed, "[w]here allegedly undisclosed material information is in fact readily accessible in the public domain, a defendant may not be held liable for failing to disclose this information." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014). Given Howie's role, *all* his complaints were based on *already* public information.

*Third*, the Supreme Court recently held that a "pure omission" is not actionable under Section 10(b) of the Securities and Exchange Act unless it "renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 265 (2024). Howie has not identified any affirmative statement in Registrant 3's filings that is misleading by omission.

*Fourth*, even before Chau's arrest, Registrant 3 included relevant disclosures in its SEC filings. Registrant 3 disclosed its relationships with gaming promoters, the regulation of those promoters, and the risks associated with them. For example, Registrant 3's 2020 Form 10-K, of which this Court may take judicial notice,[11] stated that Registrant 3 ███████████████████

---

[11] *See Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 535 (S.D.N.Y. 2017) ("When presented with a motion to dismiss … the Court may consider documents that are referenced in the complaint" and "can take judicial notice of public disclosure documents that must be filed with the SEC").

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████[12] Howie

identifies no requirement that Registrant 3 identify by name the vendors at each of its resorts, nor

suggests any other reason the disclosures were inadequate.

*Finally*, although Howie suggests that Registrant 3 had a duty to restate prior filings after

Chau's arrest, he provides no basis for that assertion. "[P]reviously issued financial statements

should be restated only to correct material accounting errors that existed at the time the

statements were originally issued." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.

Supp. 2d 474, 486 (S.D.N.Y. 2004). Howie does not explain why Chau's arrest in November

2021 impacted the accuracy of the year prior's financial statements, much less required

restatement of prior periods. Nor does Howie identify why Registrant 3's use of a vendor that

was later arrested resulted in material accounting errors. Critically, *no restatement occurred*. No

regulator or litigant has alleged a securities claim related to this conduct.

Howie's allegations do not establish a reasonable belief of a securities law violation. *La

Belle,* 2024 WL 878909, at *4. No auditor—certainly not one with "significant experience" on

these topics—could reasonably believe that the articles Howie sent to Cupersmith indicated that

Registrant 3 violated securities laws.

***Howie's Money Laundering Theory***. The Complaint alleges that "Registrant 3 falsely

claimed effective [anti-money laundering] compliance programs and disclosure controls and

internal control over financial reporting in their Form 10Ks." (AC ¶ 186.) Howie provides no

---

[12] Exhibit C, Registrant 3 FY20 Form 10-K ████████████████████

████████████████████████████████████████████████

factual allegations whatsoever to suggest that Registrant 3's compliance programs or internal controls were ineffective. He does not explain which anti-money laundering programs he references, how Registrant 3 falsely claimed compliance with them, or why it is reasonable to believe that Registrant 3 violated any anti-money laundering laws—which in any event are not offenses listed in § 1514A. His allegations are impermissibly conclusory and fail. *La Belle,* 2024 WL 878909, at *4.

     ***Howie's PCAOB Audit Standards Theory.*** Howie finally suggests that EY US's "failure to comply with PCAOB" standards was itself a securities law violation and "makes the firm a cause of [Registrant 3's] securities law violations." (AC ¶¶ 13, 207.) This is incorrect as a matter of law.

     To start, alleged violations of PCAOB audit standards are not included in the six categories of fraud enumerated in SOX. Although SOX protects the reporting of violations of "any rule or regulation of the [SEC]," PCAOB audit standards are not SEC rules or regulations. Indeed, elsewhere in SOX, Congress specified when it meant to invoke both SEC and PCAOB rules. *Cf.* 15 U.S.C. § 7233(b) (referencing "any rule or regulation of the Commission *or of the Board*") (emphasis added). And "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (citation omitted).

     Nor can Howie tie any PCAOB audit standard violation to securities fraud by an entity for which EY US is a "contractor." As a matter of law, mere violations of PCAOB audit standards do not establish—or even reasonably create an *inference*—that any violation listed in SOX, such as shareholder fraud, has occurred. *See In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 576 (S.D.N.Y. 2012). Separately, Howie's allegations are impermissibly vague:

the Amended Complaint only mentions specific PCAOB audit standards twice and never with any details about where, when, how, and by whom these standards were allegedly violated. (*See* AC ¶¶ 105, 288.) Howie's attempt to shoehorn conclusory allegations of violations of PCAOB audit standards into a SOX claim fails.

      **B.**      **Howie Fails to Allege a Causal Connection Between Any Plausible Protected Activity and Any Adverse Action.**

As a separate ground for dismissal, Howie has not alleged *any* causal connection between his limited allegations of SOX protected activity relating to Registrant 3 and any adverse action. In fact, the Amended Complaint does not allege *any fact* connecting his Registrant 3 allegations reported to EY US to any adverse action taken by EY US. Howie does not explain why EY US would have withdrawn him from the partnership because he reported Chau's arrest to Cupersmith (which Cupersmith already knew) or suggested that Cupersmith consider client continuance (which Cupersmith already had considered). That alone requires dismissal.

The facts around his "reporting" also affirmatively doom Howie's claim. Howie alleges he communicated with Cupersmith in November and December 2021 and that he was withdrawn nearly *three-and-a-half years* later, on May 1, 2025. (AC ¶¶ 166, 342.) When a plaintiff relies on temporal proximity alone, the proximity "must be very close [and] is generally insufficient to establish causation after about three months." *Feldman v. Mind Med., Inc.*, 2024 WL 3471299, at *6 (S.D.N.Y. July 19, 2024). A three-and-a-half-year gap is plainly insufficient to establish causation. In fact, it shows that EY US did *not* retaliate based on Howie's sole report to EY US.

## CONCLUSION

EY US respectfully requests that the Court dismiss the Amended Complaint with

prejudice.[13]


Dated: October 13, 2025                    */s/ David A. Gordon*
                                            David A. Gordon (*pro hac vice*)
                                            Abigail B. Molitor (*pro hac vice*)
                                            Harry Dodsworth (*pro hac vice*)
                                            Robert Johnson III (*pro hac vice*)
                                            SIDLEY AUSTIN LLP
                                            One South Dearborn
                                            Chicago, IL 60603
                                            Tel: (312) 853-7000
                                            Fax: (312) 853-7036
                                            dgordon@sidley.com
                                            amolitor@sidley.com
                                            hdodsworth@sidley.com
                                            robert.johnson@sidley.com

                                            Eric G. Hoffman
                                            SIDLEY AUSTIN LLP
                                            787 Seventh Avenue
                                            New York, NY 10019
                                            Tel: (212) 839-5000
                                            Fax: (212) 839-5599
                                            eric.hoffman@sidley.com

                                            *Attorneys for Defendants Ernst & Young LLP*
                                            *and Ernst & Young U.S. LLP*

---

[13] To the extent not precluded by such dismissal, Howie may be able to pursue other claims in arbitration pursuant to the EY US Partnership Agreement.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(c), the undersigned counsel certifies that the foregoing Memorandum of Law in Support of Defendants Ernst & Young LLP's and Ernst & Young U.S. LLP's Motion to Dismiss the Amended Complaint complies with the word count requirement because it contains 8,708 words, as determined using the Microsoft Word 365 word-processing software.

Date: October 13, 2025                              */s/ David A. Gordon*
                                                    David A. Gordon (*pro hac vice*)

## **CERTIFICATE OF SERVICE**

I, David A. Gordon, hereby certify that on October 13, 2025, I caused a true and correct unredacted copy of the foregoing to be served via e-mail on the counsel of record for Joe Howie.

/s/ *David A. Gordon*

David A. Gordon (*pro hac vice*)