**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
  JOE HOWIE,                           :         Civil Action No.: 1:25-cv-5973
                                    :
               Plaintiff,         :
                                      :
          -against-           :
                                      :
  ERNST & YOUNG LLP, ERNST & YOUNG US    :
  LLP, AND ERNST & YOUNG GLOBAL         :
  LIMITED,                              :
                                      :
               Defendants.      :
-------------------------------------------------------------- X

 

**PLAINTIFF JOE HOWIE'S MEMORANDUM OF LAW IN OPPOSITION**
**TO ERNST & YOUNG GLOBAL'S MOTION TO DISMISS THE**
**<u>AMENDED COMPLAINT</u>**

**WIGDOR LLP**

Michael J. Willemin
Lawrence M. Pearson
Daniel J. Altaras

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
lpearson@wigdorlaw.com
daltaras@wigdorlaw.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

ARGUMENT .................................................................................................................. 5

I.      THE MOTION TO DISMISS STANDARD .................................................... 5

II.     DEFENDANT IS A CONTRACTOR OF THEIR MEMBER FIRM'S
PUBLICLY TRADED CLIENTS ................................................................... 5

III.    DEFENDANT EMPLOYED HOWIE IN CONJUCTION WITH EY US ....... 10

      1.      Defendant and EY US are a Single Integrated Employer ..................... 11

      2.      Defendant and EY US were Joint Employers ...................................... 17

CONCLUSION ............................................................................................................ 24

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

Alpha Cap. Anstalt v. New Generation Biofuels, Inc.,
  No. 13 Civ. 5586 (VEC), 2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014)................................. 10

AlSariaa v. Ascend Charter Sch.,
  No. 24 Civ. 7265, 2025 WL 2937054 (S.D.N.Y. Oct. 9, 2025) ................................... 17, 18, 20

Anthony v. Nw. Mut. Life Ins. Co.,
  130 F. Supp. 3d 644 (N.D.N.Y. 2015)...................................................................................... 8, 9

Ashcroft v. Iqbal,
  556 U.S. 662 (2009)...................................................................................................................... 5

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007)...................................................................................................................... 5

Benzinger v. Lukoil Pan Americas, LLC,
  447 F. Supp. 3d 99 (S.D.N.Y. 2020)......................................................................................... 15

Brown v. Daikin America, Inc.,
  756 F.3d 219 (2d Cir. 2014)................................................................................................. 12, 13

Chill v. Calamos Advisors LLC,
  175 F. Supp. 3d 126 (S.D.N.Y. 2016)......................................................................................... 5

Conde v. Sisley Cosmetics USA, Inc.,
  No. 11 Civ. 4010 (RJS), 2012 WL 1883508 (S.D.N.Y. May 23, 2012)............................ 22, 23

Cook v. Arrowsmith Shelburne, Inc.,
  69 F.3d 1235 (2d Cir. 1995)....................................................................................................... 12

DiFolco v. MSNBC Cable L.L.C.,
  622 F.3d 104 (2d Cir. 2010)....................................................................................................... 21

Dikambi v. City Univ. of New York,
  2021 WL 5518187 (S.D.N.Y. Nov. 24, 2021)........................................................................... 21

Doheny v. Int'l Bus. Machines, Corp.,
  714 F. Supp. 3d 342 (S.D.N.Y. 2024)....................................................................................... 15

Duff v. Pristine Servs., Inc.,
  No. 19 Civ. 104232021 (RA)2021 WL 663981 (S.D.N.Y. Feb. 19, 2021)........................ 21, 23

*Francisco v. Exclusive Mgmt. Sol. Grp., Inc.*,
No. 24 Civ. 3928, 2025 WL 1982943 (S.D.N.Y. July 7, 2025) ................................. 12

*Gladitsch v. Neo@Ogilvy*,
No. 11 Civ. 919 (DAB), 2012 WL 1003513 (S.D.N.Y. Mar. 21, 2012) ..................... 11

*Gupta v. Headstrong, Inc.*,
2018 WL 1634870 (S.D.N.Y. Mar. 30, 2018) ........................................................ 21

*Howard v. Klynveld Peat Marwick Goerdeler*,
977 F. Supp. 654 (S.D.N.Y. 1997) ........................................................................ 14

*In re Asia Pulp & Paper Sec. Litig.*,
293 F. Supp. 2d 391 (S.D.N.Y. 2003)..................................................................... 14

*In re Parmalat Sec. Litig.*,
598 F. Supp. 2d 569 (S.D.N.Y. 2009)................................................................. 16, 17

*In re Parmalat Securities Litigation*,
594 F. Supp. 2d 444 (S.D.N.Y. 2009)..................................................................... 16

*In re WorldCom, Inc. Sec. Litig.*,
No. 02 Civ. 3288, 2003 WL 21488087 (S.D.N.Y. June 25, 2003)........................... 14

*Lawrence v. Int'l Bus. Mach. Corp.*,
No. 12 Civ. 8433, 2017 WL 3278917 (S.D.N.Y. Aug. 1, 2017) ............................. 20

*Lawson v. FMR LLC*,
571 U.S. 429 (2014)................................................................................... 1, 8, 9

*Ling Nan Zheng v. Liberty Apparel Co.*,
556 F. Supp. 2d 284 (S.D.N.Y. 2008)..................................................................... 22

*Littlejohn v. City of New York*,
795 F.3d 297 (2d Cir. 2015)..................................................................................... 5

*Mangahas v. Eight Oranges Inc.*,
754 F. Supp. 3d 468 (S.D.N.Y. 2024)..................................................................... 13

*Musiello v. CBS Corp.*,
518 F. Supp. 3d 782 (S.D.N.Y. 2021)..................................................................... 15

*Regan v. In the Heat of the Nite, Inc.*,
No. 93 Civ. 862, 1995 WL 413249 (S.D.N.Y. July 12, 1995) ................................. 13

Robbins v. Candy Digital Inc.,
    23 Civ. 10619, 2025 WL 2391039 (S.D.N.Y. Aug. 18, 2025) .................................................. 11

Scivetti v. Compass Inc.,
    No. 24 Civ. 3868, 2025 WL 3097331 (S.D.N.Y. Nov. 6, 2025) ............................................ 18

Stinson v. City Univ. of N.Y.,
    No. 17 Civ. 3949, 2018 WL 2727886 (S.D.N.Y. June 6, 2018).............................................. 12

Trusz v. UBS Realty Investors,
    No. 3:09 Civ. 268, 2010 WL 1287148 (D. Conn. Mar. 30, 2010)........................................... 11

Zheng v. Liberty Apparel Co. Inc.,
    355 F.3d 61 (2d Cir. 2003)............................................................................................... 22, 23

## PRELIMINARY STATEMENT

Plaintiff Joe Howie ("Plaintiff" or "Howie") respectfully submits this memorandum of law in opposition to Defendant Ernst & Young Global Limited's ("EYG," "EY Global," or "Defendant") Motion to Dismiss the Amended Complaint.  In its motion, Defendant contends that EYG falls outside the coverage of the Sarbanes-Oxley Act ("SOX") and that Howie was never its employee.  However, Defendant's motion relies on an improperly narrow presentation of SOX coverage, and a factually premature and implausible self-serving description of EYG (which is supposed to oversee the various EY member organizations, including Ernst & Young U.S. LLP ("EY US"), including their avoidance of regulatory violations in client engagements) as nothing more than a passive umbrella entity.  Therefore, for the reasons detailed below, the Court should deny Defendant's motion in its entirety.

The Supreme Court has conclusively established that SOX extends to employees of contractors, subcontractors, and agents of public companies.  See Lawson v. FMR LLC, 571 U.S. 429 (2014).  EY Global functioned as a contractor or agent of the EY member firm's (i.e., EY US) public company clients through its direct oversight over the audit practices of its member firms, including monitoring and assessment of specific high-risk engagements with member firm clients, including SEC registrants that were clients of EY US (such as Registrant 3).  Amended Complaint ("Am. Compl.") at ¶¶24, 31, 43-57, 69-71, 287-291.  As detailed herein, Defendant's portrayal of EY Global contradicts its own claims of being a globally integrated firm and the way it functionally operates. In practice, EY Global is involved in high-risk client matters and exerts significant influence over audit teams across member firms. EY teams depend on EY Global on audit methodology, technical guidance, and key technology systems. EY Global also imposes policies and procedures upon its member firms, including a Global Code of Conduct. Finally, EY Global's policies give it the ability to decide whether member firms may accept or continue audits of high-

1

risk clients. Therefore, Defendant EYG certainly is a covered entity and liable under SOX, and this status is more than plausibly pleaded in the Complaint.

However, even if EY Global was not a covered employer in accordance with the plain language of SOX (and it is), EYG would still be liable under SOX as a single integrated or joint employer of EY US due to its close interrelationship of operations and the functional control EYG exercises over its members firms, including EY US, and over the employees (including Howie) who were assigned to work for and at EYG pursuant to a Rotational Agreement between EYG and EY US (decisively demonstrating joint/single employer status). Id. at ¶¶57-60. Ultimately, Howie pleads detailed facts demonstrating Defendant EYG's work and oversight regarding specific publicly traded clients, operational control over its member firms, including EY US, and Howie's employment by both entities to a degree that EYG can easily be found to be a covered employer under SOX. At a minimum, these issues are fact-intensive and cannot be resolved on a motion to dismiss, but require not only discovery but trial before a factfinder.

## **FACTUAL BACKGROUND**

Ernst & Young LLP ("EY LLP") and EY US are member firms of Defendant EYG. In fact, EY US's 2024 Transparency Report uses the term "EY" to refer "collectively to the global organization of the member firms of EYG." Am. Compl. ¶30. EYG's extensive involvement with EY LLP and EY US inextricably links the EYG entity and its leaders both to the execution of individual audits and the oversight of the conduct of the audit practice by its member firms across the network. Id. at ¶31. According to EY's website, which pertains to Defendant and their member firms collectively, "EY is the global organization made up of the member firms of Ernst & Young Global Limited. EY member firms have agreed to work together as a network under a common brand and are committed to global co-operation. They do this through the pursuit of the common

objectives, strategy and policies (including common standards and methodologies) of EY." <u>Id.</u> at ¶32. As such, the umbrella EY website states that "EYG is the central coordinating entity in the EY network" and "responsible for setting the objectives, strategy and policies of the EY network." <u>Id.</u> at ¶33. "EYG sets strategy for the global network" and "[e]ach EY member firm's obligations and responsibilities, as a member of EYG, are governed by the regulations of EYG and various other agreements." <u>Id.</u> at ¶34. Further, "[t]he structure and principal bodies of the global organization…reflect the principle that EY, as a global organization, has a common . . . strategy." <u>Id.</u>

"Under the regulations of EYG, EY member firms commit themselves to pursue EY objectives, such as the provision of high-quality services worldwide . . . They are required to comply with common standards, methodologies and policies, including those regarding audit methodology, System of Quality Management, risk management, independence, knowledge sharing, talent and technology." <u>Id.</u> at ¶37. Therefore, the policies, strategies and practices promulgated by EYG impact virtually every aspect of an EY member firm's business, including their service of audit clients (including publicly traded clients such as many of those relationships that were the subject of Plaintiff's legally protected complaints). <u>Id.</u> at ¶¶38-54.

Further, "[b]esides agreeing to comply with the regulations of EYG, EY member firms enter into several other agreements covering aspects of their membership in the EY organization, such as the right and obligation to use the EY name and share knowledge among EY member firms. EY member firms are subject to reviews to evaluate adherence to EYG requirements and policies governing issues, such as independence, risk management, audit methodology and talent. EY member firms unable to meet quality commitments and other EYG membership requirements may be subject to termination from the EY organization." <u>Id.</u> at ¶55.

3

Furthermore, member firms operate under a shared code of conduct, management structure, and administrative resources, including technology support, while permitting employees such as Howie to transfer between them at the discretion of EY leadership.  Id. at ¶57.  Therefore, Defendant, in conjunction with the relevant member firms, serviced the clients together.  Further, EY LLP, EY US, and EYG handled Howie's complaints collectively (while also freely moving him from one organization and entity to another).  Id. at ¶57.  Indeed, for four years from June 2020 and June 2024, Howie worked for EYG pursuant to several Rotational Agreements between EY US and EYG.  These Rotational Agreements provided that Howie would dedicate 100% of his time to his EYG Global Assurance roles.  Id. at ¶58.

Ultimately, EY LLP and EY US operated under EYG's centralized policies, tools, resources, and systems.  Id. at ¶61.  Furthermore, Plaintiff and EYG both provided guidance, oversight, and input on work done by and client relationships of EY LLP, EY US, and other member firms.  Id.  Certain client relationships and work on the part of EY US and other member firms that was scrutinized by Howie (while he was formally assigned to EYG) involved publicly traded clients in the U.S. about whom Howie raised legally protected complaints regarding fraudulent conduct and violations of SEC-enforced laws and rules by both EY and clients.  Id. EYG's authority over Howie's employment conditions, combined with the close integration of EY's global operations, demonstrates that EY LLP, EY US, and EYG functioned as a single integrated employer, or in the alternative as joint employers, with respect to Plaintiff.  Id. Accordingly, Howie's protected activity which occurred while he worked for both EY Global and EY US, indisputably a covered entity within the meaning of SOX, unquestionably supports his retaliation claims against EY Global, EY LLP, and EY US.

## ARGUMENT

### I.    THE MOTION TO DISMISS STANDARD

On a motion to dismiss, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." Littlejohn v. City of New York, 795 F.3d 297, 306 (2d Cir. 2015) (citation omitted). The complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. However, "[a]sking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." Twombly, 550 U.S. at 545. The question is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Chill v. Calamos Advisors LLC, 175 F. Supp. 3d 126, 130 (S.D.N.Y. 2016) (internal quotation marks and citations omitted).

### II.    DEFENDANT IS A CONTRACTOR OF THEIR MEMBER FIRM'S PUBLICLY TRADED CLIENTS

In their motion to dismiss, Defendant claims that it falls outside of the definition of a covered entity for the purposes of SOX coverage because they are not a contractor, subcontractor, or agent of a public company as defined by the statute because they do not directly provide services to clients. Defendant's Brief at pp. 8-9. However, SOX does not define the terms "contractor" or "agent" or clarify whether employers, such as Defendant, which also indirectly provides or supplements services to their member firms' publicly traded clients are covered with their closely integrated affiliates.

5

As detailed in the pleadings, the U.S. Registrant publicly traded clients implicated in Howie's protected activity, (e.g., Registrants 1-3) contracted with the various member firms, such as EY US, in part due to the "common brand" and "global co-operation" that Defendant provides to member firm clientele, and especially large, publicly traded companies. Am. Compl. at ¶32. Specifically, "[u]nder the regulations of [Defendant EYG], EY member firms . . . are required to comply with common standards, methodologies and policies, including those regarding audit methodology, System of Quality Management, risk management, independence, knowledge sharing, talent and technology." Id. at ¶37.  Therefore, the audit methodology, policies, strategies and practices promulgated by Defendant EYG impact and supplement virtually every aspect of an EY member firm's business and services, and all the more so for the highly regulated service of audit clients (including U.S. Registrants and other publicly traded clients such as many of the client relationships that were the subject of Plaintiff's legally protected complaints). Id. at ¶¶38-54.  As part of EYG's oversight and supplemental service to those clients, individual client relationships are assessed by employees like Howie to identify and defray risks that may have been missed as part of the Firm providing audit services.  Id. at ¶¶24, 31, 69-71.

By way of example, Defendant's "global policy on client and engagement acceptance and continuance is an example of a policy issued by EYG to help ensure the adherence to EY values and to drive consistency in the System of Quality Management."  Id. at ¶43.  Defendant was directly involved in setting policy on how EY US, EY LLP, and other member firms should vet and accept clients and specific engagements, which directly implicates Plaintiff's objections and complaints.  In fact, Defendant was involved specifically in assessing the individual client relationships objected to by Howie on legal and regulatory grounds—which goes directly to the services provided to the relevant U.S. Registrants.  Id. By way of example, Defendant was involved

in the Global Watchlist process which applied to clients, including U.S. Registrants that Howie reported. Id. at ¶¶43, 161, 198, 251.

By way of further example, Defendant's "Global Audit Methodology provides a global framework for providing high-quality audit services through the consistent application of thought processes, judgments and procedures in all audit engagements, regardless of the size." Id. at ¶47. "EY US works with the EY global organization and other stakeholders to develop and deploy enablement to support the adoption of new or revised auditing standards as well as enhancements made to [the Global Audit Methodology.]" Id. As such, Defendant's "direct involvement in the servicing and work performed for the publicly traded clients relevant to Howie's protected activities and complaints is yet another example that brings EYG under the coverage of SOX's whistleblower protection provisions." Id.

By way of further example, "EY US conducts their Audit Quality Review ("AQR") program designed to inspect completed audit engagements "in accordance with the Global AQR program." Id. at ¶49. The AQR program is a key component of the System of Quality Management, again illustrating Defendant's "direct involvement in the business practices and client service of member firms, including EY LLP, and EY US LLP." Id. Therefore, Defendant's extensive involvement inextricably links EYG both to the execution of individual audits and the oversight of the conduct of the audit practice by its member firms across the network. Id. at ¶31.

Further, Defendant's "Global Independence Policy requires EY US . . . to comply with the independence standards applicable to specific engagements (e.g., the IESBA Code and AICPA Code of Professional Conduct along with the SEC, PCAOB and other federal and state regulations)." Id. at ¶54. Defendant EYG promulgated the very policies implicated in Howie's protected activity involving their member firm's U.S. Registrant and other clients.

Crucially, Howie's role with Defendant was created to evaluate and remediate the manner in which member firms contracted with their publicly traded clients. In September 2020, Howie was tapped to work on Defendant's Strengthening Trust and Confidence" ("STC") initiative "to remediate the significant shortfalls in EY's audit processes, evidenced by the recent high-profile audit failures to improve both audit quality and risk management." Id. at ¶69. Further, "[a]s part of Howie's assignment to STC, he co-led initiatives to evaluate policies, practices, and decisions in high-risk client situations and to develop improvements to client due diligence and risk assessment processes." Id. at ¶71. Finally, "[p]rior to his removal, Howie was the co-leader of the Global Assurance Risk Center of Excellence ("Risk COE"), a group he co-founded, and the Global Process for Acceptance and Continuance of Engagements ("PACE") leader for the Assurance practice at EY." Id. at ¶24. As part of these roles, Defendant coordinated global audit policy and risk identification for audits, including SEC-registered issuers. These functions constitute the very areas of service that implicate the rules and violations that Congress sought to bring within SOX's ambit. Accordingly, particularly given SOX's broad remedial purpose and drawing all reasonable inferences in Howie's favor, he has plausibly alleged that Defendant EYG indirectly and/or jointly provided services to the U.S. Registrant clients of EY US/EY LLP and other member firms connected to his protected communications and is a contractor within the meaning of SOX.

Defendant argues that somehow Howie must be, and did not allege, that he was a "firsthand witness" to corporate fraud. Defendant's Brief at p. 9 (citing Lawson v. FMR LLC, 571 U.S. at 435 and Anthony v. Nw. Mut. Life Ins. Co., 130 F. Supp. 3d 644, 652 (N.D.N.Y. 2015)). However, neither of the cases cited by EYG are applicable to the instant case or claims. In Lawson, the court merely stated that, "Congress identified the lack of whistleblower protection as a significant deficiency in the law, for in complex securities fraud investigations, employees are [often] the only

8

firsthand witnesses to the fraud." <u>Lawson</u>, 571 U.S. at 435 (internal quotations omitted). The <u>Lawson</u> case does not hold that an employee suing under SOX must be a firsthand witness, but only comments that employees often are the only firsthand witnesses to the underlying fraud, and that is one reason why whistleblower protection is important. In <u>Anthony</u>, the plaintiff "neither alleged that she was providing services to the Northwestern Mutual Funds, nor that she reported any wrongdoing committed either by the Mutual Funds or on their behalf," and "was not in a position to be a firsthand witness to shareholder fraud by the Northwestern Mutual Funds." <u>Anthony</u>, 130 F. Supp. 3d at 652-653. Those allegations contrast strongly with those of Plaintiff. Here, Howie provided and performed compliance and oversight work for the benefit of member firms, including EY US, a contractor performing audit services for U.S. Registrants and other companies, and did so even regarding specific client relationships with U.S. Registrants which were the subject of Howie's protected complaints. Therefore, due to his role with Defendant EYG, Howie was granted the access needed to witness firsthand the likely submission of fraudulent audit disclosures in violation of securities law. Am. Compl. at ¶¶7, 123, 127, 168, 170, 185, 190.

Moreover, Defendant argues that Howie could not have been a firsthand witness to corporate fraud because he relied, in part, on publicly available information to sound the alarm. Defendant's Brief at p. 10. However, Howie did not simply rely on publicly available information (and even if he did, publicly available information could serve as the basis of protected complaints if covered violations or fraud are implicated). Am. Compl. ¶¶ 100, 104, 130, 143, 155-157, 161, 203, 209, 254-256, 318. Howie used media scraping to discover troubling connections between clients and crime figures, partnered with research firms and academics, and "developed new forensic tools to identify clients with elevated fraud risk and focus efforts." <u>Id.</u> at ¶100. Howie revealed much more than just "public information," and he consistently pointed out risks that the

9

audit teams missed in internal audit workpapers in addition to material misstatements in clients' SEC filings (which certainly was not a matter of public knowledge). See, e.g., Id. at ¶¶43-44, 71, 100-101, 104-106, 139-141, 143, 147, 153, 156-157 (reviewed continuance memos), 159-161 (reviewed audit memos), 167-168, 176, 208, 213, 218-220, 226, 229-234, 241.  Courts have disposed of similar arguments under SOX: "Defendants' argument that [their client] had no duty to disclose information . . . simply because the reports were accessible through the internet is an oversimplification of the law."  Alpha Cap. Anstalt v. New Generation Biofuels, Inc., No. 13 Civ. 5586 (VEC), 2014 WL 6466994, at *9 (S.D.N.Y. Nov. 18, 2014).

Finally, Defendant claims that Howie did not engage in protected activity because his complaints did not relate to any member firm's U.S. Registrant clients.  Defendant's Brief at pp. 10-11.  This is false on the face of the Complaint.  See, e.g., Am. Compl. at ¶¶ 3-17, 66-68, 95, 103-128, 164-170, 184-190, 191-207, 208-216, 217-241, 251-263, 288, 298-309, 351.  As detailed in his opposition to EY US and EY LLP's motion to dismiss, Howie repeatedly engaged in protected activity, or at a minimum, reasonably believed that he did, when he expressed concerns regarding their Audit Quality Review ("AQR") program, high risk clients such as those on the Global Watchlist ("GWL"), publicly traded clients such as U.S. Registrants 1-5 and 9, material misstatements in various SEC filings and violations of PCAOB Auditing Standards. Id.; see also Opposition to EY US and EY LLP's Motion to Dismiss at pp. 17-26.

## III.    DEFENDANT EMPLOYED HOWIE IN CONJUNCTION WITH EY US

As an initial matter, Defendant claims that Howie was not employed because he was a partner with nominal "equity" in a partnership.  Defendant's Brief at p. 11.  However, the law is well-settled that it is not an individual's mere title or status (such as a "partner" or "principal"), but rather the practical realities of their job and relationship with the employer that determine

10

whether an individual is an employee, with reference to and analysis of various fact-intensive factors. See Opposition to EY US and EY LLP's Motion to Dismiss at pp. 2-14. In this case, the reality of Howie's job strongly establishes that he worked as an employee for purposes of SOX under the appropriate analysis. Id. In fact, the Occupational Safety and Health Administration ("OSHA") already made a factual finding that Howie qualified as a covered and protected "employee" under SOX, showing that Howie's allegations and the basic evidence available to OSHA more than plausibly or reasonably support his practical "employee" status. Am. Compl. ¶ 19. Therefore, accepting all allegations as true and drawing all reasonable inferences in favor of Plaintiff, Howie has at least adequately pleaded his status as a bona fide employee under the fact-specific analysis that applies under SOX.

Additionally, Defendant falsely argues, without citation to any supporting authority, that the "integrated" and "joint" employer doctrines are irrelevant and have no bearing on SOX liability. Defendant's Brief at p. 12. However, the law clearly recognizes, particularly in the SOX context, the single integrated and joint employer doctrines. See, e.g., Gladitsch v. Neo@Ogilvy, No. 11 Civ. 919 (DAB), 2012 WL 1003513, at *5 (S.D.N.Y. Mar. 21, 2012) ("The Complaint, combined with publicly available information and documents integral to the Complaint, sufficiently show that Ogilvy and Neo are a single or joint employer" for purposes of alleging retaliation under SOX); Trusz v. UBS Realty Investors, No. 3:09 Civ. 268, 2010 WL 1287148, *6 (D. Conn. Mar. 30, 2010) ("this Court concludes that the integrated employer test would be applicable in a SOX case"). Accordingly, because Howie successfully demonstrates the applicability of these doctrines, he may proceed under SOX against Defendant.

1.    **Defendant and EY US are a Single Integrated Employer**

"A group of distinct but closely affiliated entities should be treated as a single employer, when they operate as a single integrated enterprise." Robbins v. Candy Digital Inc., 23 Civ. 10619,

2025 WL 2391039, at *14 (S.D.N.Y. Aug. 18, 2025) (internal citation and quotations omitted). The single integrated enterprise test examines: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240 (2d Cir. 1995) (citation omitted). "Although no one factor is determinative," and, indeed, not all four factors are required, "control of labor relations is the central concern." Francisco v. Exclusive Mgmt. Sol. Grp., Inc., No. 24 Civ. 3928, 2025 WL 1982943, at *6 (S.D.N.Y. July 7, 2025), report and recommendation adopted, 2025 WL 2106678 (S.D.N.Y. July 28, 2025). For a single integrated enterprise claim to survive a motion to dismiss, "a plaintiff must at least allege facts so that the claim is plausible and gives fair notice to defendants of his theory." Stinson v. City Univ. of N.Y., No. 17 Civ. 3949, 2018 WL 2727886, at *9 (S.D.N.Y. June 6, 2018). However, the determination whether two employers functioned as a single enterprise is usually premature at this early stage in the proceeding. See Brown v. Daikin America, Inc., 756 F.3d 219, 226 (2d Cir. 2014) ("Whether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable to resolution on a motion to dismiss.").

Here, Defendant EYG, alongside its member firms, operated under a shared code of conduct, management structure, and administrative resources, including technology support, while permitting employees such as Howie to transfer between them at the discretion of EY leadership. Therefore, Defendant, in conjunction with its member firms managed employees and serviced clients together and collectively. Crucially, EY LLP, EY US, and the other member firms involved handled Howie's complaints collectively with EYG (while also freely moving him from one organization and entity to another). Am. Compl. at ¶57. Indeed, between June 2020 and June 2024, which includes the entire period that Howie engaged in protected activity, he worked for

12

Defendant EYG pursuant to several Rotational Agreements between EY US and Defendant. These Rotational Agreements provided that Howie would dedicate 100% of his time to his Global Assurance roles and that Global Assurance would cover expenses related to the Global Assurance initiatives he worked on. Id. at ¶58; see also Brown, 756 F.3d at 232, n. 8 ("[T]he very system of assigning employees from one company to work for a period of years at another company suggests a significant degree of interrelated operations.") (internal citations and quotations omitted). Further, "Evidence that employees split time between two companies can also show that labor relations were centrally controlled." Mangahas v. Eight Oranges Inc., 754 F. Supp. 3d 468, 487 (S.D.N.Y. 2024); see also Regan v. In the Heat of the Nite, Inc., No. 93 Civ. 862, 1995 WL 413249, at *3 (S.D.N.Y. July 12, 1995) (fact that "employees of Manny's Car Wash can be called upon to fill in at, for example, the Bear Bar or Brother Jimmy's if either of the other two restaurants are short-staffed" is not only "good evidence that the various bars maintain 'interrelated operations,' . . . but it also supports a reasonable inference of the presence of the most important factor in the analysis—the 'centralized control of labor relations.'"). Thus, Howie plausibly alleged sufficient interrelation of operations and centralized control of labor relations, the most important factor in the analysis, to establish the applicability of the single integrated employer doctrine.

In their moving papers, Defendant argues that they are not a single integrated employer with EY US because courts "routinely reject claims that member firms of a global accounting network should be treated as a single entity." Defendant's Brief at p. 13. However, Howie never claimed that *every* member firm should be treated as a single entity with every other member of the network. Rather, Howie alleges that EY Global, as the central entity with extensive shared functions and personnel, is part of an integrated enterprise with EY US and the other member firms involved with the U.S. Registrants. Am. Compl. ¶¶61, 350. Therefore, Defendant also argues that

13

it cannot be considered a single integrated entity with its own member firms.  Defendant's Brief at pp. 14-15.  Notably, none of the Second Circuit cases relied upon by Defendant are analogous to the instant case.  In <u>re Asia Pulp & Paper Sec. Litig.</u>, 293 F. Supp. 2d 391, 396 (S.D.N.Y. 2003), plaintiff did not allege a single integrated employer theory of liability.  Further, there were no factual allegations at all in the Complaint to support that the umbrella entity "was able to control or in any way influence the particular audits conducted or opinions offered by its individual member firms."  <u>Id.</u>  In <u>re WorldCom, Inc. Sec. Litig.</u>, No. 02 Civ. 3288, 2003 WL 21488087, at *10 (S.D.N.Y. June 25, 2003), plaintiff only alleged with no factual enhancement "that AWSC is a Swiss Societe Cooperative and an umbrella organization for its member firms worldwide." Therefore, the court found that, "These bare allegations are insufficient to plead that Andersen acted as an agent of AWSC when it conducted the WorldCom audits, or to impute Andersen's knowledge or recklessness to AWSC."  <u>Id.</u> (internal citations and quotations omitted).  In <u>Howard v. Klynveld Peat Marwick Goerdeler</u>, 977 F. Supp. 654, 662 (S.D.N.Y. 1997), <u>aff'd</u>, 173 F.3d 844 (2d Cir. 1999), the plaintiff also did not allege a single integrated employer theory of liability. Rather, the plaintiff sought "general jurisdiction over Klynveld under a theory of derivative jurisdiction."  <u>Id.</u>  Even so, the court still found that there was "no evidence [or allegations pleaded] that Klynveld jointly controls or manages Peat Marvick's general business activities."  <u>Id.</u>

In contrast with every one of these cases, Defendant's extensive involvement in service of EY US's clients through the use of its Global Audit Methodology and Global AQR Program inextricably links the EYG entity both to the execution of individual client audits and the oversight of the conduct of the audit practice for U.S. Registrant and other clients by its member firms, including EY US.  Am. Compl. ¶31.  Further, under the regulations of Defendant, its member firms "are required to comply with common standards, methodologies and policies, including those

14

regarding audit methodology, System of Quality Management, risk management, independence, *knowledge sharing*, talent and technology"— conclusively demonstrating interrelation of operations and even personnel policies and management.  Id. at ¶37.  Therefore, the policies, strategies and practices promulgated by Defendant impact virtually every aspect of the business of its member firms, including EY US (which Howie experienced firsthand), including but not limited to their service of audit clients (including U.S. Registrant and other clients such as many of those relationships that were the subject of Howie's legally protected complaints).  Id. at ¶¶38-54.

Finally, Defendant claims that the adoption and common use of Defendant's policies across the global network (including EY US) is insufficient to establish an integrated enterprise.  Defendant's Brief at pp. 16-18.  However, Plaintiff does not rely only on that to allege and establish EYG and EY US as an integrated and/or joint enterprise or employer—many other fact allegations also support that theory and finding.

In addition, each of the cases cited by Defendant to support its argument is readily distinguishable from the present case.  In Benzinger v. Lukoil Pan Americas, LLC, 447 F. Supp. 3d 99, 135 (S.D.N.Y. 2020), a subsidiary decided to "adopt[ ] policies promulgated" by its parent corporation.  In Doheny v. Int'l Bus. Machines, Corp., 714 F. Supp. 3d 342, 376 (S.D.N.Y. 2024), two companies merely shared certain policies and practices, without more.  In Musiello v. CBS Corp., 518 F. Supp. 3d 782, 791 (S.D.N.Y. 2021), the mere fact that the parent corporation drafted policies for subsidiaries "do[es] not say anything about whether these policies were enforced within CBS Radio, let alone in connection with Musiello's employment."  In contrast with each of these cases, EY US did not decide to "adopt" Defendant's policies or "share" operational guidelines promulgated by Defendant.  Rather, member firms are required to adhere to Defendant EYG's policies and standards, and Defendant actively ensures enforcement of its policies and the

utilization of its technology across the global network, upon pain of possible expulsion or other recriminations or consequences that apparently can be imposed by EYG. Am. Compl. at ¶¶24, 31-55, 57-61, 69-71, 232. These allegations distinguish this case from those relied upon by Defendant and bring it squarely within the reasoning of courts that have found an agency relationship between an accounting firm's global coordinating entity, such as Defendant, and its underlying member firms. Plaintiff has plausibly factually alleged such a relationship between EYG and EY US.

In <u>In re Parmalat Securities Litigation</u>, 594 F. Supp. 2d 444 (S.D.N.Y. 2009), the court analyzed Deloitte Touche Tohmatsu's ("DTT") relationship with its member firms and found that DTT "exercised substantial control over the manner in which the member firms conducted their professional activities." <u>Id.</u> at 452. First, the court found that "[e]ach member firm agreed in DTT's governing document, the Articles of the Verein, to 'support and adhere to the purposes and policies of the Verein' and to 'be bound by the requirements contained in resolutions and protocols . . . including . . . those regarding professional standards and methodologies.'" <u>Id.</u> Additionally, "DTT set the policies that governed member firms, including Deloitte Italy, which dictated the specific methodologies to be applied in conducting audits and the particular software and documentation procedures to be used." <u>Id.</u> As a result, the court held that there was "a genuine issue of material fact as to whether Deloitte Italy was an agent of DTT." <u>Id.</u> at 455.

In a subsequent opinion, <u>In re Parmalat Sec. Litig.</u>, 598 F. Supp. 2d 569, 574 (S.D.N.Y. 2009), the court denied summary judgment and found that there was a genuine issue of material fact whether Grant Thornton International ("GTI") controlled Grant Thornton S.p.A. ("GT Italy"). In that case, the court noted that GT Italy agreed to conduct itself "'in a manner consistent with GTI policies, procedures, guidelines, specifications and directions issued by GTI . . . and any GTI communications on technical and professional matters.'" <u>Id.</u> Further, the court also acknowledged

16

that "GTI required member firms to follow its Horizon audit methodology and use its proprietary Explorer software" and that "[m]ember firms [were] required to submit to regular quality assurance reviews and almost universally practice under the name 'Grant Thornton.'" Id. at 572, 576.

Similarly, Defendant "mandates critical components of individual audit execution through various requirements as fundamental as what audit methodology will be applied and the required use of integral technology supplied by EYG for conducting the audit (e.g., electronic audit procedure and workpaper flow and documentation aligned with the EY Global methodology, systems for independence, sanctions, and other regulatory compliance, systems for risk assessment and onboard decisioning of clients/engagements, billing, etc.). It requires member firms to comply with key global policies and procedures, including Codes of Conduct, professional standards and applicable laws and regulations." Am. Compl. ¶31. In addition, "EY member firms enter into several other agreements covering aspects of their membership in the EY organization, such as the right and obligation to use the EY name and share knowledge among EY member firms. *EY member firms are subject to reviews to evaluate adherence to EYG requirements and policies governing issues*, such as independence, risk management, audit methodology and talent. EY member firms unable to meet quality commitments and other EYG membership requirements may be subject to termination from the EY organization." Id. at ¶55 (emphasis added). Accordingly, Howie has plausibly alleged the requisite interrelation of operations and centralized control of labor between Defendant and EY US to establish a single integrated enterprise.

2.    **Defendant and EY US were Joint Employers**

It is well-settled that "[d]etermining whether a defendant constitutes a joint employer involves a highly fact-intensive analysis." AlSariaa v. Ascend Charter Sch., No. 24 Civ. 7265,

17

2025 WL 2937054, at *5 (S.D.N.Y. Oct. 9, 2025). Factors that a court must consider include: Defendant's "right to control the manner and means by which the product is accomplished . . . ; . . . the duration of the relationship between the parties; whether [Defendant] has the right to assign additional projects to the [Howie]; the extent of [Defendant's] discretion over when and how long to work . . . whether the work is part of the regular business of [Defendant]; [and] whether [Defendant] is in the business." Id. Further, "at the motion to dismiss stage, a plaintiff's burden to answer this question [i.e., whether defendant is a joint employer] is not great. It must only be plausible and not merely speculative, that [defendant] . . . exerted significant control over the terms and conditions of his employment." Id. Finally, "much of this analysis is factual in nature, which generally makes it improper to decide a dispute on this issue on a motion to dismiss." Scivetti v. Compass Inc., No. 24 Civ. 3868, 2025 WL 3097331, at *5 (S.D.N.Y. Nov. 6, 2025).

In addition to drafting, promulgating, and enforcing the policies and procedures that their member firms are required to follow, Defendant also obviously exercised significant functional control over employees that worked for them pursuant to Rotational Agreements, including Howie (for four years). Indeed, throughout the entire relevant time frame of this litigation, Howie worked for Defendant pursuant to several Rotational Agreements between EY US (which remained his formal employer and disbursed his compensation to him) and Defendant. Am. Compl. ¶58. These Rotational Agreements provided that Howie would dedicate 100% of his time to his EYG Global Assurance roles and that Global Assurance would cover expenses related to Global Assurance initiatives. Id.

In addition, these Rotational Agreements stated that while working for Defendant, the Global Assurance team at EYG would provide input towards Howie's performance reviews. Id. at ¶59. Furthermore, these Rotational Agreements encouraged Howie "'to request feedback

18

reviews from Global Assurance as appropriate' which would be 'considered during the performance review cycle.'" Id. Finally, these Rotational Agreements all required Defendant and the Global Assurance team to provide a series of commitments to Howie throughout the duration of his employment with Defendant. Id. at ¶60. By way of example only, Defendant was mandated "'to fund expenses incurred on the assignment, as they relate to the performance of the role; to provide training appropriate to perform the responsibilities of the role; [and] to provide sufficient time during the rotation period to attend/participate in practice-related training and development sessions in order for [Howie] to stay abreast of technical and industry developments and to keep core skills current.'" Id.

Moreover, Defendant EYG definitely controlled the terms and conditions of Howie's employment. During the entire four-year period that Howie worked full-time at Defendant EYG on a Rotational basis, it unilaterally set the terms, conditions, rules and policies/procedures of Howie's work. Id. at ¶73. For example, Defendant controlled the resources and projects assigned to Howie. Id. Defendant would also set deadlines for him to complete the projects and tasks assigned to him. Id. In fact, Defendant assigned projects even if Howie objected that he could not take on any additional projects because he was at capacity or did not have the resources necessary to complete the projects assigned within the time required. Id. Defendant also required Howie to work across multiple time zones and attend meetings outside of non-traditional business hours, and he did not have the ability to decline to do so and control his hours of work. Id. At the time that Howie worked for Defendant, his supervisors assigned and reviewed his work product to decide whether more work on a project was required and which projects Howie had to work on next. Id. at ¶74.

At EY Global, beginning in 2020, Howie reported to Vice Chair of Assurance David Kane ("Kane"), Global Vice Chair of Professional Practice Jean-Yves Jegourel ("Jegourel"), Global Deputy Vice Chair of Professional Practice Kurt Hohl ("Hohl"), and Global Assurance Quality Enablement Leader Jay Paulson ("Paulson") who led the Strengthening Trust and Confidence Initiative. Am. Compl. at ¶74. In 2021, Kane took over Jegourel's role. Id. In 2023, Howie began reporting to the new Global Deputy Vice Chair of Professional Practice Eric Spiekman ("Spiekman") and Global Risk Leader for Professional Practice Laney Doyle ("Doyle"). Id. These EYG-based supervisors also gave input into Howie's annual performance reviews, which directly impacted his compensation through EY US (this alone is highly suggestive of joint operations and single/joint employer status). Id. Ultimately, Howie did not have discretion to determine what projects or assignments he worked on, when he worked on those projects, or how long he spent working. Id. Accordingly, Howie has plausibly and specifically factually alleged that Defendant EYG controlled the manner and means by which his work was accomplished to be considered his joint employer at the pleadings stage. AlSariaa, 2025 WL 2937054, at *5.

In their motion, Defendant argues that it cannot be considered a joint employer, in part because it did not terminate his partnership, did not directly discipline him, did not have any control over his compensation and only supervised Howie because EY US "authorized Howie to work on certain designated EY Global projects." Defendant's Brief at pp. 18-19. As an initial matter, these items in fact suggest single/joint employer status. Second, Howie is entitled to discovery concerning such premature factual assertions by Defendant and issues such as what role Defendant had in the decision to forcibly retire Howie within days after it summarily removed him from all Global Leadership titles and roles before his agreement term was up. Am. Compl. at ¶320-322; see also Lawrence v. Int'l Bus. Mach. Corp., No. 12 Civ. 8433, 2017 WL 3278917, at *6 (S.D.N.Y.

Aug. 1, 2017) ("The joint employer and single employer doctrines frequently require discovery to resolve.").

Moreover, Defendant did in fact discipline Howie—it took adverse action him before the expiration of his rotational agreement by removing him without sufficient notice, from all Global Leadership titles and roles. This included removing him as the control operator for certification over PACE days before the end of the fiscal year, to which the certification applied. Am. Compl. at ¶320. As such, despite readily agreeing to renew him the year before, Defendant unexpectedly failed to renew his rotational agreement and decided to prematurely remove him as the control operator for certification over PACE. See Rotational Agreements with Defendant, annexed hereto as **Exhibit A**.[1] Furthermore, Defendant EYG's employees directly supervised Howie and gave input into his annual performance reviews, which directly impacted his compensation. Am. Compl. at ¶74. Finally, Howie was not merely authorized to work on certain projects. He devoted all his professional time to Defendant between June 2020 and June 2024. Id. at ¶58.

Additionally, Defendant claims that it cannot be considered a joint employer because it only exercised a "minimal level of oversight" and merely "supervised the quality and timing of Howie's work." Defendant's Brief at pp. 19-21. Not only is this an inappropriate factual argument requiring inferences in favor of Defendant and against Plaintiff, but the cases relied upon by Defendant also are completely inapposite and do not bear on the issue before the Court. In Duff v. Pristine Servs., Inc., 19 Civ. 104232021 (RA), WL 663981, at *4 (S.D.N.Y. Feb. 19, 2021), the allegations relied upon by the plaintiff were "not born out by—if not contradicted by—the facts alleged in the complaint." For example, plaintiff had claimed that an employee of the putative

---

[1] The rotational agreements are incorporated by reference in the pleadings and may be considered on a motion to dismiss. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010); Dikambi v. City Univ. of New York, 2021 WL 5518187, at *4 (S.D.N.Y. Nov. 24, 2021) (Abrams, J.); Gupta v. Headstrong, Inc., 2018 WL 1634870, at *2 (S.D.N.Y. Mar. 30, 2018) (Abrams, J.).

joint employer "assigned him hours and tasks. But the complaint alleges only that Prunty sent Duff several text messages about potential work opportunities, not that he actually assigned Duff any hours or any tasks." In Conde v. Sisley Cosmetics USA, Inc., No. 11 Civ. 4010 (RJS), 2012 WL 1883508, at *1 (S.D.N.Y. May 23, 2012), plaintiff worked for a cosmetics company that operated a cosmetics counter and argued that the department store where the cosmetics counter was located was also her employer. In that case, her direct supervisor was another employee of the cosmetics company, not the host department store. Id. Therefore, the court found that the department store exercised a "minimal level of oversight that any store would naturally exercise over vendors operating on its premises" Id. at *3.

In Zheng v. Liberty Apparel Co. Inc., 355 F.3d 61, 80 (2d Cir. 2003), the Second Circuit vacated the District Court's judgment granting Defendants' motion for summary judgment and remanded the case back to the District Court. Thereafter, the District Court reversed course and denied defendants' renewed motion for summary judgement. Ultimately, the court found that plaintiffs presented evidence that defendants monitored, inspected, provided direct instructions, and exhorted plaintiffs to work harder and faster. Ling Nan Zheng v. Liberty Apparel Co., 556 F. Supp. 2d 284, 293 (S.D.N.Y. 2008). As such, the court found that there was "a genuine issue of material fact as to whether defendants' supervision of plaintiffs exceeded the monitoring of 'contractual warranties of quality and time of delivery.'" Id. In contrast, none of Howie's allegations, including those regarding the joint employment relationship between Defendant and EY US, are contradictory or inconsistent. Furthermore, Defendant EYG (and not EY US), employed every one of Howie's direct supervisors during the entire period that he engaged in protected activity. Am. Compl. at ¶74. Additionally, Howie has not had the opportunity to conduct discovery and present evidence concerning the extent of Defendant's supervision. Finally,

Defendant maintained "effective control of the terms and conditions of [Howie's] employment" throughout the four years that he worked exclusively for them.  Zheng, 355 F.3d at 75; see also Am. Compl. at ¶¶32-60, 73-74.  Therefore, Defendant EYG engaged in more than a mere "minimal level of oversight" and supervised more than just the "contractual warranties of quality and time of delivery," unlike the cases relied upon by Defendant which involve scant fact allegations.  Duff, 2021 WL 663981, at *4-5; Conde, 2012 WL 1883508, at *3; Zheng, 355 F.3d at 75.

Finally, Defendant contends that they cannot be considered a joint employer because Howie remained employed as a partner at EY US "long after the end of his rotation." Defendant's Brief at p. 20.  This is simply not true and illustrates why Defendant's factual assertions not only are procedurally premature but cannot be taken at face value.  In fact, Defendant conveniently neglected to mention that EY US told Howie that he was being forced to retire early three days after Defendant EYG had already prematurely removed him from all Global Leadership titles and roles.  Am. Compl. at ¶¶320-322.  Afterwards, EY US and Howie immediately began negotiating his exit from the Firm.  Id. at ¶¶323-327.  Thereafter, EY escalated its retaliatory conduct against Howie by informing him that he was the subject of an internal investigation concerning his Firm-issued laptop and documents he had accessed or printed after his removal from his Global role. Id. at ¶¶333-338. As a result, Howie engaged legal counsel and EY US paused his full ejection from the Firm with his retirement funds and capital contributions held hostage, pending a possible settlement of the terms of his retirement (before terminating him some months later for an obviously pretextual reason). Id. at ¶¶339, 342. Therefore, Howie's termination from EY US proceeded jointly and in tandem with EYG's removal and non-renewal of Howie until he retained legal counsel, at which point EY US put his ultimate, final termination on hold pending discussions with his counsel.  Defendant EYG is attempting to exploit EY US's own delay in terminating

Howie (to avoid the filing of claims or an even stronger appearance of retaliation) to disclaim joint employment—the fact is that EYG and EY US acted virtually simultaneously in moving to eject Howie from the Firm. Accordingly, for the reasons stated above, Howie has plausibly alleged a single/joint employment relationship between Defendant EYG and EY US, based on Defendant's control over and close, direct involvement in his day-to-day job and the terms and conditions (and termination) of his employment at EY.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss in its entirety.

Dated:  November 24, 2025
      New York, New York         Respectfully Submitted,

             **WIGDOR LLP**

             By: _____
               Michael J. Willemin
               Lawrence M. Pearson
               Daniel J. Altaras

             85 Fifth Avenue
             New York, NY 10003
             Telephone: (212) 257-6800
             Facsimile: (212) 257-6845
             mwillemin@wigdorlaw.com
             lpearson@wigdorlaw.com
             daltaras@wigdorlaw.com

             *Counsel for Plaintiff*

## CERTIFICATION OF COMPLIANCE PURSUANT TO LOCAL CIVIL RULE 7.1(c)

I Lawrence M. Pearson, an attorney duly admitted to practice law before the Southern District of New York, hereby certify that this document, the memorandum of law, complies with the word count limit set forth in Local Civil Rule 7.1(c) because it contains 7,612 words, excluding the parts of the memorandum of law exempted by the rule.  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated:  November 24, 2025
      New York, New York

                                               Lawrence M. Pearson